UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IBEW LOCAL NO. 58 ANNUITY FUND, and ELECTRICAL WORKERS PENSION TRUST FUND OF IBEW LOCAL NO. 58, DETROIT, MICHIGAN, Individually and on Behalf of all Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> EVERYWARE GLOBAL, INC., JOHN K. SHEPPARD, BERNARD F. PETERS, and SAMIE A. SOLOMON, <br><br> Defendants. | Case No. 14-1838 <br><br> CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS <br><br> JURY TRIAL DEMANDED |

Plaintiffs IBEW Local No. 58 Annuity Fund and Electrical Workers Pension Trust Fund of IBEW Local No. 58, Detroit, Michigan ("Plaintiffs"), by and through the undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (1) a review and analysis of regulatory filings made by EveryWare Global, Inc. ("EveryWare" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (2) a review and analysis of press releases and media reports issued by and disseminated by EveryWare; and (3) a review of other publicly available information concerning EveryWare.

## SUMMARY OF THE ACTION AND OVERVIEW

1.     This is a securities class action on behalf of all purchasers of EveryWare securities between June 18, 2013, and May 16, 2014, inclusive (the "Class Period") asserting

claims under Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act").

2.      EveryWare produces, markets, and distributes kitchenware for baking, serving, using, storing, and displaying food and related products.  The Company operates in four business segments: consumer, foodservice, specialty, and international.  It has operations in North America, Europe, and Asia under two principal operating subsidiaries: Oneida Ltd. ("Oneida") and Anchor Hocking, LLC ("Anchor Hocking").

3.      Anchor Hocking and Oneida were acquired by private equity firm Monomoy Capital Partners ("MCP") in 2007 and 2011 respectively, and integrated into EveryWare in March 2012.  In May 2013, EveryWare became a publicly traded company when it was acquired by ROI Acquisition Corp. ("ROI"), whose principal investor was affiliated with the Clinton Group.  The new entity retained the EveryWare name.

4.      Throughout the Class Period, Defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects.

5.      Specifically, Defendants made false and/or misleading statements and/or failed to disclose information regarding the following, among others: 1) that the Company's mature business segments and recurring revenue model was growing and would accelerate significantly in the second half of 2013 through 2014; 2) that the Company's cash flows were sufficient to meet the Company's liquidity needs; 3) that the Company was in compliance with its debt covenants, and that its debt was being actively managed and would be reduced significantly; and 4) that Defendants' positive statements about the Company's business, operations and growth had a reasonable basis.

6.      On May 15, 2014, the Company surprised the market when it announced a net loss for the first quarter of 2014 of $38.4 million compared with net income of $0.2 million for the first quarter of 2013.  The Company further announced that it was in default on its debt covenants, that it was temporarily closing two of its factories and furloughing workers in order to conserve cash and reduce inventory and that the Company's cash flows from operating activities with the credit facility would not be expected to fund operations in the near future.  On this news, the stock plummeted, dropping 31% from $1.38 on May 15, 2014, and reaching an all-time low of 94¢ per share on May 16, 2014 on unprecedented volume.  All told, ***the stock dropped approximately 90%*** from its Class Period high of $13.24.

7.      As a result of Defendants' wrongful acts and omissions, EveryWare stock traded at artificially inflated prices during the Class Period, and Plaintiffs and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and Section 27(c) of the Exchange Act (15 U.S.C. §78aa(c)). EveryWare maintains its executive offices in this District and many of the acts and conduct in furtherance of the alleged fraud occurred in this District.  In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

10.     Plaintiffs IBEW Local No. 58 Annuity Fund and Electrical Workers Pension Trust Fund of IBEW Local No. 58, Detroit, Michigan, as set forth in the accompanying certification, incorporated by reference herein, purchased EveryWare securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11.     Defendant EveryWare is a Delaware corporation with its principal executive offices situated at 519 North Pierce Avenue, Lancaster, Ohio 43130.  EveryWare common stock is traded on the NASDAQ stock exchange ("NASDAQ") under the symbol "EVRY."

12.     Defendant John K. Sheppard ("Sheppard") was, until his resignation on February 24, 2014, the Company's President, Chief Executive Officer ("CEO"), and a director.

13.     Defendant Bernard Peters ("Peters") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer ("CFO").

14.     Defendant Samie A. Solomon ("Solomon") has been the President and CEO of the Company since February 24, 2014.

15.     Defendants Sheppard, Peters, and Solomon are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of EveryWare's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants made specific false and misleading statements and/or reviewed and approved the Company's reports and press releases

alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

16.     Each Individual Defendant's primary liability, and controlling person liability arises from the following facts, among others: (1) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (2) the Individual Defendants, by virtue of their responsibilities and activities as senior officers of the Company, were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections and/or reports; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and were advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

17.     EveryWare and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     EveryWare produces, markets, and distributes kitchenware for baking, serving, using, storing, and displaying food and related products.  The Company operates in four business segments: consumer, foodservice, specialty, and international.  It has operations in North America, Europe, and Asia, under two principal operating subsidiaries: Oneida and Anchor Hocking.

19.     Anchor Hocking and Oneida were acquired by private equity firm Monomoy Capital Partners ("MCP") in 2007 and 2011 respectively, and integrated into EveryWare in March 2012.  In May 2013, EveryWare was acquired by ROI, a special purpose acquisition company formed on September 19, 2011 by an entity controlled by the Clinton Group, and which held an initial public offering on February 29, 2012.

20.     EveryWare and its subsidiaries are mature operators within an established industry that offers good visibility into results and prospects.  Oneida and Anchor Hocking were founded in 1848 and 1873, respectively.

### Materially False and Misleading
### Statements Issued During the Class Period

21.     On June 18, 2013, the first day of the Class Period, the Company filed a Form 8-K with the SEC.  Included in the filing was an investor presentation used by EveryWare in making presentations to certain existing and potential stockholders of the Company.  The presentation touted the Company's mature business and recurring revenue model as support for its continued growth and strong free cash flow generation.  Specifically, the Company noted that the "[h]igh switching costs associated with purchasing new tabletop collections drives [the] recurring revenue model" and that its Oneida business was "70% replenishment business and

30% new installations." The Company's Anchor business was "90% replenishment business and 10% new installations."

22.   On August 1, 2013, the Company issued a press release which touted the Company's strong growth – including a 25% increase in the Company's international segment – and represented that such growth would continue into the second half of 2013.

23.   Defendant Sheppard, EveryWare's CEO, stated the Company expected continued strong growth in the second half of 2013: "I am extremely pleased that our growth continued in the second quarter and first half of the year and that our results were in line with our internal expectations. The fundamentals and outlook for our business and industry remain strong. Given our continued focus on innovation, as well as our world class brands and customer service, we believe that we are well positioned for a strong second half of the year."

24.   Defendant Sheppard repeated his comments during a conference call the Company held with industry analysts where he stated that "we are off to a very solid start in 2013 and expect the second half of the year to be even stronger. As our financial results indicate, the business continues to perform well in line with our internal expectations, and we remain on track to meet our stated financial commitments for 2013."

25.   Defendant Sheppard stated that the Company's growth prospects, in addition to being supported by its mature customer base and recurring revenue model, were improving because of macroeconomic factors:  "In addition to our strong business position, there are also some macro tailwinds such as improving housing metrics, hospitality indexes, et cetera, that we believe will continue to provide additional [indiscernible] for our growth."   Sheppard further stated that macroeconomic factors were all very positive and that ". . . we don't see anything, as we look into the next six months, that's really going to significantly impact us negatively."

Sheppard further touted the Company's increased international business noting that it would increase from about 7% at the time to "north of 11% by the end of this year."

26.    Further supporting the Company's projected growth, Defendant Sheppard stated that the Company had sufficient forward sales visibility, had locked in sufficient sales for the holidays and remained confident to "deliver the second half of the year, based on the reaction and what we have in hand so far for that period."

27.    During the conference call, Chief Financial Officer Peters confirmed that the Company's target for net sales was $457 million and that the Company was "essentially comfortable" with that projection.

28.    In response to a question concerning the Company's decrease in working capital, Defendant Peters noted that net debt was decreasing and that the Company's inventory buildup was merely a result of the seasonable nature of the Company's products.  Specifically, Defendant Peters stated that "[t]he increase in debt is due to the inventory buildup, driven by the seasonality of the business and expected growth in the second half of the year, . . .  We expect our debt level to come down significantly by the end of the year."

29.    On August 14, 2013, EveryWare filed a Form 10-Q with the SEC setting forth the financial results for the second quarter of 2013.  That 10-Q stated in relevant part that total revenue had increased $5.4 million, or 2.8%, from $194.8 million for the six months ended June 30, 2012 to $200.2 million for the six months ended June 30, 2013. The Company further stated that cash flows were sufficient, that its outstanding debt was being properly managed and that its credit facility was sufficient to fund operations: "[b]ased on our operating plans and current forecast for the remainder of 2013, we anticipate that cash flows from operations and

borrowing capacity under our ABL facility will provide sufficient funds to meet our ongoing liquidity needs."

30.     On September 12, 2013, the Company filed a Form 8-K where the Company continued to note that market conditions were improving and that the Company was continuing to manage its cost structure and to improve profitability. Defendants noted that the Company anticipated increased volumes in the second half of the year and that it was continuing to manage its cost structure and improve its profitability for the year.

31.     On October 30, 2013, EveryWare released its financial results for the third quarter of 2013. Total revenue in the third quarter ended September 30, 2013 increased 6.7% to $110.3 million. The Company reported a loss for the third quarter ended September 30, 2013 of $1.1 million. The Company reduced its financial guidance for full year 2013, from approximately $460 million in revenues to $445 and $455 million. The stock declined approximately 10.7% from the prior day's close of $10.99 to $9.81 on heavy volume.

32.     However, during a conference call with industry analysts, Defendant Sheppard confirmed that the Company's business growth was still accelerating: "We're going to continue to see International growing, we see a rebound in Foodservice, and continued strengthen in the Retail side for the most part. . . . But you're right the fourth quarter does show an acceleration and it's not as high as an acceleration as we originally forecast because of some of the dampening macroeconomic indicators that we've seen."

33.     Defendant Sheppard further stated that the growth was also attributable to additional customers: "During the third quarter we continued delivering top line revenue growth in the face of a challenging business environment. We were able to do this by securing new key customer wins in underserved channels within our consumer segment, building our international

and specialty segments, and continuing to identify significant cross-selling opportunities in our foodservice segment. I'm also very excited about the strong growth in our international segment given the significant potential we have for leveraging our brand values globally."

34.     During the conference call Defendant Peters stated that their international segment was seeing a significant acceleration in growth as reported revenues increased by over 80% in the third quarter.   Defendant Peters acknowledged that net debt had increased to $284.7 million compared to $280 million at the end of the second quarter, but stated that the increase in debt was due to the inventory build-up driven by the seasonality of the business and growth in our International segments.

35.     Peters then reassured investors by stating that the Company's debt level was expected to decline significantly by the end of the year, inventory was reduced during the holiday selling season and that the Company was in full compliance with its debt covenant requirements.

36.     On this news, shares of EveryWare dropped 11% from $10.99 on October 29, 2013 to $9.81 on October 30, 2013.

37.     On November 14, 2013, the Company filed its Form 10-Q with the SEC where it reported that total revenue had increased $6.9 million, or 6.7%, from $103.4 million in the third quarter of 2012 to $110.3 million in the third quarter of 2013. The Company stated that the increase in total revenue was driven by increases in net sales in its consumer, specialty and international segments.   The Company further reported that its gross margin as percentage of total revenue was 20.6% for the third quarter of 2013 as compared to 22.0% for the third quarter of 2012.  The Company explained that the decrease in gross margin rate was primarily due to the mix of sales by segment during the quarter.

CLASS ACTION COMPLAINT

38.     The Company further stated that based on its operating plans and current forecast for the remainder of 2013, it anticipated that cash flows from operations and borrowing capacity under its new credit facility would be sufficient to meet its ongoing liquidity needs.

39.     On February 25, 2014, the Company filed a Current Report on Form 8-K.  The Form 8-K announced the immediate and unexpected resignation of Defendant Sheppard, the Company's President and CEO.  Analysts at Oppenheimer reduced their rating on EveryWare in response, stating: "Our rating change largely reflects the announcement Tuesday morning that CEO John Sheppard has left the company, *as well as a distinct lack of visibility into and confidence in the company's strategy and ability to execute at this point*. [...] Further, what's particularly frustrating to us about this move is that one of the more compelling aspects of the EVRY story was the leadership of Mr. Sheppard, who served in numerous executive roles for consumer goods companies prior to joining EVRY, including Coca-Cola and Cott." [Emphasis added].

40.     On this news, shares of EveryWare declined from $7.58 on February 24, 2014 to $5.95 on February 25, 2014, on unusually heavy volume.

41.     On March 5, 2014, the Company announced on a conference call that it was postponing its Fourth Quarter and full year 2013 Earnings Release.

42.     On March 31, 2014, the Company issued its Form 10-K for fourth quarter and fiscal year ended December 31, 2013.  The Company reported a loss per share of $1.03 with total revenue of $439.8 million for the year ended December 31, 2013, well below the $445 and $455 million that the Company had projected.  As a result, the shares of EveryWare declined from $4.56 to $4.48 on unusually large volume.

CLASS ACTION COMPLAINT

11

43.     The Company further reported that the cost of sales had increased $26.2 million, or 8.3%, from $315.6 million for the year ended December 31, 2012, to $341.8 million for the year ended December 31, 2013.  Gross margin had declined slightly to 22.3% for the year ended December 31, 2013 as compared to 25.2% for the year ended December 31, 2012.

44.     However, despite the bad news, the Defendants confirmed that the Company had sufficient cash on hand and cash flow from operating activities, together with its credit facility to "fund currently anticipated working capital, planned capital spending, certain strategic initiatives, and debt service requirements for at least the next 12 months."

45.     On April 1, 2014, the Company hosted a conference call with industry analysts. During the call, Defendants repeated their prior statements that growth in the international segment was on target.  Defendant Peters further stated that net debt had decreased to $270 million, compared to $284.7 million at the end of the third quarter and that the decrease in debt was primarily the result of additional shipments driven by the holiday selling season, lowering inventory balances, and greater collection of accounts receivable. Peters further stated that the Company was in compliance with all financial debt covenant requirements.

46.     During the April 1 call, Defendant Solomon positively reported that "[f]rom my standpoint, if I look at the inventory balances at retail, I think we're in a good position. We felt most of that pain in Q4, and I think it's now just a function of the consumer takeaway, and our ability to supply our customers going forward."

47.     Defendants' statements described in ¶¶21-46, above, were materially false and/or misleading when made, because Defendants failed to disclose, among other things: 1) that the Company's mature business segments and recurring revenue models were not growing and would not accelerate significantly in the second half of 2013 through 2014; 2) that the

Company's cash flows were not sufficient to meet the Company's liquidity needs; 3) that the Company's debt was not being actively managed and would not reduce significantly; and 4) that Defendants' positive statements about the Company's business, operations and growth, lacked a reasonable basis.

## The Truth Finally Emerges

48.     On May 15, 2014, the Company surprised the market when it announced a net loss for the first quarter of 2014 of $38.4 million, or $1.87 per share compared with net income of $0.2 million or $0.20 per share for the first quarter of 2013.  The net loss included a $20.7 million impact of recording a full valuation allowance against the Company's U.S. net deferred tax assets.  The Company further announced that it was in default on its debt covenants, that would require $18.7 million to cure default but had only secured $12 million from its largest shareholder and that it was temporarily closing two of its factories and furloughing workers in order to conserve cash and reduce inventory and that the Company's cash flows from operating activities with the credit facility would not be expected to fund operations in the near future.

49.     Additionally, the Company reported that net sales had decreased to approximately $93 million from close to $98 million.  Total revenues decreased $4.5 million or 4.5% from $99.3 million for the three months ending March 31, 2013 to $94.8 million for the three months ending March 31, 2014, and the decrease in revenues was across all segments, except the international segment.  The Company's cost of sales increased $7.5 million or 10.2% from the three months ending March 31, 2013 and the Company's gross margin decreased from 26% for the three months ending March 31, 2013 to 14.6% for the three months ending March 31, 2014.

50.     The Company further stated that in an effort to conserve cash and reduce inventory, it had temporarily shut down two U.S. manufacturing facilities.  The Company

admitted that in an effort to reduce inventory, beginning in January 2014, it reduced production by shutting down one of its glass furnaces which negatively impacted the Company's gross margins and cash flows.  The Company further admitted that the macroeconomic environment became more challenging to its business segments in the third and fourth quarters.

51.     On this news, the stock plummeted, dropping 31% from $1.38 on May 15, 2014, and reaching an all-time low of 94¢ per share on May 16, 2014 on unprecedented volume.  All told, *the stock dropped approximately 90%* from its Class Period high of  $13.24.

52.     Analysts from Oppenheimer stated the following in response: "With the stock now trading below $1, we view it effectively as an option on the company's ability to stave off its creditors and continue as a going concern, into which we have very little insight. Further, EVRY's execution has been poor as well, and so we suggest investors simply avoid the name."

## CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased EveryWare securities (i) during the Class Period, and who were damaged thereby, and/or (ii) pursuant and/or traceable to the Offering Documents issued in conjunction with the Secondary Offering, to seek remedies under the Securities Act (collectively, the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, EveryWare securities were actively traded on the NASDAQ Stock Market.  While the exact number of Class members is unknown to Plaintiffs at

this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of EveryWare shares were traded publicly during the Class Period on the NASDAQ.  As of March 17, 2014, there were 22,120,023 shares of EveryWare common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by EveryWare or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, which is complained of herein.

56. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

57. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of EveryWare;

(c) Whether statements made by Defendants to the investing public in the Offering Documents misrepresented material facts about the business and operations of EveryWare;

(d)     Whether the price of EveryWare shares was artificially inflated during the Class Period; and

(e)     To what extent the members of the Class have sustained damages, and the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

59.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

60.     During the Class Period, Plaintiffs and the Class purchased EveryWare securities at artificially inflated prices and were damaged thereby.  When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

61.     The market for EveryWare securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, EveryWare securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's

securities, relying upon the integrity of the market price of EveryWare securities and the market information relating to EveryWare, and have been damaged thereby.

62.     During the Class Period, the artificial inflation of EveryWare stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about EveryWare's business, operations and financial prospects.  These material misstatements and/or omissions created an unrealistically positive assessment of EveryWare and its business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

63.     At all relevant times, the market for EveryWare securities was an efficient market for the following reasons, among others:

        (a)     EveryWare stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

        (b)     As a regulated issuer, EveryWare filed periodic public reports with the SEC and/on the NASDAQ;

        (c)     EveryWare regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     EveryWare was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for EveryWare securities promptly digested current information regarding EveryWare from all publicly available sources and reflected such information in EveryWare's stock price. Under these circumstances, all purchasers of EveryWare securities during the Class Period suffered similar injury through their purchase of EveryWare securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

41.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking

statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of EveryWare who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

42.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

43.     During the Class Period, the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase EveryWare securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Individual Defendants, and each of them, took the actions set forth herein.

44.     The Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for EveryWare securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

45.     The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct to conceal adverse material information about EveryWare's business, operations and financial performance and prospects, as specified herein.

46.     The Individual Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EveryWare's value and performance and continued substantial growth.  These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about EveryWare and its business operations and financial prospects in light of the circumstances under which they were made, not misleading.  As set forth more particularly herein, Defendants further engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.  Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Individual Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing EveryWare's financial condition from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Individual Defendants' misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

47.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of EveryWare securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Individual Defendants, but not disclosed in public statements by the Individual Defendants during the Class Period, Plaintiffs and the other members of the Class acquired EveryWare securities during the Class Period at artificially high prices and were damaged thereby.

48.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding EveryWare and its business and prospects, which were not disclosed by Individual Defendants, Plaintiffs, and other members of the Class would not have purchased or otherwise acquired their EveryWare securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

49.     By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

50.     As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

CLASS ACTION COMPLAINT

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

51.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     The Individual Defendants acted as controlling persons of EveryWare within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

54.     As set forth above, EveryWare and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section

20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiffs serving as class representatives;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 7, 2014                     Respectfully Submitted,


                                           */s/*Geoffrey M. Johnson
                                           Geoffrey M. Johnson (Bar No. 0073084)
                                           **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
                                           12434 Cedar Road, Suite 12
                                           Cleveland Heights, OH 44106
                                           Telephone: (216) 229-6088
                                           Facsimile: (216) 229-6092
                                           gjohnson@scott-scott.com

Joseph P. Guglielmo
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com

David R. Scott
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com

*Counsel for Plaintiffs*