UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN RE EVERYWARE GLOBAL INC. SECURITIES LITIGATION | Case No. 14-1838<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION AND OVERVIEW ...................................................................1

JURISDICTION AND VENUE ..........................................................................................7

PARTIES AND NON-PARTY EVERYWARE ........................................................................7

   A. PLAINTIFFS .........................................................................................................7

   B. EVERYWARE, A DEBTOR IN BANKRUPTCY AGAINST WHICH THIS
      ACTION IS STAYED ..............................................................................................8

   C. DEFENDANTS .......................................................................................................9

SUBSTANTIVE ALLEGATIONS ......................................................................................18

   I. THE FRAUDULENT "PUMP AND DUMP" SCHEME ................................................18

      A. Monomoy Acquires Two Manufacturing Companies That Will Become Part
         of EveryWare ..................................................................................................20

      B. EveryWare Merges with ROI and Becomes a Public Company .................................20

      C. The Monomoy Defendants Strip EveryWare of Its Capital, Resulting in an
         Insolvent Company Destined for Failure .............................................................21

      D. The Monomoy Defendants Need to Mislead Investors to Inflate EveryWare's
         Share Price So that They Can Dump the Stock .....................................................22

      E. Monomoy, Sheppard and Peters Make Baseless Representations Concerning
         EveryWare's 2013 Earnings and Revenue ............................................................24

      F. Monomoy, Sheppard and Peters Engage in Accounting Manipulations to
         Conceal $5.9 Million in Factory Expenses Until After the Planned Secondary
         Offering..........................................................................................................32

      G. Desperate to Artificially Inflate Revenue Numbers Ahead of the Secondary
         Offering, EveryWare Sells Products for Less than the Cost of Production................34

      H. In the Summer of 2013, Concurrent with the Many Efforts to Artificially
         Boost EveryWare's Stock Price, the Monomoy Defendants Prepare to Dump
         All of Their Shares..........................................................................................35

      I. At or About the Time of the Secondary Offering EveryWare's General
         Counsel Discovers Financial Irregularities and, After Raising Her Concerns,
         Is Fired and Investigated ..................................................................................36

      J. The Monomoy Defendants Succeed in Cashing Out Shares of EveryWare in
         the September 16, 2013 Secondary Offering.........................................................37

CLASS ACTION COMPLAINT

i

II.  THE MATERIALLY FALSE AND MISLEADING STATEMENTS MADE BY
THE MONOMOY DEFENDANTS, SHEPPARD AND PETERS ................................37

III. THE FALSE AND MISLEADING REGISTRATION STATEMENT FOR THE
SEPTEMBER 16, 2013 SECONDARY OFFERING AND RELATED
MISLEADING STATEMENTS..................................................................................54

IV. THE TRUTH IS REVEALED.........................................................................................58

CLASS ACTION ALLEGATIONS ..............................................................................................61

LOSS CAUSATION.......................................................................................................................63

APPLICABILITY OF PRESUMPTION OF RELIANCE ............................................................64

(FRAUD-ON-THE-MARKET DOCTRINE)..................................................................................64

NO SAFE HARBOR ......................................................................................................................65

COUNT I ........................................................................................................................................66

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
Against Defendants Sheppard, Peters, and the Monomoy Defendants .........................................66

COUNT II .......................................................................................................................................69

Violation of Section 20(a) of the Exchange Act Against Defendants Sheppard, Peters and
the Mono ........................................................................................................................................69

COUNT III ......................................................................................................................................71

Violation of Section 11 of the Securities Act of 1933 Against Defendants Sheppard,
Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, Wainshal,
and the Underwriter .......................................................................................................................71

COUNT IV ......................................................................................................................................73

Violation of Section 12 of the Securities Act of 1933 Against Defendants Sheppard,
Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, Wainshal,
and the Underwriter .......................................................................................................................73

COUNT V ........................................................................................................................................74

Violation of Section 15 of the Securities Act of 1933 Against Defendants Sheppard,
Peters, and the Monomoy Defendants ...........................................................................................74

PRAYER FOR RELIEF .................................................................................................................75

JURY TRIAL DEMANDED ..........................................................................................................76

CLASS ACTION COMPLAINT

Plaintiffs IBEW Local No. 58 Annuity Fund and Electrical Workers Pension Trust Fund of IBEW Local No. 58, Detroit, Michigan ("Plaintiffs"), by and through the undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (1) a review and analysis of regulatory filings made by EveryWare Global, Inc. ("EveryWare" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (2) a review and analysis of press releases and media reports issued and disseminated by EveryWare; (3) a review of other publicly available information concerning EveryWare; and (4) the interview of confidential witnesses referenced herein.

<u>**SUMMARY OF THE ACTION AND OVERVIEW**</u>

1.      This is a securities class action brought on behalf of all purchasers of EveryWare securities between May 21, 2013, and May 16, 2014, inclusive (the "Class Period") asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act").

2.      The securities violations complained of here are part of a complex scheme by which private equity firm Monomoy Capital Partners and its affiliated funds (the "Monomoy Group" or "Monomoy") took EveryWare public through a merger with a publicly traded shell or "blank check" company, stripped the combined Company of its capital, pumped up the Company's stock price by preparing and issuing baseless operating projections and false financial reports, and then dumped its stock on an investing public, all while driving the Company towards bankruptcy – where it now sits.

3.      EveryWare was created by the Monomoy Group by combining Oneida Ltd. ("Oneida") and Anchor Hocking LLC ("Anchor Hocking"), two leading houseware companies which Monomoy had earlier purchased.  In January 2013 EveryWare, then a private company, entered into an agreement to merge with ROI Acquisition Corp. ("ROI"), a public company whose only asset was $75 million in cash largely contributed by its public investors.

4.      To gain approval of the merger and to refinance and increase EveryWare's bank debt to fund a $90 million cash payout to Monomoy, Monomoy caused EveryWare to prepare baseless and grossly exaggerated projections of its 2013 revenues and earnings.  Specifically, beginning on January 31, 2013 and through the time of its secondary offering of EveryWare shares in September 2013 (the "Secondary Offering"), EveryWare, in its presentations to investors (and creditors), represented that it expected to earn $457 million in revenue for 2013 and adjusted EBITDA[1] of $61.1 million.  This projection was used by Monomoy to support a $420 million estimate of value for EveryWare even though the refinancing and $90 million payment to Monomoy had rendered the Company insolvent, both on a balance sheet basis and because following the Merger Transaction, EveryWare had inadequate capital to support its current business, and pay its debts in the regular course of business as they came due, much less increase its sales and profits.

5.      After the May 2013 refinancing and merger with ROI (the "Merger Transaction") was complete, Monomoy continued to own over 60% of the combined company's shares and had the right to additional amounts of "earn-out" shares if and when the Company's stock price surpassed price thresholds of $11, $12.50 and $15.  Monomoy's shares were subject to a "lock-

---

[1] EBITDA is a commonly reported measure of a company's pre-tax earnings calculated on a cash basis.  EBITDA is an acronym that stands for "earnings before interest, taxes, depreciation and amortization."  Plaintiffs use the term EBITDA and earnings interchangeably in this amended complaint.

up agreement" limiting Monomoy's ability to immediately sell its shares – all of which giving Monomoy an incentive to continue to misrepresent EveryWare's financial condition and prospects after the Merger Transaction.

6. EveryWare's baseless 2013 earnings and revenue projections artificially inflated the purported enterprise value of EveryWare for the Merger Transaction in May 2013, and then supported Monomoy's continued efforts to dump its remaining shares in the Company at inflated prices. Almost immediately after EveryWare went public in May 2013, Monomoy began taking steps to sell off its shares in EveryWare to the public in September 2013 in the Secondary Offering of EveryWare stock, still contending that the Company was "on track" to make its baseless 2013 projections.

7. Following the May 2013 Merger Transaction, in earnings calls with analysts, press releases and investor conferences, EveryWare's officers, including Defendants John Sheppard ("Sheppard") and Bernard Peters ("Peters"), continued to tout the Company's performance and high expectations for 2013, pointing to purported cost savings or "synergies" from the earlier combination of Oneida and Anchor Hocking. EveyWare's first quarter 2013 ("1Q2013") and second quarter 2013 ("2Q2013") reported results also purported to support Defendants' claims of a trend in improving margins and earnings.

8. The reality, however, was quite different. Confidential witnesses ("CWs"), former senior managers at EveryWare, explained that little had been done to merge the operations or systems of Oneida and Anchor Hocking, and that EveryWare's 2013 earnings and revenue projections had "***absolutely no factual or reasonable basis***," and had instead been derived by simply overruling EveryWare's senior managers who had the knowledge and responsibility for formulating its sales budgets. As "CW1," the person whose job it was to

develop the 2013 projected sales figures, pointed out, the proof that these projections were known to be fictitious was confirmed by the Company's failure to place purchase orders to EveryWare's vendors to be able to fill the purportedly expected sales.

9.      Furthermore, at no time during the Class Period was the Company "on track" to meet its baseless 2013 earnings and revenue projections.  To the contrary, the Company's existing profitable business in the food service segment was undercut by shifting from a reliable domestic supplier to low cost and low quality suppliers.  And the ability to grow the International segment was thwarted by the Company's capital depletion in the May 2013 Merger Transaction.

10.     The supposed improvements in margins touted by the Company were accomplished through accounting manipulations, particularly by failing to recognize factory expenses as they were incurred and instead including them in the Company's inventories, an accounting gimmick that was later reversed by inventory write-offs in the fourth quarter of 2013 ("4Q2013") – *after* Monomoy and other Defendants unloaded their stock in the Secondary Offering in September 2013.   Moreover, as CW7 revealed, in August 2013, when Defendant Sheppard represented that EveryWare remained "on track" to meet or exceed its grossly exaggerated 2013 revenue and earnings projections, Sheppard and Peters knew that EveryWare was actually "on track" to run out of money by the end of 2013 and was at serious risk of defaulting on its debt obligations.

11.     Plaintiffs bought shares traceable to the Secondary Offering based on the false and misleading September 2013 Registration Statement signed by Defendants Sheppard, Collin, Baldwin, Peters, Jurbala, Presser, Kasoff, McCray, Krueger, De Perio, and Wainshal, and also purchased shares before and after the Secondary Offering.  One of the documents incorporated in the Registration Statement was an agreement between the selling shareholders and the Offering's

Underwriters in which false "representations" about EveryWare and its public filings were made by the selling shareholders.  This published agreement also included a requirement for an opinion letter on EveryWare's condition to be provided by EveryWare's general counsel, Kerri Love.

12.     At or about the time of the September 2013 Secondary Offering, however, Ms. Love discovered "inaccurate financial disclosures" that implicated EveryWare's Chief Financial Officer ("CFO"), Defendant Peters, and members of EveryWare's Board of Directors.  Ms. Love reported these irregularities to EveryWare management and demanded that the errors be corrected or that she would report them to the SEC.  As EveryWare itself later reported in its SEC filings, on October 7, 2013, Ms. Love left the Company (only three weeks after the Secondary Offering) and that the Company had settled Ms. Love's claims for wrongful termination.  And when an information technology manager tasked with investigating Ms. Love retrieved incriminating electronic files – which he was required to report to CFO Peters, the subject of Ms. Love's charges – the technology manager, too, was fired.

13.     The true state of affairs at EveryWare began to emerge on October 30, 2013, when EveryWare shocked the market with its announcement of disappointing third quarter 2013 ("3Q2013") operating results and a revised and significantly lowered projection for 2013 annual revenues and earnings.  As a result of this sudden and unexpected shift occurring for a quarter that had ended only two weeks after the Secondary Offering in which large amounts of insiders' stock had been sold, including 1.7 million shares by Monomoy, analysts following EveryWare's stock pointed to "credibility" problems on the part of EveryWare, and its stock price plummeted by 24%.

14.     On February 25, 2014, the Company unexpectedly announced that its CEO, Defendant Sheppard, had left the Company.  Analysts felt "blindsided" by this new and sudden disclosure, describing it as further evidence of the Company's failed execution and credibility problems.  On this news, shares of EveryWare declined another 28%.  Shortly thereafter, on March 5, 2014, the Company announced that it was postponing its release of 4Q2013 and full year 2013 earnings results.  On this news, the stock declined an additional 25%.  Thus, in the roughly six months after the September 2013 Secondary Offering where the Company's stock had traded at an inflated price of $11.50, EveryWare stock had dropped more than $7 to about $4 dollars a share, causing Plaintiffs and the class millions of dollars of losses.

15.     On March 31, 2014, the Company issued its Form 10-K for 4Q2013 and fiscal year ended December 31, 2013.  Both the adjusted EBITDA and revenue for 2013 fell far short of the 2013 projections.  In reporting its 4Q2013 sharply lower earnings, the Company disclosed that the disappointing fourth quarter earnings were largely attributable to $5.9 million in expense recognized for what it described as a "change in estimate" for a factory "variance," meaning that the Company had delayed reporting factory expenses during earlier periods when they had been incurred.  After making this adjustment, EBITDA for 4Q2013 decreased *113%* versus 4Q2012, a stunning decline that further underscored the extent to which Sheppard, Peters and Monomoy Defendants had succeeded in manipulating EveryWare's accounting to their financial benefit.

16.     On May 15, 2014, the Company announced that its financial condition had become so weak that it could no longer satisfy the covenants in its bank loan agreements, and that it might not be able to continue as a "going concern" unless its lenders waived EveryWare's violations.  The Company also disclosed far worse performance than the market had been led to expect.    With these further disclosures of EveryWare's dismal financial condition and

CLASS ACTION COMPLAINT

6

performance, the Company's stock price dropped to $1.40, again causing Plaintiffs and the class still more millions of dollars of losses.

17.     After a year of negotiating with its lenders, on April 7, 2015 EveryWare filed its Chapter 11 bankruptcy petition.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) and Sections 11, 12 and, 15 of the Securities Act (15 U.S.C. §§77k, 77l, and 77o.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act (15 U.S.C. §78aa), and Section 22 of the Securities Act (15 U.S.C. §77v).

19.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), Section 27(c) of the Exchange Act (15 U.S.C. §78aa(c)), and Section 22(a) of the Securities Act (15 U.S.C. §77v(a)).  EveryWare maintains its executive offices in this District and many of the acts and conduct in furtherance of the alleged fraud occurred in this District.  In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES AND NON-PARTY EVERYWARE

A.     PLAINTIFFS

20.     Plaintiffs IBEW Local No. 58 Annuity Fund and Electrical Workers Pension Trust Fund of IBEW Local No. 58, Detroit, Michigan (collectively, "IBEW") purchased EveryWare securities during the Class Period, and suffered damages as a result of the federal

securities law violations and false and/or misleading statements and/or material omissions alleged herein.  IBEW's trades in EveryWare securities are set forth in its certification filed herewith.  Certain of IBEW's purchases were made on September 16, 2013 and are traceable to EveryWare's 2013 Secondary Offering, conducted on that date.  Particularly, on the day of the Secondary Offering, September 16, 2013, trading volume in EveryWare was 196,700 shares as reported on Yahoo Finance.  On September 16, 2013, IBEW purchased 29,000 shares of EveryWare stock, approximately 15% of the total trading on that day, from its broker, Morgan Stanley, at the uniform price of $11.54, or four cents higher than the offering price.  Typically, a broker such as Morgan Stanley will purchase shares of a Company, such as EveryWare, from multiple counterparties, including the Underwriter Defendants, to satisfy its customers' purchase orders.  Given the amount of shares sold in the Secondary Offering (1,750,000 shares) in comparison to the pre-existing public float (2,023,000 shares), the large number of shares purchased by IBEW on the same day as the Secondary Offering and the fact that IBEW's purchase price was within pennies of the offering's price, it is almost certain that at least some, if not all, of IBEW's shares purchased are the same as the shares offered by the Defendants in the Secondary Offering.  IBEW expects to develop evidence proving this inference in discovery through third-party subpoenas to FINRA and the DTC, as well as through discovery from the Underwriter Defendants.

**B.    EVERYWARE, A DEBTOR IN BANKRUPTCY AGAINST WHICH THIS ACTION IS STAYED**

21.    EveryWare is a Delaware corporation with its principal executive offices situated at 519 North Pierce Avenue, Lancaster, Ohio 43130.  Until recently EveryWare common stock traded on the NASDAQ stock exchange ("NASDAQ") under the symbol "EVRY."  On April 8, 2015, EveryWare received a notice that it was being delisted from NASDAQ.  On April 7, 2015,

EveryWare filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware.  In light of EveryWare's bankruptcy filing, and the automatic stay under the Bankruptcy code, IBEW does not assert claims against EveryWare by this amended complaint.

## C.     DEFENDANTS

### EveryWare's Officer Defendants

22.     Defendant John K. Sheppard ("Sheppard") joined EveryWare in April 2012 and was, until his resignation on February 24, 2014, the Company's President and Chief Executive Officer ("CEO").  During this period, Sheppard was also an EveryWare director.

23.     Defendant Bernard Peters ("Peters") was, at all relevant times, the Company's Executive Vice President and CFO.  Defendant Peters joined EveryWare in January 2013.

24.     Defendants Sheppard and Peters, because of their positions with and job responsibilities at the Company, possessed the power and authority to control the contents of EveryWare's reports filed with the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Defendants Sheppard and Peters themselves signed the false and misleading Registration Statement for the Secondary Offering and made specific false and misleading statements and material omissions as further described below.  These officers also reviewed, approved and/or controlled the Company's reports and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, Sheppard and Peters knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

The Monomoy Private Equity Defendants

25.    Defendant Daniel Collin ("Collin") was EveryWare's Chairman of the Board during the Class Period.  Prior to that time, he was a director of Anchor Hocking Company from 2007 and Oneida, Ltd. from 2011.  For all relevant times, Collin was also an equity partner in Monomoy Capital Partners, LLC ("Monomoy"), a private equity firm based in New York City that was EveryWare's majority shareholder.  Collin co-founded Monomoy in 2005, and has been Co-CEO of Monomoy since 2014.  Collin signed the false and misleading Registration Statement accompanying the Secondary Offering.   In his capacities as Chairman of the Board of EveryWare and as a principal of Monomoy, Collin controlled EveryWare, and other Defendants making the false and misleading statements alleged herein and, as a result, had control over the false and misleading statements and material omissions alleged in this action.  As stated in EveryWare's Proxy dated April 11, 2014, Collin had "significant involvement" with EveryWare and its predecessors between 2007 and 2014, and culpably participated in and exercised actual control over the false and misleading statements alleged herein.  For example, as discussed by Confidential Witness Number 1 ("CW1") below, in 2012 and 2013, Collin met with senior EveryWare managers in charge of sales to discuss the Company's operations.  At least one of these managers, CW1, had direct knowledge that the 2013 revenue and profit estimates at issue in this case were unrealistic, lacking any reasonable basis and in conflict with facts that were not disclosed to the public at the time the estimates were disseminated.  Beginning at or about the time that EveryWare went public, Collin engaged in efforts to permit Monomoy and himself personally to profit from the false and misleading statements that had inflated EveryWare's stock price.  For example, on June 17, 2013, Collin caused EveryWare to file paperwork with the SEC that would have permitted the sale of 15 million shares in EveryWare, Monomoy's entire

CLASS ACTION COMPLAINT

majority ownership interest in the Company, although the terms of the Lock-up Agreement applicable to this sale had yet to be satisfied. Ultimately, EveryWare's Audit Committee waived the Lock-up Agreement's sale prohibitions, and Monomoy sold 1.7 million shares of EveryWare stock for $11.50 a share for a total of $19.55 million at the September 16, 2013 Secondary Offering.

26.     Defendant Stephen Presser ("Presser") was a Director on the EveryWare Board of Directors during the Class Period, and exercised management over EveryWare operations on an informal basis. For all relevant times, Presser was also an equity partner in Monomoy Partners. Defendant Presser co-founded Monomoy in 2005. Defendant Presser signed the false and misleading Registration Statement accompanying the Secondary Offering. In his capacities as a Director of EveryWare and partner at Monomoy, and through his informal assumption of day-to-day management over aspects of EveryWare's operations, Defendant Presser controlled EveryWare and other Defendants making the false and misleading statements alleged herein and, as a result, had control over the misstatements and omissions alleged in this action. As stated in EveryWare's April 11, 2014 Proxy, Presser had "significant involvement" with EveryWare and its predecessors between 2007 and 2014, and Presser culpably participated in and exercised actual control over the false and misleading statements alleged herein. For example, according to Confidential Witness Number 2 ("CW2"), a national sales manager at Anchor Hocking and then EveryWare between January 2013 and September 2014, Presser worked out of EveryWare's headquarters in Lancaster, Ohio approximately three to four days a week. CW2 has personal knowledge of this fact because he observed Presser on his monthly visits to EveryWare's headquarters. Presser also was directly involved in approving specific pricing and other details of CW2's sales deals. Presser exercised this control in conference calls with EveryWare sales

staff, where Presser discussed the terms of particular customer deals. CW2 stated that it was "absolutely clear" that Monomoy and Presser were involved in every aspect of EveryWare's business at a daily level. Beginning at or about the time that EveryWare went public, Presser engaged in efforts to permit Monomoy and himself personally to profit from the false and misleading statements that had inflated EveryWare's stock price. For example, on June 17, 2013, Presser, along with Collin, caused the Company to file paperwork with the SEC that would have permitted the sale of 15 million shares in EveryWare, Monomoy's entire majority ownership interest in the Company, although the terms of the Lock-up Agreement applicable to this sale had yet to be satisfied. Ultimately, EveryWare's Audit Committee waived the Lock-up Agreement's prohibitions and Monomoy sold 1.7 million shares of EveryWare stock for $11.50 a share for a total of $19.55 million at the September 16, 2013 Secondary Offering.

27.     Defendant Monomoy Capital Partners, L.P. is the lead Monomoy entity. According to the Schedule 13D filed with the SEC on May 31, 2013, following the May 21, 2013 merger, this Monomoy entity owned 42.0% of EveryWare.[2]

28.     Defendant MCP Supplemental Fund, L.P. is another Monomoy entity. According to the Schedule 13D filed with the SEC on May 31, 2013, following the May 21, 2013 merger, this Monomoy entity owned 1.3% of EveryWare.

29.     Defendant Monomoy Executive Co-Investment Fund, L.P. is another Monomoy entity. According to the Schedule 13D filed with the SEC on May 31, 2013, following the May 21, 2013 merger, this Monomoy entity owned 0.2% of EveryWare.

---

[2] The ownership percentages listed for the various Monomoy entities add up to more than 100% because they refer to overlapping ownership interests. In total, the Monomoy entities owned approximately 68% of EveryWare's stock prior to the Secondary Offering. After the Secondary Offering, the Monomoy entities owned 60% of EveyWare's stock.

CLASS ACTION COMPLAINT

30.     Defendant Monomoy Capital Partners II, L.P. is another Monomoy entity. According to the Schedule 13D filed with the SEC on May 31, 2013, following the May 21, 2013 merger, this Monomoy entity owned 23.8% of EveryWare.

31.     Defendant MCP Supplemental Fund II, L.P. is another Monomoy entity. According to the Schedule 13D filed with the SEC on May 31, 2013, following the May 21, 2013 merger, this Monomoy entity owned 0.8% of EveryWare.

32.     Defendant Monomoy General Partner, L.P. is another Monomoy entity. According to the Schedule 13D filed with the SEC on May 31, 2013, following the May 21, 2013 merger, this Monomoy entity owned 43.5% of EveryWare.

33.     Defendant Monomoy General Partner II, L.P. is another Monomoy entity. According to the Schedule 13D filed with the SEC on May 31, 2013, following the May 21, 2013 merger, this Monomoy entity owned 24.6% of EveryWare.

34.     Defendant Monomoy Ultimate GP, LLC is another Monomoy entity.  According to the Schedule 13D filed with the SEC on May 31, 2013, following the May 21, 2013 merger, this Monomoy entity owned 68.1% of EveryWare.

35.     The various Monomoy funds listed in ¶¶27-34 are all partners in Monomoy Capital Partners, L.P., collectively referred to herein as "Monomoy," who along with Collin and Presser are referred to as the "Monomoy Defendants."  Monomoy is a private equity firm based in New York City.   Collectively, Monomoy owned approximately 68% of EveryWare's stock after the merger and until the Secondary Offering.  After the Secondary Offering, Monomoy owned approximately 60% of EveryWare.  Monomoy controlled EveryWare, as well as the other Defendants making the false and misleading statements alleged herein, and as a result, had control over the misrepresentations and omissions alleged in this action.   As part of the

transaction by which ROI merged with EveryWare (then a private company), Monomoy received a $90 million cash distribution, and depleted the combined entity's capital to the point of rendering it insolvent.  Monomoy secured the vote of ROI public shareholders for the approval of the merger and the additional financing for the $90 million payment, by misrepresenting EveryWare to be solvent and through the use of the grossly exaggerated and factually baseless projections of EveryWare's 2013 revenue and earnings.  The Merger Transaction also contained a provision for "earn-out" shares whose award was dependent on the growth of EveryWare's stock price, so that Monomoy was incentivized to continue to inflate EveryWare's stock price through false and misleading statements.

### The Underwriter Defendants

36.     The following Underwriter Defendants participated in EveryWare's September 2013 Secondary Offering, to the following extent:

| Name | Number of Shares Underwritten |
| --- | --- |
| Oppenheimer & Co., Inc. | 1,426,250 |
| CJS Securities, Inc. | 96,250 |
| Telsey Advisory Group, LLC | 96,250 |
| Imperial Capital, LLC | 70,000 |
| BTIG, LLC | 61,250 |

37.     Defendant Oppenheimer & Co., Inc. ("Oppenheimer") was an underwriter of EveryWare's Secondary Offering, and served as a financial advisor for and assisted in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus.  Oppenheimer acted as sole book-running manager in the Secondary Offering.

Oppenheimer also participated in conducting and promoting the roadshow for the Secondary Offering, and in paying the expenses of the other Defendants who participated in the roadshow.

38.     Defendant CJS Securities, Inc. ("CJS") was an underwriter of EveryWare's Secondary Offering, and served as a financial advisor for and assisted in the preparation and dissemination of EveryWare's false and misleading Registration Statement and Prospectus.  CJS acted as co-manager in the Secondary Offering.  CJS also participated in conducting and promoting the roadshow for the Secondary Offering, and in paying the expenses of the Defendants who participated in the roadshow.

39.     Defendant Telsey Advisory Group, LLC ("Telsey") was an underwriter of EveryWare's Secondary Offering, and served as a financial advisor for and assisted in the preparation and dissemination of EveryWare's false and misleading Registration Statement and Prospectus.  Telsey acted as co-manager in the Secondary Offering.  Telsey also participated in conducting and promoting the roadshow for the Secondary Offering, and in paying the expenses of the Defendants who participated in the roadshow.

40.     Defendant Imperial Capital, LLC ("Imperial") was an underwriter of EveryWare's Secondary Offering, and served as a financial advisor for and assisted in the preparation and dissemination of EveryWare's false and misleading Registration Statement and Prospectus.  Imperial acted as co-manager in the Secondary Offering.  Imperial also participated in conducting and promoting the roadshow for the Secondary Offering, and in paying the expenses of the Defendants who participated in the roadshow.

41.     Defendant BTIG, LLC ("BTIG") was an underwriter of EveryWare's Secondary Offering, and served as a financial advisor for and assisted in the preparation and dissemination of EveryWare's false and misleading Registration Statement and Prospectus.  BTIG acted as co-

manager in the Secondary Offering.  BTIG also participated in conducting and promoting the roadshow for the Secondary Offering, and in paying the expenses of the Defendants who participated in the roadshow.

42.     Defendants Oppenheimer, CJS, Telsey, Imperial, and BTIG are collectively referred to herein as the "Underwriter Defendants."

43.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to EveryWare's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Secondary Offering; (ii) the terms of the Secondary Offering, including the price at which EveryWare's common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  The Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with offers and sales of EveryWare's shares pursuant and/or traceable to the Secondary Offering.

44.     As a result of their role as underwriters, the Underwriter Defendants are liable to investors in the Secondary Offering and to those who purchased shares traceable to the Offering, including Plaintiffs, for false and misleading statements and misleading omissions in the Registration Statement, which included and incorporated EveryWare's prospectus.  As against the Underwriter Defendants, Plaintiffs assert only claims of negligence and strict liability and make no allegation of reckless or knowing misconduct on their part.

<u>Other Individual Defendants Who Are Liable for Signing the False and Misleading Registration Statement for the Secondary Offering</u>

45.     The following additional individuals, identified in ¶¶46-52, *infra*, also signed the false and misleading Registration Statement for the Secondary Offering conducted in September 2013 (the "Additional Section 11 Defendants").

46.     Prior to the May 2013 merger, Defendant Thomas J. Baldwin was a principal in ROI.  After the Merger Transaction and at the time of the Secondary Offering, Baldwin was the Vice Chairman of the Board of Directors of EveryWare and signed the Registration Statement for the Secondary Offering.

47.     Defendant Michael Jurbala was the Vice President of Finance and Corporate Controller and Principal Accounting Officer for EveryWare and signed the Registration Statement for the Secondary Offering.

48.     Defendant Barry L. Kasoff was a Director of EveryWare and signed the Registration Statement for the Secondary Offering.

49.     Defendant Ronald McCray was a Director of EveryWare and signed the Registration Statement for the Secondary Offering.

50.     Defendant William Krueger was a Director of EveryWare and signed the Registration Statement for the Secondary Offering.

51.     Defendant Joseph A. De Perio was a Director of EveryWare and signed the Registration Statement for the Secondary Offering.

52.     Defendant Ron Wainshal was a Director of EveryWare and signed the Registration Statement for the Secondary Offering.

53.     As a result of signing the Registration Statement, which included and incorporated EveryWare's prospectus, containing false and misleading statements and material

misleading omissions, the Additional Section 11 Defendants are liable to investors in the Secondary Offering, and to those who purchased shares traceable to the Offering, including Plaintiffs.  As against these Additional Section 11 Defendants, Plaintiffs assert only claims of negligence and strict liability and make no allegations of reckless or knowing misconduct on their part.

## SUBSTANTIVE ALLEGATIONS

## I.    THE FRAUDULENT "PUMP AND DUMP" SCHEME

54.    This case describes a scheme in which the Monomoy Defendants refinanced, merged and took their privately owned and thinly capitalized company public, while stripping it of the cash necessary for it to operate.  Monomoy accomplished this by developing a wholly baseless set of 2013 operating projections – revenues of $457 million and earnings of $61.1 million – which it continued to tout and reaffirm until the weeks following the Secondary Offering, while EveryWare's operations sharply deteriorated as a result of the Company's inadequate capital and its inability or unwillingness to pay its suppliers.  To convince EveryWare's creditors, ROI, and the merged company's public shareholders to fund this scheme, the Monomoy Defendants, Sheppard and Peters made a number of material false and misleading statements and misleading omissions.  Among other things, these Defendants (1) created and used exaggerated revenue and earnings projections for 2013, that they were told were unrealistic, to support an inflated valuation of $420 million for EveryWare and conceal that the Merger Transaction, and particularly the $90 million cash payment to Monomoy, had rendered the Company insolvent and unable to pay its suppliers and retain, much less grow, its businesses; (2) following the Merger Transaction, fraudulently represented that EveryWare's operations were performing in line with the previously provided 2013 projections, as its business deteriorated to

the point where, by July 2013, the Company was unable to pay its vendors and was on track to run out of money by the end of the year; (3) engaged in accounting manipulations that misstated EveryWare's inventories, underreported its cost of sales and inflated its operating margins, which misled the market about its earnings trends by concealing and deferring the recognition of $5.9 million in factory overhead expenses (until *after* the Secondary Offering in which the Monomoy Defendants sold millions of dollars of their stock); and (4) sold products for less than their cost of production in order to sustain the illusion that EveryWare remained healthy and continued to grow its revenues.

55.     The Monomoy Defendants attempted to and did profit from their scheme in four separate ways.  First, in connection with the original transaction by which EveryWare was taken public on May 21, 2013, the Monomoy Defendants used the baselessly optimistic projections for EveryWare's 2013 earnings and revenues to justify assigning an artificially high initial value to EveryWare of $420 million.  This high initial value allowed the Monomoy Defendants to extract a payment of $90 million as part of the Merger Transaction.  Second, under the terms of the merger agreement, Monomoy would be entitled to 3.5 million additional shares of EveryWare if the stock price of EveryWare reached certain target share prices in the months after the merger.  Third, if the stock price of EveryWare reached a price of $12.50 for a certain amount of time, the six-month period of the Lock-up Agreement barring Monomoy's stock sales would expire early and allow the Monomoy Defendants to sell their shares (though here EveryWare's Audit Committee waived the lock-up restrictions over Monomoy's shares to permit it to sell *1.7 million* shares in the Secondary Offering even though EveryWare's price did not remain about $12.50 for the requisite amount of time).  Fourth, by artificially inflating the price of EveryWare

stock, the Monomoy Defendants increased their profits from their sales of EveryWare stock, including in the Secondary Offering.

**A.  Monomoy Acquires Two Manufacturing Companies That Will Become Part of EveryWare**

56.    EveryWare produces, markets, and distributes kitchenware for baking, serving, using, storing, and displaying food and related products.  The Company operates in four business segments: consumer, foodservice, specialty, and international.   It has operations in North America, Europe, and Asia, under two principal operating subsidiaries: Oneida and Anchor Hocking.

57.    Anchor Hocking and Oneida were acquired by private equity firm Monomoy in 2007 and 2011 respectively, and integrated into EveryWare in March 2012.

58.    EveryWare and its subsidiaries are mature businesses within an established industry.  Oneida and Anchor Hocking were founded in 1848 and 1905, respectively.

**B.  EveryWare Merges with ROI and Becomes a Public Company**

59.    On May 21, 2013, EveryWare merged with ROI.   In its SEC reports, ROI described itself as "a newly organized blank check company incorporated as a Delaware corporation and formed for the purpose of, directly or indirectly, effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or engaging in any other similar Business Combination with one or more businesses or assets . . . ."  As defined by the SEC, a blank check company "is a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person."

60.    On May 9, 2013, ROI filed a Form S-4 Registration Statement with the SEC in which it indicated its intent to enter into a "Business Combination" and plan of merger providing

for ROI's acquisition of EveryWare.  On May 21, 2013, ROI announced that it received stockholder approval for its planned acquisition of EveryWare Global, Inc. and the merger was completed.

61.     Following the completion of the merger, the Monomoy Defendants, collectively, continued to own more than 60% of EveryWare's outstanding common stock.  These holdings made the Monomoy Defendants the controlling shareholders of EveryWare and allowed the Monomoy Defendants to control EveryWare and its officers.  As EveryWare has stated in its SEC reports, due to their large holdings in EveryWare, [the Monomoy Defendants] "have the ability to determine the outcome of corporate actions of the Company requiring stockholder approval."

### C.     The Monomoy Defendants Strip EveryWare of Its Capital, Resulting in an Insolvent Company Destined for Failure

62.     In their efforts to squeeze as much money as possible out of EveryWare, private equity firm Monomoy and its principals Collin and Presser created a merged public company that was destined for failure with a pressing need to mislead investors to cover that fact, first so that Monomoy could obtain the financing and ROI investor approval of the merger (and the $90 million cash payment to Monomoy), and then to pump up EveryWare's shares long enough for the Lock-up Agreement to expire and permit Monomoy to dump its shares in a Secondary Offering.

63.     Under the terms of the merger with ROI, the Monomoy Defendants stripped out EveryWare's capital through a $90 million payment to them that essentially left the Company insolvent.  This is reflected in EveryWare's unaudited pro forma balance sheet as of March 31, 2013, attached as Exhibit 99.2 to a Form 8-K Everyware filed with the SEC on May 28, 2013. Prior to the merger with ROI, EveryWare had assets of $320 million and liabilities of $310

million, leaving stockholder equity of $10 million. After the merger and the $90 million payment to the Monomoy Defendants, the combined Company had assets of only $323 million and liabilities of $382 million, meaning stockholder equity was ***negative*** $59 million, and that the Merger Transaction had rendered EveryWare insolvent on a balance sheet basis. As further described below, the Merger Transaction, and particularly the $90 million cash depletion paid to Monomoy, also rendered the Company insolvent in the sense that, as a result of the transaction, Monomoy no longer had the ability to pay its debts as they came due in the ordinary course of business. Nonetheless, Defendants falsely represented both to EveryWare's banks and to investors that EveryWare had an enterprise value of $420 million – by using the 2013 baseless earnings projections.

### D. The Monomoy Defendants Need to Mislead Investors to Inflate EveryWare's Share Price So that They Can Dump the Stock

64. Even after taking out all of EveryWare's capital, causing the Company to become deeply insolvent and threatening the livelihood of thousands of EveryWare employees, the Monomoy Defendants had additional plans for extracting wealth from EveryWare. Specifically, the Monomoy Defendants retained over 15 million shares of EveryWare which they needed to sell before investors realized that the Company was essentially worthless.

65. The Monomoy Defendants began working on this aspect of their scheme almost immediately after EveryWare went public in May 2013. As early as June 17, 2013, the Monomoy Defendants developed and caused to be filed the initial Registration Statement in preparation for a Secondary Offering in which the Monomoy Defendants would sell their entire position in EveryWare in September 2013. Although Monomoy's stock was subject to a Lock-up Agreement barring sales for six months, the term could be reduced if EveryWare's stock traded for $12.50 or higher (or if the Company's Audit Committee waived the lock-up restrictions,

which is what ultimately occurred).  Monomoy also had received "earn-out" shares which would vest when EveryWare's stock reached certain price thresholds.  Thus, to escape the Lock-up Agreement's restrictions, obtain ownership of the earn-out shares and obtain a windfall on the sales of their stock, the Monomoy Defendants needed to (and did) mislead investors over the months following the Merger Transaction.

66.     Specifically, the merger agreement provided that the Monomoy Defendants' shares were subject to a Lock-up Agreement that generally barred them from selling their shares until November 18, 2013.  However, the lock-up term could expire earlier if EveryWare's share price exceeded $12.50 for 20 trading days within a 30-trading-day period after the merger.  Thus, if the Monomoy Defendants could pump up EveryWare stock above $12.50, they could sell early.

67.     Further, in order to maximize the number of shares they received in the Merger Transaction, the Monomoy Defendants again needed to inflate the value of EveryWare stock.  The merger agreement provided the Monomoy Defendants with 3.5 million "earn-out" shares that would be lost if EveryWare's share price did not achieve certain levels in the years after the merger.  If EveryWare's share price did not hit $11 for at least 20 trading days in a 30-trading-day period, the Monomoy Defendants would lose 1 million shares.  If EveryWare's share price did not hit $12.50 for at least 20 trading days in a 30-trading-day period, the Monomoy Defendants would lose 1.25 million shares.  And if EveryWare's share price did not hit $15 for at least 20 trading days in a 30-trading-day period, the Monomoy Defendants would lose 1.25 million shares.

68.      Finally, every dollar increase in EveryWare's share price translated into $15 million in additional proceeds on the 15 million shares that the Monomoy Defendants had planned to sell.

69.      The Monomoy Defendants were therefore highly incentivized to inflate the price of EveryWare common stock in the months following the merger.  They succeeded, in part, by driving up EveryWare's stock price to $11.50 using a false and misleading Registration Statement and obtaining the Audit Committee's consent to waive the Lock-up Agreement restrictions over 1.7 million shares in the Secondary Offering.

### E.      Monomoy, Sheppard and Peters Make Baseless Representations Concerning EveryWare's 2013 Earnings and Revenue

70.      Beginning in January 2013, the Monomoy Defendants, Sheppard, and Peters concocted grossly exaggerated 2013 revenue and earnings estimates for EveryWare that portrayed the Company as being in the midst of a massive growth spurt.  Initially, these estimates – which confidential witnesses have since revealed to be wholly without any basis and contrary to the level of vendor purchases necessary to accomplish the supposedly expected sales – served to justify EveryWare's merger with ROI, along with its attendant $90 million payment to the Monomoy Defendants.   Later in 2013, these estimates, along with representations that EveryWare was "on track" to meet those estimates, served to buoy EveryWare's stock price and thereby facilitated the Monomoy Defendants' planned sale of their EveryWare shares.

71.      Thus, on January 31, 2013, EveryWare publicly issued projections for 2013 annual adjusted EBITDA of $61.1 million, and 2013 annual revenue of $457 million.  These figures, which represented significant growth in profits and revenue from prior years, were then used to justify assigning an "Enterprise Value" to EveryWare of approximately $420 million. The purported $420 million in value was initially used both to increase EveryWare's bank debt

and also to persuade ROI's public investors to vote to approve the merger, and to not demand that the combined Company redeem their stock, as they were entitled to do.

72.     In other words, the Monomoy Defendants used their $420 million valuation, which had been accomplished through the inflated 2013 revenue and earnings projections, to lull ROI's shareholders (and EveryWare's banks) into agreeing to finance the $90 million payment to Monomoy for the sale of a minority interest in the combined Company.  While many ROI public investors voted against the merger or redeemed their shares (essentially had their original investment of $10 per share returned), ROI's managers bought up enough ROI shares to push the merger through. [3]

73.     Throughout the spring and summer of 2013, Defendant Sheppard continued to represent that EveryWare's business operations and results were "*on track*" to achieve EveryWare's 2013 baseless projections, even as the Company's operations deteriorated as a result of its lack of capital to the point where, by July 2013, it was obvious within the Company that EveryWare would run out of money by the end of 2013.

74.     Confidential Witness 1 ("CW1") was the person who was responsible for preparing the key 2013 sales numbers in the first instance.  He explained that his numbers, prepared from the Company's historical experience and attainable growth, were rejected without any factual support and that the $457 million 2013 revenue estimate and $61.1 million 2013

---

[3] Though not at issue in this case, there are several reasons why ROI's public shareholders may have been particularly vulnerable to the Monomoy Defendants' misrepresentations.  One, the ROI Board of Directors did not obtain a third-party valuation or fairness opinion with respect to the deal, and admitted that there were "conflicts of interest" that may have colored their view of the transaction.  If the deal went through, the sponsor of ROI, the ROIC Acquisition Holdings LP, would receive a sizable stake in the new company, whereas if ROI failed to find a company to merge with after a certain amount of time had elapsed (*i.e.*, by November 2013), the public money invested in ROI had to be returned to the public investors and the ROIC Acquisition Holdings LP would receive nothing.

earnings estimate were wholly unrealistic, inconsistent with the Company's vendor purchases and arrived at by fiat. At the time Monomoy acquired Oneida in 2011, CW1 was Senior Vice President of Sales for Oneida. He remained in this position with EveryWare until he decided to leave the Company in June 2013. In his position, CW1 was personally involved with EveryWare's formulation of its revenue projections and was one of the individuals responsible for working on the 2013 estimates at issue in this case.

75.    CW1 explained that he began working on EveryWare's 2013 estimates between October and December 2012. At that time, prior to Defendant Peters becoming CFO in January 2013, Andrew Church was EveryWare's CFO. Mr. Church's process for formulating the estimates for the coming year involved gathering inputs from the relevant segments of the Company and presenting a proposed budget to Defendant Sheppard, who ultimately determined the final budget and publicly reported estimates.

76.    CW1 and his co-worker, with whom he worked closely, were asked to provide sales estimates that became part of the 2013 revenue and earnings estimates. CW1 was responsible for providing estimates for one of the largest segments of the Company in terms of its earnings and revenue. To complete this task, CW1 provided an estimate based on the Company's past performance, particularly 2011, and trends from the previous two years. CW1 and his co-worker discussed their estimates with Church, and all three individuals agreed that CW1's estimates were reasonable and should be presented to Sheppard.

77.    Thereafter, Church related to CW1 that CW1's 2013 estimates had been rejected and that Sheppard required a "higher top end," meaning a higher sales revenue projection. CW1 responded to these demands by stating that he did not think a higher number was supportable in light of EveryWare's current operations. Sheppard then overruled CW1 and forced the Company

to adopt "estimates" that were "substantially higher" than the estimates that CW1 had provided and which, according to CW1, were "completely unrealistic" and had "absolutely no factual or reasonable basis."

78.    CW1's concern regarding the 2013 earnings and revenue estimates was further buttressed by his conversation with his co-worker, who was the other individual responsible for developing EveryWare's forecast.  In discussing the baseless estimates that Sheppard had mandated, CW1's co-worker stated, "I can't believe this number they want, we're never going to hit it," and agreed with CW1 that the 2013 estimates were in "fantasyland."  CW1's co-worker nevertheless advised that they should accept Sheppard's mandate because the alternative was being fired.  Disgusted by this deception, CW1 voluntarily left the Company in June 2013.

79.    CW1 further explained how the projections selected by Sheppard were known to be unrealistic and disbelieved.  At approximately the same time that Sheppard was overruling his forecasts, late 2012 and early 2013, CW1 was informed by Bill Grannis, EveryWare's senior vice president for sourcing, that EveryWare management had instructed him to cut inventories in 2013.  Because the Company had to make purchases from vendors and increase inventories before it could deliver its products and recognize sales revenue, the decision by EveryWare management to cut back on inventories signified that EveryWare management did not subjectively believe their own 2013 revenue forecast.  A robust increase in revenue in the quarters following the merger would require higher, not lower inventories.  CW1 recalls that, in discussing the matter, Mr. Grannis commented, "I don't know how you can hit your (sales) number by what they're doing to my inventory."

80.    CW1 further stated that between 2012 and 2013, he twice met with Dan Collin to discuss EveryWare's sales. He recalled Collin asking what CW1 needed to increase sales.  CW1

responded that to grow revenues he needed "good marketing support" like catalogues, trade shows, inventory design and other "fundamentals." Collin, however, responded, "no no no, what do you really need?" Based on this conversation, CW1 concluded that Collin was not really interested in improvements to operations to grow EveryWare revenues.

81.     CW1 also observed that, contrary to Sheppard's representations, EveryWare was not achieving major synergies from the mergers of Oneida, Anchor Hocking and ROI. To the contrary, CW1 observed that neither Sheppard nor Monomoy ever developed a plan to integrate the various businesses incorporated into EveryWare. CW1 observed that key business functions at Oneida and Anchor Hocking were not integrated. For example, Anchor Hocking was on an Oracle system and Oneida was on SAP, so sales numbers from one were "translated" in pieces for the other, which was time consuming and produced incomplete information that was outdated by the time it was assembled. CW1 stated that he (and other sales managers) "could not get a basic sales report" when needed, and he complained to Church, saying, "I have no idea how my business is going to perform and no idea how to manage it" without basic reports. Warehouses were still separate and integration had not begun; IT from the two companies was not integrated and lacked an integration plan.

82.     CW1's observation that the projections Sheppard declared regarding 2013 earnings and revenue could not be reconciled with the decision by Company management to cut back on inventory is supported by the observations of CW3, CW4, CW5, CW6 and CW7.

83.     CW3, CW4, CW5, CW6 and CW7 each witnessed a serious cut back in EveryWare's inventory and a deterioration in EveryWare's operations that was in direct conflict with the 2013 revenue and earnings estimates, as well as Sheppard's pronouncements through

the September 2013 Secondary Offering that EveryWare was healthy and on track to meet its aggressive 2013 growth estimates.

84.　　CW3 was a sales manager at EveryWare from 2011 to October 2013.　CW3's career began at Oneida, where CW3 had responsibility for a portion of the southern United States.　CW3 agreed with CW2's observation that changes in inventory directly correlate to changes in sales.　According to CW3, because EveryWare operated in an industry with low margins, the Company's inventory of goods purchased from vendors approximated the level of its sales orders.

85.　　CW3 observed that, between May 2013 and October 2013, EveryWare had cut back on its vendor purchases to the point where her work was frustrated by frequent inventory shortages.　CW3 observed that, in May 2013, EveryWare cut back on the bonuses it paid her staff and also radically reduced her staff from 8 to 2.　CW3 explained that Monomoy tried to "squeez[e] every nickel" out of the Company and was not making any investment in the Company's future success.

86.　　CW3 stated that there were constant inventory shortages in 2013 and that the shortages had become a subject of conversation among sales staff.　At the same time, EveryWare was seeing sales declines for its national accounts and was at risk of losing Marriott, one of its main customers.

87.　　CW3 was notified of inventory shortages by email. CW3 recalls that months after a sales order had been placed, she would receive emails indicating that the order had not been filled.

88.　　CW4 was a district sales manager at Oneida from August 2011 to August 2012 and then a national accounts manager at EveryWare until June 2014.　CW4 observed inventory

CLASS ACTION COMPLAINT

shortages in her area during the summer of 2013.  CW4 understood that these shortages were driven, in part, by Sheppard's replacement of reliable suppliers based in the United States with cheaper products manufactured in China.

89.     CW4 explained that EveryWare's inventory problems were harming EveryWare's relationships with its major customers, including, *e.g.*, two of CW4's accounts, Ruby Tuesday's and Chili's.  Both expressed frustrations to CW4 regarding the quality of EveryWare's products and the delays that they had experienced in waiting for EveryWare to fill orders.

90.     CW4 further witnessed that immediately after EveryWare went public, there were layoffs of key Oneida personnel, and it was "obvious" to her and the sales people she worked with that the reduction of sales head count reflected a changed approach towards Oneida's future.  In addition, CW4 observed that EveryWare did not replace sales personnel as they left.

91.     CW5 was an inventory control manager at EveryWare.  In 1991, CW5 joined a company that was acquired by EveryWare.  CW5 left EveryWare in August 2014.  During his time at EveryWare, CW5 was based in the U.K. and reported to the supply chain director for the U.K.  The witness's area of responsibility was to work with vendors and procure the particular inventory required for customer sales.

92.     CW5 stated that, between June 2013 and September 2013, vendors he worked with informed him that EveryWare had started slowing payments to them, and that this became a topic of regular conversation in the second half of 2013.

93.     CW5's manager informed him EveryWare was experiencing cash shortages and that the Company's international segment would have to manage inventory with less available capital.  The witness stated that the perception in the U.K. office was that the EveryWare corporate management was starving the international segment of cash.

CLASS ACTION COMPLAINT

94.     According to CW5, many shipments of product were "stuck on the docks" because the terms of agreements with vendors called for payments to be made once shipments were delivered to the docks, where EveryWare would take possession after making payment. However, EveryWare did not have the funds and as a result the product simply accumulated at the docks.  CW5 explained that he eventually decided to leave the Company because EveryWare's continued refusal to pay vendors left him unable to do his job.

95.     CW6 was a national sales manager at EveryWare in the specialty division.  CW6 started with Anchor Hocking in 2004 and left EveryWare in September 2014.  CW6 observed that both the Anchor Hocking and Oneida portions of EveryWare were experiencing inventory shortages by the summer of 2013.  CW6 also recalled that EveryWare's inventory problems were compounded in the summer of 2013 by furnace fires that caused the shutdown of certain of the Company's operations.

96.     CW7 worked at EveryWare and its predecessors between February 2009 and December 2014 in the Company's U.K. office where he was the Director of Finance.  CW7 stated that in 2013, Defendant Peters had reviewed the plan by EveryWare's U.K. management to grow the business.  That plan called for the U.K. operation to support itself from its earnings and from a credit facility based in the U.K. until November 2013, when it was expected that EveryWare U.S. would provide additional capital support because the U.K. credit facility would be exhausted.

97.     However, during a mid-November 2013 call attended by CW7, when Defendant Peters was informed that it was time for EveryWare U.S. to extend the promised capital, Peters told CW7 that the funding would not be forthcoming because there was "no money in the U.S."

One week later, CW7 was informed by the head of EveryWare International, Colin Walker, that EveryWare was in danger of failing to meet its U.S. debt covenants.

98.    CW7 stated that, based on his knowledge of EveryWare's business, that EveryWare's management had to have known that EveryWare was running out of money and in danger of defaulting on its debt months before November 2013.  CW7 specifically pinpointed July 2013 as a time when such facts would have been unmistakable to EveryWare management. CW7 based this statement on his knowledge of the fact that EveryWare's business had very substantial lead times in orders to deliver and in revenue.  Defendant Sheppard made a similar point during EveryWare's August 1, 2013 earnings calls, when he explained that he had significant visibility into EveryWare's revenues for 2013 in light of the fact that a high percentage of the year's orders had already been placed.  Thus, per CW7, at the time Sheppard represented on August 1, 2013 that EveryWare was on track to meet or exceed its grossly exaggerated 2013 revenue and profit estimates, the truth was, as Sheppard knew, that EveryWare was nearly broke, in danger of defaulting on its debt and not paying vendors.

**F.    Monomoy, Sheppard and Peters Engage in Accounting Manipulations to Conceal $5.9 Million in Factory Expenses Until After the Planned Secondary Offering**

99.    One of the themes espoused by Defendants Sheppard and Peters to support their aggressive 2013 profit projections was that the "synergies" from the consolidation of the Oneida and Anchor Hocking operations was resulting in cost savings.  CW1, however, explained that, in fact, Oneida and Anchor Hocking continued to be operated as separate companies, and even their systems had yet to be consolidated.

100.    Moreover, the improved margins that the Company touted prior to its October 30, 2013 3Q2013 announcement had been obtained by including period expenses in the Company's

inventories, and recognizing them only after Defendants had dumped their stock.  Thus, $5.9 million in factory expenses were included in inventories to make the Company's margins appear stronger than they were.  Thus, on March 31, 2014, in connection with the announcement of 4Q2013 earnings, EveryWare revealed that its much-worse-than-expected margins had occurred because it had "identified a deviation from historical experience and accordingly [this] resulted in a change in estimate of $5.9 million."

101.    During the April 1, 2014 earnings call, Defendant Peters explained how 4Q2013 expenses had suddenly become so much higher than previous quarters:

> <Q - Kevin Leary>: Good morning. I was hoping that you could take a minute and just slowly help me understand this inventory write-down a little bit better. It's a relatively large charge, and specifically I'm curious what the identified deviation from historical experience was that was identified in the fourth quarter?
>
> <A - Bernard F. Peters>: Hi. This is Bernard Peters. So as we mentioned, we took a $5.9 million charge related to capitalized factory overheads. Basically, as we were in the process of updating our cost standards for 2014, we notice a deviation in terms of machine efficiency, and also refined our methods to determine how much should we capitalize as part of inventory. As a result of that, we took a charge in Q4, and then we're going to apply it respectively on a quarterly basis. But again, if you zoom in, it was really a function of focusing on machine efficiency, where we saw the deviation, and then re-refining the methods to determine how much we need to bake into the inventory.
>
> <Q - Kevin Leary>: So does that mean that machines are running less efficiently, and cost of goods increased per unit above what you had previously estimated?
>
> <A - Bernard F. Peters>: Only as it relates to the capitalization method we're using previously

102.    The impact of these undisclosed costs was significant.  As a result of the charge, EBITDA decreased *113%* versus the prior year period, a massive decline that further underscores the extent to which Sheppard, Peters and the Monomoy Defendants had inflated EveryWare's results.

**G.      Desperate to Artificially Inflate Revenue Numbers Ahead of the Secondary Offering, EveryWare Sells Products for Less than the Cost of Production**

103.    In a further attempt to exaggerate its revenue numbers during 2013, EveryWare also sold products for less than the cost of production.  In doing this, EveryWare was able to record sales and build up its revenues, making it appear to investors that it was a successful and profitable company.  However, by selling products below the cost of production, as is now obvious, the Company was taking a hit to its profits.  Accordingly, what Defendants made out to look like strong revenues in an effort to maintain a high price for shares of EveryWare common stock during the weeks and months leading up to the September 2013 Secondary Offering were, in fact, artificially inflated based on sales in which the Company was actually sustaining a loss.

104.    It was only months after the Secondary Offering that the Company finally acknowledged this fact.  On a conference call with investors on April 1, 2014, then-current CEO Solomon stated, "when we take a hard look at our product profitability, we recognize that we're selling some things that we don't make money on.  As we manage our capacity, we have the opportunity, and we're taking the opportunity to stop doing that going forward."

105.    As the Company and analysts noted, once EveryWare stopped selling products below cost (and recognized its accumulated, higher inventory costs as expense), the Company's financial results plummeted.  As an analyst report prepared by Defendant Telsey explains, when the "decision to exit some unprofitable accounts" was made, this led to a "sales shortfall in the consumer segment."  Similarly, Defendant Oppenheimer blamed the weakness in EveryWare's Fourth Quarter and Full Year 2013 financial results, in part, on the decision "to exit low/no margin product lines."

106.    Once EveryWare disclosed the truth about its practice of selling products for less than the cost of production, its revenues dropped considerably, as did the price of the Company's shares.

**H.    In the Summer of 2013, Concurrent with the Many Efforts to Artificially Boost EveryWare's Stock Price, the Monomoy Defendants Prepare to Dump All of Their Shares**

107.    On June 17, 2013, almost immediately after the May 21, 2013 Business Combination, EveryWare, on behalf of several "selling stockholders," filed a Form S-3 Registration Statement with the SEC in which they announced their intent to sell 21,313,334 shares of EveryWare common stock.  Out of these over 21 million shares, more than 15 million were to be sold by the Monomoy Defendants, which accounted for all of the Monomoy Defendants' shares.  In addition, Defendant Baldwin sought to sell 15,000 shares and Defendant Sheppard sought to sell 8,171 shares.

108.    On August 13, 2013, EveryWare filed its second amendment to the Form S-3 Registration Statement.  In this version, the selling stockholders reduced the number of shares they would seek to sell in the Secondary Offering – from 21 million, to 6.5 million.  Now, the Monomoy Defendants proposed to sell approximately 5.1 million of their shares, while Defendant Baldwin sought to sell 3,381 shares and Defendant Sheppard sought to sell 2,763 shares.

109.    On September 3, 2013, the Company filed another amendment to its Form S-3 Registration Statement.  The selling stockholders continued to seek to sell 6.5 million shares of EveryWare common stock, although the precise amounts were slightly altered from previous iterations.  The Monomoy Defendants proposed to sell just over 5.0 million shares, while Sheppard sought to sell 2,740 shares and Baldwin 3,482 shares.  On September 9, 2013, the SEC

issued a Notice of Effectiveness, granting EveryWare (and its selling stockholders) the right to conduct the Secondary Offering.

110.    On September 12, 2013, the Company announced an underwritten public offering of 4,000,000 shares of the Company's common stock by the selling shareholders of EveryWare. Significantly, the Company also reported that, on the same day, "the Audit Committee of the Board of Directors of the Company waived the application of the lockup provisions of the [Lock-up Agreement with the Monomoy Defendants] to permit the sale of such shares in the secondary offering contemplated by the prospectus supplement filed with the [SEC] on September 12, 2013 to the extent of the number of shares of Common Stock that are actually sold in such offering."

I.    **At or About the Time of the Secondary Offering EveryWare's General Counsel Discovers Financial Irregularities and, After Raising Her Concerns, Is Fired and Investigated**

111.    Kerri Cárdenas Love served as EveryWare's Chief Administrative Officer and General Counsel at the time of the Secondary Offering.  Ms. Love's final date of employment with EveryWare was October 7, 2013, three weeks after the Secondary Offering.

112.    As described in the complaint of former EveryWare employee Michael Stewart, who had been tasked with investigating Ms. Love after she blew the whistle, Ms. Love discovered certain "inaccurate financial disclosures" at EveryWare.

113.    According to Stewart's complaint, the inaccurate financial disclosures implicated EveryWare's top managers, including EveryWare's CFO, Defendant Peters, and members of EveryWare's Board of Directors, who are also Defendants in this case.  Upon making this discovery, Ms. Love approached EveryWare's management and threatened to report her discovery to the U.S. Securities & Exchange Commission if the issues were not corrected within ninety days.  Based on the date of Ms. Love's departure, which Defendants reported in

EveryWare's SEC filings, October 7, 2013, her discovery occurred at or about the time of the Secondary Offering. According to EveryWare's SEC reporting, on April 1, 2014, Ms. Love and EveryWare "entered into a Confidential Separation Agreement and General Release."

114. Mr. Stewart in his complaint explains that after he was instructed to review Ms. Love's records, he was required to report his findings to CFO Peters – one of the individuals implicated by Ms. Love – with weekly updates of the details he was discovering. According to Stewart, "[u]pon reporting to Peters and providing the weekly updates, Stewart began experiencing retaliation from" EveryWare and Defendant Peters and that "[s]hortly after Stewart began reporting to Peters, Stewart became targeted for termination." Soon thereafter, Stewart's employment with the Company also was terminated.

**J.     The Monomoy Defendants Succeed in Cashing Out Shares of EveryWare in the September 16, 2013 Secondary Offering**

115. On September 16, 2013, the day the Secondary Offering was commenced, EveryWare filed its final Prospectus Supplement with the SEC on Form 424B3. A total of 1,750,000 shares were sold in the Secondary Offering, at an offering price of $11.50 per share. Out of these shares, the Monomoy Defendants sold 1,699,773 shares, or 90%.

**II.     THE MATERIALLY FALSE AND MISLEADING STATEMENTS MADE BY THE MONOMOY DEFENDANTS, SHEPPARD AND PETERS**

116. To facilitate the fraudulent scheme described above, the Monomoy Defendants, Sheppard and Peters made numerous false and misleading statements, as provided below.

117. On January 31, 2013, EveryWare, along with ROI, issued a press release announcing their merger. In that press release, EveryWare represented that the "enterprise value" of the combined Company was "approximately $420 million." This valuation was misleading because, with the refinancing and cash payment to EveryWare, the Company was

rendered insolvent, and the $420 million was derived from the 2013 earnings and revenue estimates which were themselves baseless. In truth, EveryWare, as a result of the Merger Transaction, would have negative shareholder equity in the amount of about $60 million, and its ability to fund its current operations, as well as to grow its business, was undercut by its lack of capital. To address this shortage, the Monomoy Defendants cut costs to such a degree that EveryWare was unable to make reliable and quality deliveries to its major customers. Thus, Monomoy undermined EveryWare's viability, putting it on the road to bankruptcy. Indeed, at the same time that EveryWare and its officers were touting the $420 million valuation, EveryWare was in the process of cutting back on its 2013 inventory in a clear signal that management fully intended to contract, not grow, revenues and profits, so that management knew there was no basis for and disbelieved the $420 million misleading valuation.

118. In the January 31, 2013 press release, EveryWare represented that "*For the year ended December 31, 2013, EveryWare projects Adjusted EBITDA of approximately $61.1 million*." In the same press release, EveryWare represented to investors that they could rely on the 2013 EBITDA estimate because it was compiled in the regular course of business at EveryWare and reflected a good faith estimate based on up-to-date information, stating:

> *This press release includes projected 2013*, estimated 2012 and actual 2011 adjusted *EBITDA* . . .
>
> *EveryWare believes that these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to EveryWare's financial condition and results of operations*. *EveryWare's management uses these non-GAAP measures to compare the Company's performance to that of prior periods for trend analyses, for purposes of determining management incentive compensation, and for budgeting and planning purposes. These measures are used in monthly financial reports prepared for management and EveryWare's board of directors. EveryWare believes that the use of these non-GAAP financial measures provides an additional tool for investors* to use in evaluating ongoing operating results and trends and in comparing the Company's financial measures with other

consumer products companies, many of which present similar non-GAAP financial measures to investors.

[Emphasis added].  For the reasons stated above, the $420 million valuation was not developed from business trends or budgeting and planning information, and was not believed by EveryWare management.  Rather than providing useful information to investors, this estimate was prepared to mislead investors (and creditors) about the value of EveryWare.

119.    As described by CW1, EveryWare's 2013 revenue and earnings estimate itself has no reasonable basis, and was belied by the fact that EveryWare was cutting back on the 2013 inventory needed to satisfy sales at the projected level.

120.    EveryWare filed the press release above with the SEC as Exhibit 99.2 to its January 31, 2013 Form 8-K.  These representations were then reiterated and incorporated by reference on June 11, 2013, during the class period, when EveryWare referred to them in its Post-Effective Amendment No. 1 to the Registration Statement for the Secondary Offering. These representations were again made when they were incorporated by reference in later amendments to the Registration Statement filed by EveryWare in connection with its September 16, 2013 Secondary Offering.  Specifically, the SEC Form 8-K, dated January 31, 2013 was incorporated by reference in Amendment No. 3 to that Registration Statement, which was filed on September 3, 2013, so that the $420 million misleading valuation became one of the misleading representations for the Secondary Offering.

121.    On January 31, 2013, EveryWare filed an investor presentation with the SEC.  In the presentation, EveryWare represented that it had "Industry-leading revenue and EBITDA growth trends."  The Company also portrayed itself as growing quickly, in large part due to its estimated 2013 EBITDA and revenue, providing projected growth "From 2011-2013E Revenue and Adjusted EBITDA CAGR of 24.7% and 30.5%, respectively."  Because there was no

reasonable basis for the 2013 revenue and earnings projections, the representations of expected growth trends year-over-year were also known by management to be misleading.

122.    The January 31, 2013 investor presentation repeated the representation that EveryWare's estimates were reliable measures of the Company's financial prospects.   The presentation represented that the estimates were based on the Company's "current expectations." Furthermore, the presentation  stated:

> *[C]ertain financial information in this presentation give effect to the proposed business combination with ROI, including TEV, 2013 Estimated EPS, 2013 Estimated Adjusted EPS and 2013E P/E Growth . . .*
>
> *EveryWare believes that these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to EveryWare's financial condition and results of operations. EveryWare's management uses these non-GAAP measures to compare the Company's performance to that of prior periods for trend analyses, for purposes of determining management incentive compensation, and for budgeting and planning purposes. These measures are used in monthly financial reports prepared for management and EveryWare's board of directors.* EveryWare believes that the use of these non-GAAP financial measures provides an additional tool for investors to use in evaluating ongoing operating results and trends and in comparing the Company's financial measures with other consumer products companies, many of which present similar non-GAAP financial measures to investors.

[Emphasis added].  EveryWare's representations concerning the reliability of the 2013 earnings estimate were misleading for the same reasons set forth above in ¶¶117-19.

123.    In the January 31, 2013 investor presentation, EveryWare used its false earnings and revenue projections as the basis to assert it had an enterprise value of $420.5 million and had an "Attractive Valuation" compared to other companies.  The presentation included a chart, making these points, which is recreated below:

| Attractive Valuation | | |
|---|---|---|
| | **EveryWare** | **Comparable Companies** |
| **Fully Distributed TEV** | $420.5 million | |
| **2013E TEV/Adjusted EBITDA** | 6.9x | 8.1x |
| **2013E P-E GAAP** | 10.1x | 12.7x |
| **2013E P-E-Adjusted** | 7.8x | 12.7x |
| **P/E Growth** | .6x | 1.3x |

With the above chart, EveryWare represented that its total enterprise value ("TEV") of $420.5 million was only 6.9 times 2013 adjusted EBITDA, whereas comparable companies were valued at 8.1 times adjusted EBITDA, a common measure by which the market arrives at a company's stock price. Similarly, EveryWare made the point that its share price was only 10.1 times 2013 earnings, whereas the share price of comparable companies was 12.7 times 2013 earnings. In other words, EveryWare asserted to the market that the Company was a relative bargain compared to other comparable companies based on 2013 expected results, when, as described above, the 2013 revenue and earnings projections were baseless.

124. Also in the January 31, 2013 investor presentation, EveryWare projected its 2013 revenue as $457 million, an increase of approximately 8% over 2012. EveryWare projected adjusted EBITDA of $61.1 million, an increase of approximately 10% over 2012. EveryWare further represented that it expected 2013 gross margins would grow to 27.1% from 24.7% in 2012. These projections were misleading for the same reasons as set forth in ¶¶117-19 and in ¶¶103-06.

125. EveryWare filed the January 31, 2013 investor presentation with the SEC as Exhibit 99.1 to its SEC Form 8-K. These representations were then reiterated and incorporated

by reference on June 11, 2013, during the class period, when EveryWare referred to them in its Post-Effective Amendment No. 1 to the Registration Statement for the Secondary Offering. These representations were made again when they were incorporated by reference in a later amendment to the Registration Statement filed by EveryWare in connection with its September 16, 2013 Secondary Offering. Specifically, the SEC Form 8-K, dated January 31, 2013 was incorporated by reference in Amendment No. 3 to that Registration Statement, which was filed on September 3, 2013, so that this misleading investor presentation became one of the misleading representations for the Secondary Offering.

126. On February 1, 2013, ROI hosted an investor conference call during which Defendants Collin and Sheppard spoke.    Collin stated that:

> "For Monomoy, the most important aspect of this transaction is the continued role as the company's largest shareholder. We believe in the business, we believe in its people and we believe in the future growth of the organization.  We also believe that the structure of the transaction we are discussing today aligns the interests of all parties involved as we will work together tirelessly to drive go-forward performance and shareholder value in the years to come."

This representation was false and misleading because Monomoy was not committed to EveryWare and was not completing the merger with ROI in order to maintain its position as the Company's largest shareholder. To the contrary, at the time Collin spoke, he, along with the Monomoy Defendants were in the midst of a complex scheme to render EveryWare insolvent and sell off the Company's stripped down remnants to investors at prices artificially inflated by their own false statements, as well as the false statements of Sheppard and Peters.

127. EveryWare filed a transcript of the February 1, 2013 investor conference with the SEC as Exhibit 99.1 to its SEC Form 8-K of the same date.  These representations were then reiterated and incorporated by reference on June 11, 2013, during the class period, when EveryWare referred to them in its Post-Effective Amendment No. 1 to the Registration Statement

for the Secondary Offering.  These representations were made again when they were incorporated by reference in a later amendment to the Registration Statement filed by EveryWare in connection with its September 16, 2013 Secondary Offering.  Specifically, the SEC Form 8-K, dated February 1, 2013 was incorporated by reference in Amendment No. 3 to that Registration Statement, which was filed on September 3, 2013, so that these misleading statements became one of the group of misleading representations for the Secondary Offering.

128.    EveryWare's misleading 2013 revenue and earnings projections, which remained unchanged until the weeks following the Secondary Offering, determined EveryWare's valuation for the Merger Transaction, and thereafter directly drove the pricing of EveryWare's stock by the market.  For example, on April 8, 2013, the analyst firm Telsey Advisory Group initiated coverage on EveryWare with a "12-month price target of $12."  As the firm explained, this valuation was derived from its estimated earnings for EveryWare in 2013: "Our 12-month price target of $12 is based on applying a ~12x P/E multiple to our 2013 EPS estimate of $.97."

129.    On May 28, 2013 EveryWare filed a Form 8-K which described the Merger Transaction including the refinancing and increase of EveryWare's bank debt, the $90 million cash payment to Monomoy, the terms of the Lock-up Agreement, the earn-out shares and the approval of the merger by ROI shareholders, with $46.7 million of ROI's cash paid to shareholders who redeemed their ROI stock.  Attached as an exhibit to the Form 8-K was a pro forma balance sheet of the combined EveryWare and ROI companies, adjusted for the Merger Transaction, including the increase in bank debt which was largely used to fund the $90 million cash payment to Monomoy.  The pro forma balance sheet showed that prior to the Merger Transaction, as of March 31, 2013, EveryWare's assets exceeded its liabilities by $10 million;

and that after and as a result of the Merger Transaction, the combined Company's liabilities exceeded its assets by $60 million.

130. The May 28, 2013 Form 8-K, in referring to the "benefits of the Business Combination," the "future financial performance of the Company" and "expansion plans" asserted, *inter alia*, that these statements were based on "information available as of the date of this Current Report" and "current expectations." As of May 28, 2013 the Company was still touting its same 2013 revenue and earnings projections, which for the reasons stated in ¶¶117-19, Defendants knew to be unrealistic and contrary to their current expectations.

131. The May 28, 2013 Form 8-K also described the Company's 1Q2013 performance. It explained that "general administrative expenses," or "SAG," had decreased by $2.5 million or 25.1% versus the prior year's quarter, "primarily due to synergies and cost savings generated since the merger of Oneida and Anchor Hocking." As CW1 described, however, the operations of Oneida and Anchor Hocking had yet to be combined, so that there had been no "synergies" resulting in a lower SAG expense.

132. The Form 8-K also asserted that the Company had excluded from expense "$1.8 million of unallocated positive factory variances" which it attributed to "higher manufacturing efficiencies." This, too, was false and misleading because, as the Company admitted in explaining its 4Q2013 results, the higher factory expense that was incurred in earlier quarters had been capitalized into inventory – thereby wrongfully reducing the expense reported in earlier quarters, and inflating the Company's EBITDA for the earlier quarters.

133. As described above, on June 11, 2013, EveryWare filed a Post-Effective Amendment No. 1 to the Registration Statement for the Secondary Offering, which incorporated by reference the false and misleading statements filed with the SEC in EveryWare's earlier-filed

SEC Form 8-K's. The amendment was signed by Defendant Sheppard, and also Defendants Collin and Presser, the principals from Monomoy, in their respective capacities as Chairman of EveryWare's Board of Directors and member of EveryWare's Board of Directors. The amendment was also signed by Defendant Peters in his capacity as EveryWare's Executive Vice President and CFO.

134. Also, on June 11, 2013, Oppenheimer & Co. Inc. initiated analyst coverage of EveryWare with a "12-18 month" target price of $14. Oppenheimer based its $14 price target on a "discounted cash flow" analysis under which EveryWare's expected revenues and earnings were used to arrive at a stock price. This analysis again underscored the materiality of the misleading statements by EveryWare and Sheppard concerning EveryWare's 2013 revenues and earnings.

135. On June 18, 2013, EveryWare filed an investor presentation as Exhibit 99.1 to a form 8-K filed with the SEC. In the presentation, EveryWare again reaffirmed its 2013 annual revenue estimate of $457 million and Adjusted EBITDA of $61.1 million. The presentation again represented that these estimates were based on the Company's "current expectations." These representations were misleading for the reasons described in ¶¶117-19.

136. The investor presentation again made reference to EveryWare's baseless earnings and revenues estimates in a chart entitled "Strong Fundamentals." The chart listed as EveryWare's strengths, "Strong net sales and EBITDA growth" and "Significant growth and margin expansion opportunities expected to require low incremental investment." These representations were false and misleading for the reasons set forth in ¶¶117-19 in ¶¶103-06.

137.    On August 1, 2013, EveryWare issued a press release regarding its results for the 2Q2013.  The press release was entitled "EveryWare Global Inc. Announces Strong Second Quarter and Year to Date June 30, 2013 Financial Results."  It reported that:

•"Total revenue in the second quarter of 2013 and the six months ended June 30, 2013 increased 2.5% to $100.8 million, and 2.8% to $200.2 million, respectively, versus the prior year periods"

• International segment revenue in the second quarter of 2013 and the six months ended June 30, 2013 increased 25.2% to $9.2 million, and 11.6% to $18.0 million, respectively, versus the prior year periods. Excluding currency fluctuation, international segment revenue increased by 27.5% and 14.0%, for the second quarter of 2013 and the six months ended June 30, 2013, respectively.

• EBITDA in the second quarter of 2013 and the six months ended June 30, 2013 increased 19.5% to $13.8 million, and 32.4% to $22.9 million, respectively, versus the prior year periods.

•   Adjusted EBITDA in the second quarter of 2013 decreased 2.0% to $16.0 million, and for the six months ended June 30, 2013 increased 3.4% to $27.5 million.

These representations were false and misleading for the reasons set forth in ¶¶117-19 and in ¶¶103-06.

138.    The August 1, 2013 press release contained a quote from Defendant Sheppard:

"I am extremely pleased that our growth continued in the second quarter and first half of the year and that *our results were in line with our internal expectations. The fundamentals and outlook for our business and industry remain strong.* Given our continued focus on innovation, as well as our world class brands and customer service, we believe that we are well positioned for a strong second half of the year. *During the second quarter, we continued to realize the benefit of the Oneida and Anchor Hocking combination, and are encouraged by the accelerating growth in our international segment. The acquisition of the Samuel Groves and George Wilkinson businesses in the U.K. and our Brazilian licensing agreement strengthen our international presence and underscore our commitment to building our global platform.* Looking ahead, we remain committed to achieving our financial targets for the year"

[Emphasis added].  Sheppard's representation that EveryWare was on track to meet its earnings and revenue projections was false and misleading because, as described by the CWs, by this

point, EveryWare was in a complete freefall as a result of Monomoy's stripping out of all of the Company's assets.  Thus, as CW7 explained, by this point, EveryWare and its management knew, based on the orders and other sales data as of August 2013, that the Company was on track toward running out of money by the end of the year.  Thus, far from being on track to meeting the Company's 2013 revenue and earnings projections, which were fanciful when conceived before Monomoy's plundering, the Company was in the midst of collapsing.  CW3, CW4, CW5 and CW6 provide further support for the fact that by the summer of 2013, the Company was running out of money and failing to pay its vendors.   Further, as CW1 described, there were no benefits from the Oneida and Anchor Hocking combination because the companies had yet to be combined.  Moreover, any improvements in margin had been accomplished through accounting manipulations, including capitalizing "factory overhead variances" into inventory rather than recognizing current expense.   As CW7 described, by the summer of 2013 EveryWare management knew that the Company's lack of capital was preventing the international segment from accomplishing sales growth from EveryWare's U.K. office's acquisitions of the Samuel Groves and George Wilkinson businesses.  As Defendants well knew by the summer of 2013, the cumulative effect of the massive budget cuts and inventory shortages would make it impossible for the Company to retain its current customers and business, much less to achieve its revenue and earnings growth targets in the second half of 2013.

139.    Also on August 1, 2013, EveryWare held a conference call with analysts concerning EveryWare's results for 2Q2013.  Defendants Sheppard and Peters participated on behalf of the Company.

140.    During the 2Q13 earnings call, Sheppard again reaffirmed that EveryWare was "on track" to meet its false 2013 earnings and revenue projections:

So, from an operational and financial standpoint, we are off to a very solid start in 2013 and expect the second half of the year to be even stronger. As our financial results indicate, the business continues to perform well in line with our internal expectations*, and we remain on track to meet our stated financial commitments for 2013*. I'll let Bernard walk you through the details of the financials. But just to start off with a quick overview, total reported revenue in the quarter increased 2.5% to $100.8 million, and through the first six months of 2013, increased 2.8% to $200.2 million. Reported EBITDA also increased a very strong 19.5% in the quarter and was up 32% through the first half of 2013.

[Emphasis added].  These representations were false and misleading for the reasons set forth in

¶¶103-106, 117-19 and 138.  Significantly, as explained in paragraph 138, by August 1, 2013, it

was unmistakably clear to Sheppard that EveryWare could never reach its 2013 projections and,

in fact, was on a course to run out of money by the end of 2013 and default on its debt

obligations and was, therefore, at serious risk of ceasing to exist as a Company.

141.    During the 2Q2013 earnings call, Sheppard further stated:

So now turning to Foodservice. This segment accounts for about 32% of sales. *The Foodservice segment is highly attractive, given its higher contribution margins and strong recurring revenue characteristics*. Once a new customer is established, high switching costs and confidence in replacement product due to broken or misplaced tableware help to establish long-term customer relationships.

*In our Foodservice segment, we see ample room for profitable growth as we leverage the integration of our Anchor Hocking foodservice glass business with our industry-leading flatware and dinnerware business*. While we are currently the number three provider of foodservice beverageware, we see great potential for growth as our customers look to EveryWare as a one-stop shop for all of their tabletop needs

*            *            *

*Finally, our International segment. This segment continues to show accelerating growth, with second quarter reported revenue increasing 25% over the prior year. International growth is a key tenet of our overall growth strategy*, and while today our International business comprises only about 7% of sales, we expect that to represent over 11% at the end of this year and close to 25% in the next five years.

CLASS ACTION COMPLAINT

[Emphasis added]. These representations were false and misleading for the reasons stated in ¶¶103-106 and 138. Further, as described by CW3 and CW4, the Company was losing key foodservice clients as a result of its shift to low quality and unreliable suppliers. Also, as described by CW7 by the summer of 2013 Defendants knew that the profitable growth in the international segment required capital – which had been depleted as a result of the Merger Transaction.

142.    During the 2Q2013 earnings call, Peters made the following statements:

*Looking at the top line, total reported revenue in the quarter increased 2.5% to $100.8 million compared to $98.4 million in the prior-year period. Excluding currency fluctuation, the revenue increase was* 2.7%. *The increase in the second quarter revenue is primarily attributable to strong growth in the company's International and Specialty segments.* For the first six months of the year, total reported revenue increased 2.8% to $200.2 million compared to $194.8 million in the prior year period. Excluding currency fluctuation, the revenue increase was 3% due to growth in all of our segments.

*In terms of profitability, EBITDA increased 19.5% to $13.8 million in the quarter. The strong growth in EBITDA is a testament to the continued volume and revenue growth of the business and the decline in operating expenses driven by synergies and cost savings generated with the integration of Anchor Hocking and Oneida. Specifically, we generated $2.7 million of savings in the second quarter linked to the identified synergies.* These lower costs impact primarily SG&A and, to a lesser extent, our cost of goods sold

[Emphasis added]. These statements were false and misleading for the reasons set forth in ¶¶103-106, 117-19 and 138.

143.    During the question and answer period of the 2Q2013 earnings call, Sheppard continued to tout his purported (and false and misleading) expectations for higher performance in the second half of 2013:

*<Q >:* Hi, good morning and congratulations on your first quarter as a public company. *To try to help us get a better feel for it, could you comment and help all of us understand the seasonality of your business, and more specifically, how we should think about the gross margin expectation for the second half of*

*the year, given the seasonality* and also given the July shutdown you mentioned on your facility?

**<A John K. Sheppard>:** [] Thanks for the question. ***In terms of seasonality,*** . . . ***when I say the back half of the year, we're back-end loaded.*** And that's primarily the result of a couple items. One is ***on the International side, we made the strategic decision earlier this year to really widen our product offering across the globe. And so, what you'll see is, in the UK, growth across our Consumer segment, Foodservice in the web because of this additional product assortment***.

[Emphasis added]. Sheppard's representation that EveryWare's expected results were "back-loaded" to the second half of the year, and that, in particular U.K. and Foodservice performance was expected to improve in the second half of 2013 was false and misleading for the reasons stated in ¶¶103-106, 117-19 and 138.

144. During the question and answer period of the 2Q2013 earnings call, Sheppard continued to falsely tout his expectations for higher growth in the international segment:

And finally on the export glass business. It's more an issue there of just making sure we have the logistics in place, which we now do. ***So International will continue to grow. As we said, we're up almost 27% – almost 28% if you exclude the foreign exchange, and we expect that growth to continue in the second half of the year, as we really start to leverage this infrastructure we put in place.***

[Emphasis added]. These statements are false and misleading for the reasons stated in ¶¶103-106, 117-19 and 138.

145. During the question and answer period of the 2Q2013 earnings call, Sheppard and Peters had the following colloquy with an analyst in which they repeatedly reconfirmed that, as of August 1, 2013, the Company was on track to meet its 2013 earnings and revenue guidance:

**<Q>:** . . . ***I guess, first, just so we are all on the same page here, I guess the question for Bernard. Could you walk us through your specific financial targets for the year, maybe revenue, adjusted EBITDA, adjusted net income***, and then, what is incremental to that from the Wilkinson and Groves acquisitions?

**<A - Bernard F. Peters>:** Thanks, Joe. Yes. ***In terms of net sales, as we have disclosed before, our target is about $457 million. That's what we explained to the public previously. In terms of EBITDA, again, we're sticking to the***

*numbers that we've disclosed before, at about $61 million*. Net income is not something that we typically disclose. I will leave at revenues and EBITDA. *So, overall, we are essentially comfortable with these numbers as of now*.

**<A - John K. Sheppard>:** Yes. Hey, Joe, this is John. I'll just jump in here. *On the revenue number, obviously, that's about 8%*. Our long-term goals on – we've always stated for top-line growth has been in that 5% to 7%. So we're anticipating 8% as a result of all the initiatives we've put in place. *And so – and we expect that 8% – we're still comfortable with that 8% range. And so, yes, we're comfortable with that.*

[Emphasis added].    Peters' and Sheppard's reaffirmance of the false and misleading 2013 revenue and earnings estimates was false and misleading for the reasons set forth in ¶¶103-106, 117-19 and 138.

146.    In fact, after being questioned about the impact on revenue of a recent acquisition by the Company, Sheppard represented that EveryWare's 2013 revenue would actually be higher than the $457 million projection and would actually be in the range of $460 million:

**<Q >:** Okay. Just so I'm clear, those numbers that you just gave us were numbers that you had given us in the past. So –

**<A - John K. Sheppard>:** Yes.

**<Q >:** So – previous to the UK acquisition, so I'm just trying to see what's incremental.

**<A - John K. Sheppard>:** Yes. Okay. Let me walk you through that, sorry. *So, basically, we're – the number is around 8% we expect for this year, and we're comfortable with that.* That's – we're right in line with our internal plans to hit that. *The Metalrax acquisition, or the Samuel Groves and George Wilkinson business units of Metalrax Housewares will give us – as we said, [ph] that was around (32:52) $14 million, $15 million for the first 12 months*. Now in the first six months, we actually expect that to be – it's more back-end loaded, because of some of the initiatives we put in place and as we integrate the sales forces, et cetera. So, you won't see, though, the huge impact of Metalrax until the first six months of 2014. *For 2013, we expect some modest growth there, in I'd say the $5 million to $6 million range. And so we believe that they – we can – the new estimate from – $457 million is our budget. We think we can be around the $460 million range right now, and that's what we're comfortable with. It takes us to around 8.5% when you include that. So – and you're right, because that's*

*– we've always said $457 million, excluding Metalrax. With Metalrax, it should be in that 8% to 8.5% range and around $460 million.*

[Emphasis added]. Sheppard's representation – as of August 1, 2013 – that EveryWare was on track to exceed its even higher international revenues was false and misleading for the reasons set forth in ¶¶103-106, 117-19 and 138.

147. After another analyst asked a follow-up question on 2013, Sheppard tripled down, agreeing that $460 million was a *"conservative"* revenue estimate and that 2013 revenue could easily be higher, in the range of *$462 million*:

> <Q >: *Follow-ups, John, in your remarks, you indicated that the acquisitions could add $5 million to $6 million in revenue this year, but you only added back $3 million. I assume that's an attempt to be conservative*, or did I miss –
>
> <A - John K. Sheppard>: *It's – yes, it's actually an attempt to be conservative*. It's going to add around $5 million to $6 million as we look at our business. Yes, we're – I'd say the $460 million range. I said 8% to 8.5%. So we obviously try to make sure that we're going to deliver our numbers. I'd say – but when we look at the Metalrax business, it's going to be in that $5 million to $6 million range. We're still working through the integration of that. *We still feel very comfortable with the $5 million to $6 million. And so when you add that to that – yes, I mean, so, is it $461 million, $462 million? That would be probably a good number.* I'd feel more comfortable with the $460 million, but we were certainly striving for a little bit higher than that.

[Emphasis added]. Sheppard's representations that EveryWare was actually on track to achieve earnings and revenue over and above the baseless 2013 estimates were false and misleading for the reasons set forth in ¶¶103-106, 117-19 and 138.

148. In response to a question by an analyst, Sheppard represented that his assessment that EveryWare was on track to meet its 2013 annual estimates for earnings and revenues (which required that products be delivered) were reliable based upon sales orders that were already on hand:

> <Q >: Got it. Okay. *And then just, in terms of your visibility, obviously your business is not one where you have a huge amount of inventory turns. I'm*

*curious how much visibility you have into the second half in terms of [ph] sell-in (35:17) and orders in hand from retailers at this point*?

**<A - John K. Sheppard>:** *Yes. It's more than I had thought before I joined this segment*. I think what you find is that, for a lot of our accounts, they would – it's for holiday promotional sets that you try to lock in – I'd say, pretty much starting now and every week as you go forward, you start to kind of capture more and more of your goal for the year on your holiday sets and your promotional programs. And so what we've seen is, as you sit here today, you look and you say, oh gosh, we haven't locked in a certain amount of holiday, that's typical. *As you get into August, September, you start to see, okay, now you blocked in 30%, 40%, 70%. And that's how it kind of works through the year. And as you get towards the end of the year, you end up usually locking in all of that*. So, where we are today, we're very comfortable with the holiday set program and particularly with the new SKUs and the market initiatives that we put in place almost 12 months ago that are – as you said, have been accepted so well as a result of what we saw at the Chicago Housewares Show when we launched these new products and the acceptance there. *So that's why we're – we remain confident in our ability to deliver the second half of the year, based on the reaction and what we have in hand so far for that period.*

[Emphasis added].

149.    These misrepresentations had the desired effect of boosting EveryWare's stock price in anticipation of the Secondary Offering in which Monomoy planned to dump its stock. For example, on August 2, 2013, Oppenheimer & Co. Inc. issued an analyst report covering the earnings call and setting a price target of $15 for EveryWare.  In explaining its rationale, Oppenheimer wrote, "Importantly, management noted that these results [2Q2013] were consistent with its own internal expectations, and that it remains on track to achieve its prior full-year guidance, including revenue of $457 million and adjusted EBITDA of $61 million. . . ." Oppenheimer further stated, "*Looking out at 2H, EVRY's guidance implies a rather significant acceleration in revenue growth. That said, management spent a fair amount of time on Thursday's call discussing the drivers of acceleration, including the new customer wins in the Consumer segment and international growth*."

150.    The analyst firm Telsey Advisory Group issued an analyst report on August 2, 2013 that set a price target for EveryWare of $14.  In explaining its rationale, the Telsey Advisory Group noted that "EveryWare maintained its adjusted EBITDA guidance of $61 million and now expects sales to be ~$460 million, $3 million higher than previously forecast, due to the contribution of the recently announced acquisition in the U.K."

## III.    THE FALSE AND MISLEADING REGISTRATION STATEMENT FOR THE SEPTEMBER 16, 2013 SECONDARY OFFERING AND RELATED MISLEADING STATEMENTS

151.    As described above, a major driver of the securities violations at issue in this case was Monomoy's desire to earn a massive profit on its stake in EveryWare by cashing out all of its shares in September 2013 at prices inflated by Defendants' various false statements.  The Registration Statement filed by EveryWare, as well as the prospectuses issued, contained materially false and misleading statements and omissions, including violating Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303") by failing to truthfully report the Company's true trends and conditions.  In addition, the Monomoy Defendants made false and misleading statements in connection with the Secondary Offering.

The False and Misleading Registration Statement

152.    The Registration Statement for the Secondary Offering was initially filed on June 17, 2013, only three weeks after the Merger Transaction, and was amended three times, on July 23, 2013, August 13, 2013 and September 3, 2013.  The initial registration statement, with its amendments and related prospectus, constitutes the "Registration Statement" for purposes of the alleged violations of the Securities Act.  The Registration Statement became effective on September 9, 2013.  The prospectus for the offering was filed on September 16, 2013, the date of the Secondary Offering.

153.    The initial June 17, 2013 Registration Statement, known as an SEC Form S-3, would have allowed the Monomoy Defendants and other selling shareholders to sell 21,313,334 shares for estimated proceeds of $222,298,073.62.  The vast bulk of these shares, 15+ million shares, were to be sold by Monomoy, which would have exhausted its ownership interest in EveryWare.

154.    As explained above, because Defendants failed in their efforts to sustain EveryWare's share price at $12.50 in the months preceding September 2013, the prohibitions on Monomoy's sale of its shares contained in the Lock-up Agreement continued to apply. Ultimately, Monomoy sold 1.7 million shares in the Secondary Offering pursuant to a waiver of the Lock-up Agreement restrictions approved by EveryWare's Audit Committee.

155.    The Registration Statement was false and misleading because it incorporated by reference EveryWare's false and misleading earnings and revenue projections from its earlier-filed Form 8-K's.  See ¶¶117-127.  These statements were false and misleading for the reasons described in in these paragraphs.  Further, it was misleading for the Registration Statement to include these representations without disclosing that by September 16, 2013, the Company was in the midst of collapse, had essentially run out of money  and was in danger of violating its debt covenants.

156.     The Final Prospectus incorporated by reference a draft agreement between the underwriters and selling shareholders, including Monomoy, that accompanied the September 12, 2013 SEC Form 8-K.  The agreement specifically provided that "[t]he sale of Shares by each Selling Stockholder pursuant to this Agreement is not prompted by such Selling Stockholder's knowledge of any material information concerning the Company or any of its subsidiaries which is not set forth in the Prospectus."  This statement was false and misleading because, as described

herein, the Monomoy Defendants knew that they had stripped EveryWare of its assets in January 2013, strangled the Company of the resources it needed to survive thereafter, and pushed the Company into a severe decline, and that the decline precipitated by Monomoy's actions had progressed to the point whereby the Company was on the brink of collapse.  The Monomoy Defendants also knew that EveryWare's 2013 earnings and revenue projections, which were used to prop of EveryWare's stock price throughout 2013, were baseless fabrications.

157.    Furthermore, this Underwriting Agreement contained draft "Representations, Warranties and Agreements," which provided:

> "No Selling Stockholder has taken and will not take, directly or indirectly, any action designed to or that might reasonably be expected to cause or result in stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Shares."

This statement was false and misleading because, as described herein, the Monomoy Defendants had taken a vast number of steps, both direct and indirect, to artificially boost the price of EveryWare stock in advance of the Secondary Offering, including the issuance of misleading earnings and revenue estimates for 2013.

158.    Furthermore, in violation of Item 303, the Registration Statement failed to disclose the following material trends and conditions:  (1) that the Merger Transaction had rendered EveryWare insolvent and without adequate capital to pay its suppliers and other expenses in the ordinary course; (2) that in the wake of the stripping away of the Company's capital, the Monomoy Defendants and Sheppard had imposed draconian cost reductions, including shifting its purchases from reliable, high quality domestic suppliers to low quality and unreliable suppliers in China, which had led to inventory shortages, alienated major long-time customers, particularly in the high margin food service segment, and interfered with the Company's ability to retain its existing business, much less grow its revenues and profits,

including in the international area; (3) that the 2013 revenues and earnings projections lacked any basis and were not believed by Company management; (4) that EveryWare was selling products at negative profits in order to artificially boost revenue; and (5) that EveryWare had improperly failed to recognize as expense incurred factory costs and instead capitalized them to inventory in violation of the Company's accounting policies.

The False and Misleading Offering Prospectus

159.    On September 16, 2013, EveryWare filed the prospectus for the Secondary Offering.   The prospectus provided for an initial sale by Monomoy and the other selling shareholders of 1,750,000 shares of EveryWare stock at a price of $11.50, for proceeds of $20,125,000.

160.    The prospectus was false and misleading because it incorporated by reference EveryWare's false and misleading earnings and revenue projections from the Company's earlier-filed Forms 8-K.  As explained above, these statements were false and misleading for the reasons set forth in ¶¶117-118. The prospectus was part of the Registration Statement and false and misleading for the same reasons as the Registration Statement.

Monomoy's False and Misleading Representations and Warranties In Its Underwriting Agreement

161.    On September 17, 2013, Monomoy filed a Schedule 13D/A with the SEC. Attached as Exhibit 11 was a signed version of the agreement that had been included in the Registration Statement.   The agreement was signed by Monomoy Capital Partners L.P., MCP Supplemental Fund, L.P., Monomoy Executive Co-Investment Fund, L.P., Monomoy Capital Partners II L.P., MCP Supplemental Fund, II L.P., Monomoy General Partner L.P., Monomoy General Partner II L.P., and Monomoy Ultimate GP LLC, as well as Dan Collin on behalf of other individual sellers.

162.    Monomoy attached the Underwriting Agreement with Oppenheimer & Co. Inc. to its form Schedule 13D/A filed with the SEC.  As described in ¶¶156-57, the representations in the Underwriting Agreement were false and misleading.

163.    At or about the time of the Secondary Offering, Kerri Love, EveryWare's General Counsel who was required under the Underwriting Agreement to provide an opinion letter to the Underwriter, identified further accounting irregularities and reported them to senior management.  Rather than correct the false and misleading financial reports, Defendants fired Ms. Love, and then fired Michael Stewart who had located Ms. Love's incriminating records.

## IV.    THE TRUTH IS REVEALED

164.    Defendants began to reveal the true state of EveryWare's affairs on October 30, 2013.  On that date, EveryWare released its financial results for 3Q2013, *i.e.*, the period ended September 30, 2013, just two weeks after the Secondary Offering was conducted.  The Company reported a loss of $1.1 million for 3Q2013 and revised its 2013 annual guidance for expected revenues from $460 million to a range of $445 and $455 million, and for EBITDA from $61 million to a range of $55-57 million.  At the earnings call conducted the same day to explain the 3Q2013 results, CFO Peters disclosed that EveryWare's margins had declined 140 basis points due to a shift in EveryWare's sales product mix in the "Foodservice and Consumer" segments – *i.e.*, that highly profitable Foodservice sales had fallen while sales in less profitable areas had increased.

165.    In response to this news, on October 30, 2013 Oppenheimer & Co. Inc. issued an analyst report in which it dropped its target price for EveryWare to $13 from the $15 price it had targeted on August 2, 2013.  In explaining its rationale, Oppenheimer stated, "EveryWare's 3Q results were below expectations, weighed down by margin pressures owing to revenue mix.

Further, the company reduced its full year guidance."  On October 31, 2013, Imperial Capital issued an analyst report also lowering EveryWare's target price from $15 to $13, citing the Company's lowered guidance and margin decline.  Telsey Advisory Group issued an analyst report on October 31, 2013 lowering EveryWar's target price from $14 to $13, citing the lowered guidance and margin decline.

166.    In response to these disclosures, the price of EveryWare stock plummeted from $10.99 on October 29, 2013 to $8.36 on November 1, 2013, an approximately 24% decline.

167.    In further commenting on the reasons for its assessment of EveryWare's prospects, on November 19, 2013, Oppenheimer & Co. Inc. issued a report explaining that the Company's "management" had a "meaningful credibility deficit" among "investors."

168.    On February 25, 2014, the Company filed a Form 8-K announcing the immediate and unexpected resignation of Sheppard, the Company's President and CEO.  On this news, shares of EveryWare declined from $7.58 on February 24, 2014 to $5.45 on February 26, 2014, a decline of approximately 28%.

169.    Oppenheimer, in its analyst report filed the same day, reported that it had been "blindsided" by the announcement and reduced its rating on EveryWare to "perform." Oppenheimer explained that "*the unexpected departure of CEO John Sheppard, announced Tuesday morning, [] underscores our concerns about the company's execution in a difficult operating environment, while also reflecting a distinct lack of visibility into the company's strategy*."  Oppenheimer also then withdrew its price target for EveryWare.

170.    On March 5, 2014, the Company announced on a conference call that it was postponing its Fourth Quarter and full year 2013 Earnings Release.  On this news, the stock

declined from $5.46 on March 5, 2014 to $4.07 on March 7, 2014, a decline of approximately 25%.

171.     On March 31, 2014, the Company issued its Form 10-K for fourth quarter and fiscal year ended December 31, 2013.  The Company reported a loss per share of $1.03 with total revenue of $439.8 million for the year ended December 31, 2013, well below the $457 million 2013 estimate that Defendants had used to support the price of EveryWare stock through the time of the Secondary Offering in September 2013.  Adjusted EBITDA for 2013 was $51.5 million, far below the $61 million guidance that Sheppard had reaffirmed as recently as August 2013.  Between March 31, 2014 and May 14, 2014, the price of EveryWare stock fell steadily from $4.56 on March 31, 2014 to $1.40 on May 14, 2014.

172.     On May 15, 2014, the Company surprised the market yet again when it announced a net loss for the first quarter of 2014 ("1Q2014") of $38.4 million, or $1.87 per share compared with net income of $0.2 million or $0.20 per share for 1Q2013. The Company further announced that it was in default on its financial debt covenants in its loan agreements with its banks that would require $18.7 million in additional capital to cure the default.  The Company further announced that it was temporarily closing two of its factories and furloughing workers in order to conserve cash and reduce inventory and that the Company's cash flows from operating activities with the credit facility would not be expected to fund operations in the near future.

173.     Additionally, the Company reported that net sales had decreased $4.5 million, or 4.5% year-over-year, and that the decrease in revenues had occurred across all segments, except the international segment.  The Company's cost of sales increased $7.5 million or 10.2% year-over-year and the Company's gross margin had decreased from 26% in 1Q2013 to 14.6% in 1Q2014, a reduction of 44%.

174.    The Company further stated that in an effort to conserve cash and reduce inventory, it had temporarily shut down two U.S. manufacturing facilities.  The Company admitted that, in an effort to reduce inventory, beginning in January 2014, it had reduced production by shutting down one of its glass furnaces, which negatively impacted the Company's gross margins and cash flows.

175.    On this news, the stock plummeted, dropping 31% from $1.38 on May 15, 2014, and reaching an all-time low of 94¢ per share on May 16, 2014 on unprecedented volume.  All told, *the stock dropped approximately 90%* from its Class Period high of $13.24.  Each of these stock price drops from were a result of partial disclosures of the truth relating to the financial condition, or actual or expected performance for 2013 that had been the subject of earlier materially misleading statements or omissions.

176.    On April 7, 2015, the Company filed for bankruptcy.

## CLASS ACTION ALLEGATIONS

177.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased EveryWare securities (i) during the Class Period, and who were damaged thereby, and/or (ii) pursuant and/or traceable to the Offering Documents issued in conjunction with the Secondary Offering, to seek remedies under the Securities Act (collectively, the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

178.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, EveryWare securities were actively traded on the

NASDAQ Stock Market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of EveryWare shares were traded publicly during the Class Period on the NASDAQ. As of March 17, 2014, there were 22,120,023 shares of EveryWare common stock outstanding. Record owners and other members of the Class may be identified from records maintained by EveryWare or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

179. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, which is complained of herein.

180. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

181. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of EveryWare;

      (c)     Whether statements made by Defendants to the investing public in the Offering Documents misrepresented material facts about the business and operations of EveryWare;

      (d)     Whether the price of EveryWare shares was artificially inflated during the Class Period; and

      (e)     To what extent the members of the Class have sustained damages, and the proper measure of damages.

182.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

183.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

184.    During the Class Period, Plaintiffs and the Class purchased EveryWare securities at artificially inflated prices and were damaged thereby.  When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market, were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

185.    The market for EveryWare securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, EveryWare securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of EveryWare securities and the market information relating to EveryWare, and have been damaged thereby.

186.    During the Class Period, the artificial inflation of EveryWare stock was caused by the material misrepresentations and/or omissions particularized in this complaint, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about EveryWare's business, financial condition, operations and prospects.  These material misstatements and/or omissions created an unrealistically positive assessment of EveryWare and its business and value, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the prices of the Company's stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

187.    At all relevant times, the market for EveryWare securities was an efficient market for the following reasons, among others:

(a)    EveryWare stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, EveryWare filed periodic public reports with the SEC and/on the NASDAQ;

(c)     EveryWare regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as earnings calls with analysts and communications with the financial press and other similar reporting services; and/or

(d)     EveryWare was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

188.    As a result of the foregoing, the market for EveryWare securities promptly digested current information regarding EveryWare from all publicly available sources and reflected such information in EveryWare's stock price. Under these circumstances, all purchasers of EveryWare securities during the Class Period suffered similar injury through their purchase of EveryWare securities at artificially inflated prices, and a presumption of reliance applies.

### NO SAFE HARBOR

189.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements and omissions alleged to be false and misleading herein relate to then-existing facts and conditions.  In addition, to the extent that certain of the statements alleged to be false or misleading may be characterized as forward looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from

those in the purportedly forward-looking statements, or material facts necessary to make the statements not misleading were withheld.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of EveryWare who knew, or was reckless in not knowing, that the statement was false or misleading when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Sheppard, Peters, and the Monomoy Defendants

190.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

191.    During the Class Period, Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase EveryWare securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions set forth herein.

192.    Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for EveryWare securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons, or both, as alleged below.

193.     Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about EveryWare's business, operations and financial performance, and prospects, as specified herein.

194.     Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EveryWare's value and performance and continued substantial growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about EveryWare and its business operations and financial prospects in light of the circumstances under which they were made, not misleading. As set forth more particularly herein, these Defendants further engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period. Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed

to ascertain and to disclose such facts, even though such facts were available to them. Defendants Sheppard's, Peters', and the Monomoy Defendants', including Collin's and Presser's, material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing EveryWare's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by these Defendants' misstatements and/or omissions concerning the Company's business, operations, financial wellbeing, and prospects throughout the Class Period, if these Defendants did not have actual knowledge of the misrepresentations and/or omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

195. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of EveryWare securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by these Defendants, but not disclosed in public statements by these Defendants during the Class Period, Plaintiffs and the other members of the Class acquired EveryWare securities during the Class Period at artificially high prices and were damaged thereby.

196. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs

and the other members of the Class and the marketplace known the truth regarding EveryWare and its business and prospects, which were not disclosed by Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their EveryWare securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

197.    By virtue of the foregoing, Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

198.    As a direct and proximate result of Defendants Sheppard's, Peters', and the Monomoy Defendants, including Collin's and Presser's, wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against Defendants Sheppard, Peters and the Monomoy Defendants

199.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

200.    Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, acted as controlling persons of EveryWare within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control and did influence and

control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

201.    The Monomoy Defendants, including Collin and Presser, controlled the statements and omissions made by Defendants Sheppard and Peters, as well as by EveryWare, by virtue of their majority ownership of EveryWare common stock, positions of authority within the Company (including directorships), and/or based upon other reasons as alleged herein.

202.    Defendants Sheppard and Peters controlled the statements and omissions made by EveryWare, by virtue of their executive positions and duties at the Company.

203.    In particular, Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

204.    As set forth above, EveryWare and Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, violated Section 10(b) and Rule 10b-5 by their acts and/or material omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, are also liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these

Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT III

### Violation of Section 11 of the Securities Act of 1933 Against Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, Wainshal, and the Underwriter Defendants

205.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206.     This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, and Wainshal, and the Underwriter Defendants.

207.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

208.     Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, and Wainshal each signed the Registration Statement.  As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.  These Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document contained all facts required to be stated therein.  In the exercise of reasonable care, Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, and Wainshal should have known of the material

misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  Accordingly, these Defendants are liable to Plaintiffs and the Class.

209.    The Underwriter Defendants each served as underwriters in connection with the Secondary Offering.  As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.  These Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  Accordingly, each of the Underwriter Defendants is liable to Plaintiffs and the Class.

210.    By reasons of the conduct herein alleged, each of Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, and Wainshal, and the Underwriter Defendants violated §11 of the Securities Act.

211.    Plaintiffs acquired the Company's common stock pursuant or traceable to the Secondary Offering, and without knowledge of the untruths and/or material misleading omissions in the Registration Statement.  Plaintiffs and the Class sustained losses as a result of their purchases of the Company's shares in or traceable to the Secondary Offering.

212.    By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under §11 as measured by the provisions of §11(e), from Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, and Wainshal, and the Underwriter Defendants, and each of them, jointly and severally.

213.    With respect to the Underwriter Defendants, as well as Defendants Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, and Wainshal, Plaintiffs allege only negligence and strict liability, and disavow any allegations rooted in fraud.

## COUNT IV

### Violation of Section 12 of the Securities Act of 1933 Against Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, Wainshal, and the Underwriter Defendants

214.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

215.    This claim is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, Wainshal, and the Underwriter Defendants.

216.    These Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the Secondary Offering.  Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, Wainshal, and the Underwriter Defendants issued, caused to be issued, and signed the Registration Statement in connection with the Offering.  The Registration Statement was used to induce investors, such as Plaintiffs and the other members of the Class, to purchase the Company's shares.

217.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material

facts required to be stated therein.  These Defendants' acts of solicitation included participating in the preparation of the false and misleading Registration Statement.

218.    Plaintiffs and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement.

219.    Defendants Sheppard, Peters, Collin, Presser, Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, Wainshal, and the Underwriter Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects.  Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

220.    This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after the Company's shares were sold to the Class in connection with the Secondary Offering.

221.    With respect to the Underwriter Defendants, as well as Defendants Baldwin, Jurbala, Kasoff, McCray, Krueger, De Perio, and Wainshal, Plaintiffs allege only negligence and strict liability, and disavow any allegations rooted in fraud.

## COUNT V

## Violation of Section 15 of the Securities Act of 1933 Against Defendants Sheppard, Peters, and the Monomoy Defendants

222.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

CLASS ACTION COMPLAINT

223.    This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser.

224.    Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, were controlling persons of the Company within the meaning of §15 of the Securities Act.  The Monomoy Defendants, including Collin and Presser, were controlling persons for Peters and Sheppard.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants, individually and collectively, had the power to influence, and exercised the same, over the Company to cause it to engage in the conduct complained of herein.  By reason of such conduct, Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, are liable pursuant to §15 of the Securities Act.

225.    By reason of such wrongful conduct, Defendants Sheppard, Peters, and the Monomoy Defendants, including Collin and Presser, are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiffs serving as class representatives;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 15, 2015                           Respectfully Submitted,


                                              */s/*Geoffrey M. Johnson_____
                                              Geoffrey M. Johnson (Bar No. 0073084)
                                              **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
                                              12434 Cedar Road, Suite 12
                                              Cleveland Heights, OH 44106
                                              Telephone:  (216) 229-6088
                                              Facsimile:  (216) 229-6092
                                              gjohnson@scott-scott.com

                                              Beth A. Kaswan
                                              Thomas L. Laughlin
                                              Donald Broggi
                                              **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
                                              The Chrysler Building
                                              405 Lexington Avenue, 40th Floor
                                              New York, NY 10174
                                              Telephone: 212-223-6444
                                              Facsimile: 212-223-6334
                                              bkaswan@scott-scott.com
                                              tlaughlin@scott-scott.com
                                              dbroggi@scott-scott.com

                                              David R. Scott
                                              Stephen J. Teti
                                              **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
                                              156 South Main Street
                                              P.O. Box 192
                                              Colchester, CT  06415
                                              Telephone:  (860) 537-5537
                                              Facsimile:  (860) 537-4432
                                              david.scott@scott-scott.com
                                              steti@scott-scott.com

                                              *Counsel for Plaintiffs*

CLASS ACTION COMPLAINT

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Thomas Mittelbrun III, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.  I am the Administrator of IBEW Local No. 58 Annuity Fund ("IBEW 58 Annuity") and Electrical Worker's Pension Trust Fund of IBEW Local No. 58, Detroit Michigan ("IBEW 58 Pension") (collectively, "Plaintiffs").

2.  I have reviewed the complaint in this matter and authorize Scott+Scott, Attorneys at Law, LLP to pursue this action.

3.  Plaintiffs are willing to serve as a representative party on behalf of the purchasers of EveryWare Global, Inc. ("EveryWare") securities during the Class Period, including providing testimony at deposition and trial, if necessary.

4.  During the Class Period, Plaintiffs purchased and/or sold the security that is the subject of the Complaint as set forth on the attached Schedule A.

5.  Plaintiffs did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.  During the three-year period preceding the date of my signing this Certification, Plaintiffs sought to serve, or served, as a representative party or lead plaintiff on behalf of a class in the following private actions arising under the Securities Act or the Exchange Act:

*Iron Workers District Council of New England Pension Fund et al v. NII Holdings, Inc. et al*, Case No. 1:14-cv-00227-LMB-JFA (E.D. Va.);

*Kohut v. KBR, Inc.*, Case No. 4:14-cv-01287 (S.D. Tex.);

*In re Ply Gem Holdings, Inc. Sec. Litig.*, Case No. 1:14-cv-03577-JPO (S.D.N.Y.);

*In re Magnum Hunter Resources Corp. Sec. Litig.*, Case No. 1:13-cv-02668-KBF (S.D.N.Y.);

*In re Turquoise Hill Resources Sec. Litig.*, Case No. 1:13-cv-08846-LGS (S.D.N.Y.);

*City of Austin Police Retirement System v. Kinross Gold Corporation et al*, Case No. 1:12-cv-01203-VEC (S.D.N.Y.).

7.  Plaintiffs will not accept any payment for serving as a representative party on behalf of

the class beyond its *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at ___Warren, Michigan___ (City, State)

IBEW LOCAL NO. 58 ANNUITY FUND and
ELECTRICAL WORKER'S PENSION TRUST FUND
OF IBEW LOCAL NO. 58, DETROIT, MICHIGAN

5-12-2015
Date

Thomas Mittelbrun III, Administrator

## SCHEDULE A

### *IBEW Local No. 58 Annuity Fund*

Class Period Transactions in EveryWare Global, Inc.

(Class Period: 5/21/2013 through 5/16/2014)

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share |
|---|---|---|---|
| 06/24/2013 | Buy | 16,720 | $12.21 |
| 06/25/2013 | Buy | 8,280 | $12.25 |
| 07/01/2013 | Buy | 48,900 | $12.12 |
| 07/10/2013 | Buy | 3,600 | $12.60 |
| 09/03/2013 | Buy | 1,600 | $13.06 |
| 09/16/2013 | Buy | 26,700 | $11.54 |
| 11/01/2013 | Buy | 2,000 | $8.75 |
| 02/28/2014 | Sell | -876 | $5.50 |
| 03/03/2014 | Sell | -31 | $5.43 |
| 03/04/2014 | Sell | -2,887 | $5.46 |
| 03/05/2014 | Sell | -971 | $5.48 |
| 03/05/2014 | Sell | -79,069 | $5.20 |
| 03/07/2014 | Sell | -23,794 | $3.96 |
| 03/07/2014 | Sell | -172 | $4.04 |

## SCHEDULE A

### *Electrical Worker's Pension Trust Fund*
### *of IBEW Local No. 58, Detroit Michigan*

Class Period Transactions in EveryWare Global, Inc.

(Class Period: 5/21/2013 through 5/16/2014)

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share |
|---|---|---|---|
| 06/24/2013 | Buy | 1,471 | $12.21 |
| 06/25/2013 | Buy | 729 | $12.25 |
| 07/01/2013 | Buy | 4,400 | $12.12 |
| 07/10/2013 | Buy | 300 | $12.60 |
| 09/16/2013 | Buy | 2,300 | $11.54 |
| 11/01/2013 | Buy | 200 | $8.75 |
| 12/19/2013 | Sell | -9,400 | $7.85 |

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed by United States Postal Service the document to the non CM/ECF participants indicated on the Manual Notice List and as follows:

DANIEL COLLIN
415 Greenwich Street
New York, NY 10013-2076

STEPHEN W. PRESSER
755 West End Ave
Apartment 8A
New York, NY 10025-6241

MONOMOY CAPITAL PARTNERS, LLC
MONOMOY EXECUTIVE CO-INVESTMENT FUND, L.P.
MONOMOY CAPITAL PARTNERS II, L.P.
MCP SUPPLEMENTAL FUND II, L.P.
MONOMOY GENERAL PARTNER, L.P.
MONOMOY GENERAL PARTNER II, L.P.
MONOMOY ULTIMATE GP, LLC
142 West 57th Street
17th Floor
New York, NY 10019

OPPENHEIMER & CO., INC.
85 Broad Street
New York, NY 10004

CJS SECURITIES, INC.
50 Main Street
White Plains, NY 10606

TELSEY ADVISORY GROUP, LLC
535 Fifth Avenue
12th Floor
New York, NY 10017

CLASS ACTION COMPLAINT

IMPERIAL CAPITAL, LLC
2000 Avenue of the Stars
Los Angeles, CA 90067

BTIG, LLC
600 Montgomery Street
6th Floor
San Francisco, CA 94111

THOMAS J. BALDWIN
2968 Burnt Pond Road
Ostrander, OH 43061-9770

MICHAEL JURBALA
3523 Seneca Turnpike
Syracuse, NY 13215-8645

BARRY L. KASOFF
20 Paxford Lane
Scarsdale, NY 10583-3307

RONALD D. MCCRAY
328 Morris Avenue
Newark, NJ 07103-2666

WILLIAM J. KRUEGER
6596 Gates Mill Boulevard
Mayfield Heights, OH 44124-4222

JOSEPH A. DE PERIO
229 West 60th Street
Apartment 4S
New York, NY 10023-7509

RON WAINSHAL
6 Windy Hill Road
Westport, CT 06880-3729

/s/Geoffrey M. Johnson
Geoffrey M. Johnson (Bar No. 0073084)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH  44106
Telephone:  (216) 229-6088
Facsimile:  (216) 229-6092
gjohnson@scott-scott.com

CLASS ACTION COMPLAINT