IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| : | | |
| : | | |
| : | **Case No. 2:14-CV-01838** | |
| : | | |
| **IN RE EVERYWARE GLOBAL, INC.** : | **JUDGE ALGENON L. MARBLEY** | |
| **SECURITIES LITIGATION** : | | |
| : | **Magistrate Judge Kemp** | |
| : | | |

## OPINION & ORDER

## I.      INTRODUCTION

Plaintiffs IBEW Local No. 58 Annuity Fund, Electrical Workers Pension Trust Fund of

IBEW Local No. 58, and IBEW Local No. 58 have filed a securities class action complaint

against Defendants on behalf of all purchasers of EveryWare Global, Inc. ("EveryWare")

securities between May 21, 2013 and May 16, 2014, asserting claims under Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Sections 11, 12, and 15 of

the Securities Act of 1933 ("Securities Act").  Six Defendants or groups of Defendants have filed

Motions to Dismiss Plaintiffs' Amended Complaint on various grounds:  Defendants

Oppenheimer & Co. Inc., CJS Securities, Inc., Telsey Advisory Group, LLC, Imperial Capital,

LLC and BTIG, LLC (the "Underwriter Defendants") (Doc. 110); Defendants Daniel Collin,

Stephen W. Presser, Monomoy Capital Partners, LLC, Monomoy Capital Partners, L.P., MCP

Supplemental Fund, L.P., Monomoy Executive Co-Investment Fund, L.P., Monomoy Capital

Partners II, L.P., MCP Supplemental Fund, II, L.P., Monomy General Partner, L.P., Monomoy

General Partner II, L.P., and Monomoy Ultimate GP, LLC (the "Monomoy Defendants" or,

without Collin and Presser, the "Monomoy Entities") (Doc. 111); Defendant John K. Sheppard,

former Chief Executive Officer of EveryWare (Doc. 112); Defendant Bernard F. Peters, former Chief Financial Officer of EveryWare (Doc. 113); Defendants Thomas J. Baldwin, Barry L. Kasoff, Ronald McCray, William Krueger, Joseph A. De Perio, and Ron Wainshal (the "Non-Management Directors") (Doc. 114); and Defendant Michael Jurbala, EveryWare's Controller and Principal Accounting Officer (Doc. 115).

For the following reasons, the Court **GRANTS** the six Motions to Dismiss because Plaintiffs have not stated a claim for relief under Federal Rule of Civil Procedure 12(b)(6).

## II.     BACKGROUND

### A.  Factual History

This action concerns a purported "pump and dump" scheme by the Monomoy Defendants (a group of New York City-based private equity funds as well as their two principals, Defendants Collin and Presser), Sheppard, and Peters to inflate the price of EveryWare Global Inc. stock so that the Monomoy Defendants could sell their 15 million shares before the share price plummeted.  Plaintiffs' complaint alleges the following facts.

In March of 2012, Monomoy combined two private kitchenware companies already under its control, Oneida, Ltd. and Anchor Hocking LLC, into EveryWare Global Inc., a producer, marketer, and distributor of kitchenware.  (Am. Compl., Doc. 38 at ¶¶ 56-58.) Sheppard served as CEO beginning in April of 2012.  (*Id.* at ¶ 22.)  On May 21, 2013, EveryWare Global Inc. merged with ROI Acquisition Corp. ("ROI"), a "blank check" company, defined as a publicly traded company that raises money to pursue an acquisition of an existing company.  (*Id.* at ¶ 59.)  After the merger was complete, the Monomoy Defendants were the controlling shareholders of the new public company EveryWare ("EveryWare" or "the Company"), owning more than 60% of the Company's common stock.  (*Id.* at ¶ 61.)  Under the

2

terms of the merger, the Monomoy Defendants received a $90 million payment and approximately 15 million shares of common stock in EveryWare, while ROI's shareholders received about 35% of the shares in the new company.  (*Id.* at ¶ 63; 5/21/13 8-K, Doc. 111-3.) These terms were disclosed publicly.  (5/21/13 8-K, Doc. 111-3.)  Before the merger, EveryWare had assets of $320 million and liabilities of $310 million and, after the merger, EveryWare had assets of $323 million and liabilities of $382 million.  (Am. Compl., Doc. 38 at ¶ 63.) EveryWare stock began trading at $10 per share following the merger.  (Doc. 111-24.)

The merger agreement between ROI and EveryWare ("Merger Agreement") provided that shares owned by the Monomoy Defendants were subject to a six month Lock-Up Agreement that barred them from selling their shares until November 18, 2013 unless the share price exceeded $12.50 for 20 trading days within a 30-trading-day period commencing at least 90 days after May 21, 2013 or the Audit Committee of the EveryWare Board waived the lock-up restriction.  (Am. Compl., Doc. 38 at ¶¶ 65-66; 5/21/13 Form 8-K, Doc. 111-3 at 44.)  The Merger Agreement also entitled Monomoy to retain up to 3.5 million "earn-out" shares if the price of EveryWare stock hit certain targets for 20 trading days in a 30-day trading period:  1 million shares if the price reached $11; 1.25 million additional shares if it hit $12.50; and 1.25 million additional shares if it reached $15.  (*Id.* ¶ at 67.)  If the price did not hit the targets for at least 20 days in a 30-day period, Monomoy would lose the shares.  (*Id.*)

On January 31, 2013, before the merger with ROI, the former EveryWare publicly issued its 2013 revenue and earnings projections.  (*Id.* at ¶ 71.)  The company projected annual revenue

of \$457 million for 2013 as well as an adjusted EBITDA[1] of \$61.1 million.  (*Id.*)  The Company

also calculated EveryWare's "Enterprise Value" at approximately \$420 million.  (*Id.*)  According

to Plaintiffs, a confidential witness ("CW1"), the Senior Vice President of Sales for Oneida from

2011 until June 2013 when he left the company, has stated that he was personally involved in the

formulation of the 2013 projections.  (*Id.* at ¶ 74.)  CW1 worked on the 2013 estimates between

October and December 2012, and along with a coworker he was "responsible for providing

estimates for one of the largest segments of the Company in terms of its earnings and revenue."

(*Id.* at ¶¶ 75, 76.)  CW1 and his coworker formulated their estimates based on the Company's

past performance and recent trends.  (*Id.* at ¶ 76.)  They discussed their estimates with former

Chief Financial Officer Andrew Church;[2] all three agreed the estimates were reasonable and they

were ultimately presented to CEO Sheppard.  (*Id.*)  Church later told CW1 that Sheppard had

rejected his 2013 estimates because the sales revenue projection was too low.  (*Id.* at ¶ 77.)  CW1

countered to Church that neither he nor his co-worker thought a higher projection was

supportable, but Sheppard adopted substantially higher estimates than those that CW1 provided.

(*Id.* at ¶¶ 77-78.)  CW1 left the company because he was "disgusted" by this incident.  (*Id.* at

78.)  Plaintiffs also stated that CW1 knew that the projections were baseless because Bill

Grannis, EveryWare's Senior Vice President for sourcing, informed CW1 that Grannis had been

instructed to cut his inventories for 2013, which would make it difficult to hit the targeted sales

numbers that could lead to higher revenue.  (*Id.* at ¶ 79.)

---

[1] EBITDA, which stands for "earnings before interest, taxes, depreciation, and amortization," is a
commonly reported measure of a company's pre-tax earnings calculated on a cash basis.  (*Id.* at ¶
4 n.1.)  The Court will use the terms "EBITDA" and "earnings" interchangeably.
[2] Peters replaced Church as CFO in January 2013.  (*Id.* at ¶ 75.)

The amended complaint also states that several other witnesses, including a sales manager, a district sales manager, an inventory control manager, a national sales manager, and the Director of Finance for EveryWare's United Kingdom office, attested to a "serious cut back in EveryWare's inventory and a deterioration in EveryWare's operations." (*Id.* at ¶ 83.) The confidential witnesses reported: staff reductions, inventory shortages, and declining sales (*id.* at ¶¶ 85-86); information from vendors that EveryWare had begun slowing payments to them between June 2013 and September 2013 (*id.* at ¶ 92); products being "stuck on the docks" due to EveryWare's inability to pay for them (*id.* at ¶ 94); and a statement to Confidential Witness 7 ("CW7"), the Director of Finance in the United Kingdom office, from the head of EveryWare International, Colin Walker, in November 2013 that there was a lack of capital to pay the Company's debts. (*Id.* at ¶ 97.) CW7 also stated that in July 2013 it would have been "unmistakable" to EveryWare management that the Company was running out of money and in danger of defaulting on its debt because of the fact that the nature of the business required substantial lead time for orders to be delivered; therefore, the Company would have known that it was on the verge of insolvency well in advance of payments becoming due. (*Id.* at ¶ 98.)

In January of 2013, Peters became the CFO of EveryWare. (*Id.* at ¶ 23.)

In its January 31, 2013 presentation to investors, the Company displayed a chart representing the value of its stock in relation to comparable companies, suggesting that its share price was a relative bargain. (*Id.* at ¶ 123.) It also laid out its 2013 financial projections, which included predictions of an 8% increase in revenue and a 10% increase in EBITDA over 2012. (*Id.* at ¶ 124.) The investor presentation was incorporated by reference into the first amendment to the Registration Statement for the Secondary Offering. (*Id.* at ¶ 125.)

In late May, EveryWare released its financial results from the first quarter of 2013, which reflected growth in both revenue and EBITDA. (5/21/13 Form 8-K, Doc. 111-3 at 64.) On August 1, 2013, EveryWare disclosed financial results for the second quarter of 2013, reporting that revenue for the first six months of 2013 had increased 2.8% over the first six months of 2012 and that adjusted EBITDA was up 3.4% over that same time period. (Am. Compl., Doc. 38 at ¶ 137.) Sheppard also reported that the results "were in line with our internal expectations" and that the "fundamentals and outlook for our business and industry remain strong." (*Id.* at ¶ 138.) On a conference call with analysts in which Defendants Sheppard and Peters participated, Sheppard reaffirmed that EveryWare was "on track to meet our stated financial commitments for 2013." (*Id.* at ¶ 140.) Peters also stated that the Company was "sticking to the numbers that we've disclosed before" with regard to its EBITDA prediction of $61 million. (*Id.* at ¶ 145.) Sheppard also stated that the revenue estimate may even be low, musing that $460 million might be more accurate, and that even that prediction was "an attempt to be conservative." (*Id.* at ¶¶ 146-47.) One of the Underwriter Defendants, the Telsey Advisory Group, in recommending a target share price of $14, noted in an analyst report that "EveryWare maintained its adjusted EBITDA guidance of $61 million and now expects sales to be [approximately] $460 million, $3 million higher than previously forecast, due to the contribution of the recently announced acquisition in the U.K." (*Id.* at ¶ 150.)

The Company's August 2013 earnings statement noted that its projections "involve a number of risks and uncertainties" and that EveryWare's "actual results or performance may be materially different from those expressed or implied by these forward-looking statements." (8/1/13 Form 8-K, Doc. 111-6 at 9.)

According to the amended complaint, as an "accounting gimmick" EveryWare included $5.9 million in factory expenses as inventories, rather than recognizing them as expenses at the time they were incurred, and then waiting until after the Secondary Offering to reveal them as expenses in the fourth quarter of 2013. (*Id.* at ¶¶ 10, 100.) Plaintiffs allege that this accounting maneuver was intended to make the Company's profit margins appear stronger than they were, and that once the accounting adjustment was made in the fourth quarter, adjusted EBITDA decreased by 113% compared to 2012. (*Id.* at ¶ 102.) Further, Plaintiffs allege that the Company sold products below the cost of production in order to record sales and build up revenues, even though its profits were taking a hit, because it would make the Company appear strong in the lead-up to the Secondary Offering. (*Id.* at ¶ 103.) Sheppard's successor as CEO, Sam Solomon, later stated on an April 1, 2014 call with investors that "we recognize that we're selling some things that we don't make money on. . . . [W]e're taking the opportunity to stop doing that going forward." (*Id.* at ¶ 104.) Underwriter Defendants Telsey and Oppenheimer, Inc. later noted that the decision to exit some of these product lines led to a sales shortfall and weaker financial results than expected. (*Id.* at ¶ 105.)

In the three months leading up to the Secondary Offering, EveryWare's stock was trading at an average daily closing price of $12.68. (Doc. 118, Ex. 4.) Meanwhile, the Company was preparing for the Secondary Offering. On June 17, 2013, EveryWare filed a Form S-3 Registration Statement ("Registration Statement") with the Securities and Exchange Commission ("SEC") in which it announced its intent to sell 21,313,334 shares of EveryWare common stock, more than 15 million of which would be sold by the Monomoy Defendants, comprising all of the Monomoy Defendants' shares. (Am. Compl., Doc. 38 at ¶ 107.) Defendant Sheppard also announced his intent to sell 8,171 shares. (*Id.*) On August 13, 2013, the Company filed an

7

amendment to the Registration Statement, reducing the number of shares it intended to sell to 6.5 million, 5.1 million of which would be sold by the Monomoy Defendants and 2,763 by Sheppard. (*Id.* at ¶ 108.) The Company filed another amendment on September 3, 2013, slightly revising its target number of shares to sell, and on September 9, 2013, the SEC granted EveryWare and the selling stockholders the right to conduct the Secondary Offering. (*Id.* at ¶ 109.)

On September 12, 2013, the Company announced both that it would sell 4 million shares of common stock in the Secondary Offering and that the Audit Committee had waived the lock-up restrictions to permit the Monomoy Defendants to sell their stock. (*Id.* at ¶ 110.) On September 16, 2013, EveryWare released the Prospectus for the Secondary Offering, providing for an initial sale of 1.75 million shares at a price of $11.50 per share. (*Id.* at ¶ 159.) The Monomoy Defendants sold just under 1.7 million shares of common stock in the Secondary Offering, approximately 90% of the shares sold in the Secondary Offering. (*Id.* at ¶ 115.) The sales by the Monomoy Defendants, after payment of fees and costs to Underwriter Defendants, totaled approximately $18.5 million. After the Secondary Offering, the Monomoy Entities continued to hold about 60% of EveryWare's common stock. (*Id.* at ¶ 35.) Neither Sheppard nor Peters sold any stock in the Secondary Offering. (9/16/13 Prospectus, Doc. 111-11 at 91.) As of September 11, 2013, Sheppard owned 40,691 shares of common stock and Peters owned 100 shares. (*Id.*)

Three weeks after the Secondary Offering, Kerri Love, EveryWare's Chief Administrative Officer and General Counsel, was fired. (Am. Compl., Doc. 38 at ¶ 111.) According to a complaint filed by former EveryWare employee Michael Stewart, Love had complained to top managers, including Peters, about inaccurate financial disclosures and

8

threatened to report her discovery to the SEC. (*Id.* at ¶¶ 112-13.) Stewart was tasked with investigating Love's records. (*Id.* at ¶ 112.) Love eventually entered a confidential separation agreement with the Company. (*Id.* at ¶ 113.) After she was fired, Stewart was eventually terminated as well, which he characterized as retaliatory. (*Id.* at ¶ 114.)

Plaintiffs allege that the Registration Statement, which incorporated by reference the earlier 2013 projections from the Company's Forms 8-K, was false and misleading because it failed to disclose that the Company was in the midst of collapse and had essentially run out of money. (*Id.* at ¶ 155.) Further, Plaintiffs claim that the Registration Statement omitted the following material trends and conditions: (1) that the Merger Transaction had stripped EveryWare of its capital to such a degree as to render it insolvent and unable to pay suppliers; (2) that the Monomoy Defendants and Sheppard imposed draconian cost reductions, which led to inventory shortages, alienated longtime customers, and impaired the Company's ability to retain its existing business and increase revenues; (3) that Company management did not believe the 2013 revenues and earnings projections; (4) that EveryWare was selling products at negative profits in order to boost revenue artificially; and (5) that EveryWare had improperly failed to recognize certain already incurred factory costs as expenses and instead capitalized them to inventory in violation of the Company's accounting policies. (*Id.* at ¶ 158.)

The Final Prospectus accompanying the Secondary Offering incorporated by reference a draft agreement between the underwriters and selling shareholders, including Monomoy, which provided that "[t]he sale of Shares by each Selling Stockholder pursuant to this Agreement is not prompted by such Selling Stockholder's knowledge of any material information concerning the Company or any of its subsidiaries which is not set forth in the Prospectus." (*Id.* at ¶ 156.) The Agreement also contained a statement that no selling shareholder would take any action that

would reasonably be expected to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of shares.  (*Id.* at ¶ 157.)  Plaintiffs allege that these statements were false and misleading because the Monomoy Defendants knew that they had stripped EveryWare of its capital and strangled it of the resources it needed to survive, and had also taken a number of steps to manipulate the price of the stock.  (*Id.* at ¶¶ 156, 157.)

On October 30, 2013, EveryWare released its third quarter financial results.  (*Id.* at ¶ 164.)  Based on a reported loss of $1.1 million for the third quarter of 2013, the Company revised its expected revenues from $460 million to $445-455 million and its expected EBITDA from $61 million to $55-57 million.  (*Id.*)  On a call with investors that same day, Peters stated that the declining profits were caused by a drop in sales in the highly profitable food service division of the company.  (*Id.*)  Later that day, three of the Underwriter Defendants issued analyst reports dropping the target price for the stock to $13 from previously issued target prices of $14 or $15.  (*Id.* at ¶ 165.)  The share price on the market plummeted from $19.00 on October 29, 2013 to $8.36 on November 1. 2013.  (*Id.* at ¶ 166.)  On November 19, 2013, one of the underwriters, Oppenheimer & Co., opined that EveryWare's management had a "meaningful credibility deficit" among investors.  (*Id.* at ¶ 167.)

On February 25, 2014, Sheppard resigned as CEO and the Board of Directors replaced him with Sam Solomon.  (*Id.* at ¶¶ 14, 168.)  The stock price dropped from $7.58 to $5.45 from February 24, 2014 to February 26, 2014.  (*Id.* at ¶ 168.)  Oppenheimer wrote in its analyst report that it was "blindsided" by the announcement and again reduced its rating, criticizing the company's "execution" and noting "a distinct lack of visibility into the company's strategy."  (*Id.* at ¶ 169.)  On March 5, 2014, EveryWare announced that it was postponing its fourth quarter and

full-year 2013 earnings release, triggering a further decline in the share price from $5.46 to $4.07. (*Id.* at ¶ 170.)

On March 31, 2014, the Company belatedly issued those results, reporting total revenue of $439.8 million for 2013 and adjusted EBITDA of $51.5 million. (*Id.* at ¶ 171.) These numbers were significantly below the original 2013 projections of $457 million in revenue and $61.1 million in earnings. By May 14, 2014, the stock had fallen to $1.40 per share. (*Id.*)

On May 15, 2014, EveryWare announced a net loss for the first quarter of 2014 of $38.4 million, compared to a net income of $0.2 million for the first quarter of 2013. (*Id.* at ¶ 172.) The Company further announced that it was in default on its financial debt covenants in its loan agreements with banks, and that it would require an infusion of $18.7 million in additional capital to cure the default. (*Id.*) The Company announced the temporary closing of two factories and a mass layoff, as well as decreases in net sales, along with significant decreases in revenue across all but the international segment of the business. (*Id.* at ¶ 173.)

By the next day, the share price reached an all-time low of $0.94/share. (*Id.* at ¶ 175.) On April 7, 2015, EveryWare filed for bankruptcy. (*Id.* at ¶ 176.)

## B. Procedural History

Plaintiffs filed a class action complaint in this Court on October 7, 2014. (Doc. 1.) The original complaint named EveryWare, Sheppard, Peters, and current EveryWare CEO Solomon as Defendants. (*Id.* at ¶¶ 11-14.) Plaintiffs asserted causes of action for violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants and violations of Section 20(a) of the Exchange Act against Sheppard, Peters, and Solomon. (*Id.* at ¶¶ 42-54.)

Plaintiffs filed an amended class action complaint on May 15, 2015. (Doc. 38.) The amended complaint added the Monomoy Defendants, the Non-Management Director

11

Defendants, and the Underwriter Defendants.  (*Id.* at ¶¶ 22-53.)  The amended complaint includes the following counts, the third, fourth, and fifth of which were new:

- Count I for violation of Section 10(b) of the Exchange Act and Rule 10b-5 against Sheppard, Peters, and the Monomoy Defendants;

- Count II for violation of Section 20(a) of the Exchange Act against Sheppard, Peters, and the Monomoy Defendants;

- Count III for violations of Section 11 of the Securities Act of 1933 against Sheppard, Peters, Collin, Presser, Jurbala, the Non-Management Director Defendants, and the Underwriter Defendants;

- Count IV for violations of Section 12(a)(2) of the Securities Act of 1933 against Sheppard, Peters, Collin, Presser, Jurbala, the Non-Management Director Defendants, and the Underwriter Defendants;

- Count V for violation of Section 15 of the Securities Act of 1933 against Sheppard, Peters, and the Monomoy Defendants.

(*Id.* at ¶¶ 190-225.)  Plaintiffs seek compensatory damages for all class members, including interest, and attorneys' fees and costs.  (*Id.* at 75-76.)  Plaintiffs assert no claims against EveryWare in the amended complaint because it is currently in bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware and, therefore, subject to the automatic stay under 11 U.S.C. § § 362(d)(1).  (*Id.* at ¶ 21.)

All Defendants all moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim:  the Underwriter Defendants (Doc. 110), the Monomoy Defendants (Doc. 111), Defendant Sheppard (Doc. 112), Defendant Peters (Doc. 113), the Non-Management Director Defendants (Doc. 114), and Defendant Michael Jurbala (Doc. 115).  The motions are fully briefed and ripe for review.

### III.   STANDARD OF REVIEW

The Court may dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations."  *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005).  Thus, the Court must construe the complaint in the light most favorable to the non-moving party.  *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).  The Court is not required, however, to accept as true mere legal conclusions unsupported by factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Generally, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The allegations need not be detailed but must "give the defendant fair notice of what the claim is, and the grounds upon which it rests."  *Nader v. Blackwell*, 545 F.3d 459, 470 (6th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  In short, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  It must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

With regard to Plaintiffs' claims sounding in fraud, Plaintiffs must also satisfy Federal Rule of Civil Procedure 9(b).  Rule 9(b) requires that "in any complaint averring fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (quoting Fed. R. Civ. P. 9(b)).  The requirement "reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading."  *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504

13

(6th Cir. 2008) (internal quotation marks omitted). The Sixth Circuit has explained that to satisfy Rule 9(b), a plaintiff must at a minimum "allege the time, place, and content of the alleged misrepresentation" as well as "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal citations omitted). Plaintiffs may plead fraud based "upon information and belief," but the complaint "must set forth a factual basis for such belief, and the allowance of this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations*." Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) (internal quotation marks omitted). In its analysis, the Court will address which claims sound in fraud and, therefore, must satisfy the more stringent requirements of Rule 9(b).

## IV.    ANALYSIS

Defendants move for dismissal of all of Plaintiffs' claims. First, they assert that Plaintiffs' claims under Section 10(b) of the Securities Act (Count I) must be dismissed because Plaintiffs have not pleaded a materially false or misleading statement or omission attributable to any Defendant or, in the alternative, have not properly pleaded scienter or loss causation. (Doc. 111 at 18.) Second, they argue that Defendants' claims under Sections 11 and 12(a)(2) of the Securities Act (Counts III and IV) are barred by the applicable statute of limitations and, alternatively, because Plaintiffs lack statutory standing under both Sections 11 and 12(a)(2). (*Id.*) In the alternative, they contend that the Section 11 and 12(a)(2) claims fail because Plaintiffs have not alleged any materially false or misleading statements or omissions in the Registration Statement or the Prospectus. (*Id.*) Finally, they contend that Plaintiffs' "control person" claims under both Section 20(a) of the of the Exchange Act (Count II) and Section 15 of the Securities Act (Count V) are facially deficient because: (1) they do not plead a primary

14

violation of either statute by a "controlled person"; and (2) they do not allege sufficient facts to plead that the allegedly "controlling" Defendants were sufficiently involved in the challenged statements.  (*Id.*)  The Court will address each argument in turn.

As a preliminary matter, the Court grants Defendants' request to take judicial notice of public documents, including documents filed with the SEC, attached to their various motions to dismiss.  In ruling on a motion to dismiss, the Court "may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice."  *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).  In ruling on a motion to dismiss in a securities fraud case, the Court "may consider the full text of the SEC filings, prospectus, analysts' reports and statements integral to the complaint, even if not attached, without converting the motion into one for summary judgment" under Federal Rule of Civil Procedure 56.  *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001) (internal quotation marks omitted).  The Court may take judicial notice of such documents, however, "only to the extent that their 'existence or contents prove facts whose accuracy cannot be reasonably questioned.'"  *Beaver Cnty. Ret. Bd. V. LCA-Vision Inc.*, No. 1:07-CV-750, 2009 WL 806714, at *4 (S.D. Ohio Mar. 25, 2009) (quoting *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005)).

### A.  Section 10(b) Claims

Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations."  15 U.S.C. § 78j(b).  Commission Rule 10b-5 forbids, among other things, the making of "any untrue statement of a material fact" or the omission of any material fact

"necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5(b).
*See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).  Plaintiffs' Section 10(b) and Rule
10b-5 claims are subject to the particularity pleading requirements of Rule 9(b), which, in the
context of an Exchange Act claim, require a plaintiff to specify the fraudulent statements,
identify the speaker, state where and when the statements were made, and explain why the
statements were fraudulent.  *Frank v. Dana Corp.*, 547 F.3d 564, 569-70 (6th Cir. 2008) (citation
omitted).  Plaintiffs must also allege the time, place, and contents of the misrepresentation.  *Id.* at
570.  Further, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that in a
private claim of securities fraud under the Exchange Act, a plaintiff must "specify each statement
alleged to have been misleading, the reason or reasons why the statement is misleading, and, if
any allegation regarding the statement or omission is made on information and belief, the
complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. §
78u-4(b)(1).  A plaintiff must also "state with particularity facts giving rise to a strong inference
that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In other
words, the PSLRA requires plaintiffs "to state with particularity both the facts constituting the
alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive,
manipulate or defraud.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)
(quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)).

In cases involving publicly traded securities, the essential elements of an action under
Section 10(b) and Rule 10b-5 can be summarized as:  (1) a material misrepresentation or
omission; (2) scienter, that is, a wrongful state of mind; (3) a connection with the purchase or
sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, a causal connection
between the misrepresentation and the loss.  *Dura*, 544 U.S. at 341-42.  Defendants argue that

Plaintiffs' Section 10(b) claim must be dismissed because Plaintiffs have: (1) not alleged any materially false or misleading statements or omissions; (2) failed to state facts giving rise to an inference of scienter; and (3) failed to plead loss causation.  (Doc. 111 at 42-59.)  They do not dispute that Plaintiffs can establish the other elements of a Rule 10(b) claim, and the Court agrees that Plaintiffs have sufficiently pleaded facts to support the third, fourth, and fifth elements of a Section 10(b) claim.

The Court will first determine whether Plaintiffs have properly pleaded any actionable false or misleading statements.  Plaintiffs have identified the following allegedly false and misleading statements:  (1) the 2013 earnings and revenue projections; (2) misleading statements from the Monomoy Defendants and Sheppard that EveryWare was being priced at a discount compared to comparable companies; and (3) statements by Sheppard, Peters, and the Monomoy Defendants that the company remained "on track" to meet the 2013 projections.

### 1.  The 2013 Projections

The parties do not dispute that revenue and earnings projections are generally considered "forward-looking" within the meaning of the PSLRA.  *See* 15 U.S.C. § 78u-5(i)(1) ("The term 'forward-looking statement' means . . . a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.")  Ordinarily, the maker of such a forward-looking statement is protected from liability for that statement under the PSLRA safe-harbor provision.  15 U.S.C. § 78u-5(c)(1).  The safe harbor does not apply, however, if: "the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements." *Helwig v. Vencor*, 251 F.3d 540, 548 (6th Cir. 2001) (en banc), *overruled on other grounds by*

17

*Tellabs*, 551 U.S. at 314 (citing 15 U.S.C. § 78u-5(c)(1)). The parties dispute whether Defendants had actual knowledge that the 2013 projections were false or misleading and, if they did, whether the forward-looking statement lacked meaningful cautionary statements.

Plaintiffs contend that they have shown that Sheppard and Monomoy had actual knowledge of the falsity of the 2013 projections because Sheppard "disregard[ed] the views of EveryWare's senior finance officials in issuing 2013 projections that were 'substantially higher' than what they recommended and without disclosing to investors the dissenting views of these officials." (Doc. 118 at 27.) Plaintiffs contend that the statements they have identified are actionable because they do not "fairly align[] with the information in the issuer's possession at the time" and were not based on a "meaningful . . . inquiry." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1328-29 (2015) (noting that a plaintiff can state a Section 11 omissions claim "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take more the statement itself"). In support of this contention, Plaintiffs point to the statements of CW1, which they contend indicate that three EveryWare senior officials responsible for the 2013 projections all agreed with the original revenue projection they submitted to Sheppard, who overruled it and mandated a projection that was "substantially higher." (Am. Compl., Doc. 38 at ¶¶ 76-77.) Because the statements Sheppard rejected were formulated based on EveryWare's past performance and the projections that were ultimately used were not, Plaintiffs contend that they were not based on a meaningful inquiry or fairly aligned with the information in EveryWare's possession. (Doc. 118 at 38.)

Confidential witnesses "may assist securities fraud plaintiffs . . . so long as they are not vague and conclusory." *Local 295/Local 851 IBT Emp'r Grp. Pension Tr.*, 731 F. Supp. 2d 689,

721 (S.D. Ohio 2010) (citing *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323-25 (2011)). The complaint must allege that the confidential witnesses were in a position "to establish their basis of knowledge of the alleged misconduct ('what, when, where, and how') and they must establish that the defendants were aware of the misconduct." *Id.* (quoting *Ley*, 543 F.3d at 811); *see, e.g.*, *Ricker v. Zoo Entertainment, Inc.*, 534 F. App'x 495, 496 n. 2 (6th Cir. 2013) ("Witness 3's employment in [the defendant's] accounting department positioned her to learn of the facts now alleged."). The Sixth Circuit has said that "generalized statements cannot substitute for *specific* facts through which a factfinder can strongly infer that the Defendants themselves knew of or recklessly disregarded the falsity of the earnings statements, especially because the majority of the Confidential Witnesses are not identified as having any contact or interaction with any of the Defendants." *Konkol v. Diebold, Inc.*, 590 F.3d 390, 401 (6th Cir. 2009), *abrogated on other grounds by Matrixx Initiatives*, 131 S. Ct. at 1323-25). Plaintiffs further contend that they have pleaded with particularity that CW1 was in a position to know the facts attributed to him because he was one of three senior officials responsible for preparing the 2013 projections and regularly worked with Sheppard and then-CFO Church. (Doc. 118 at 28.)

CW1 was a Senior Vice President of Sales at EveryWare until June 2013. (Am. Compl., Doc. 38 at ¶ 74.) The complaint alleges that he and a co-worker worked on the formulation of the 2013 projections between October and December 2012, and that, in particular, he was "responsible for providing estimates for one of the largest segments of the Company in terms of its earnings and revenue." (*Id.* at ¶¶ 75-76.) He and his coworker discussed their estimates with then-CFO Church, and all three individuals agreed that the estimates were reasonable and should be presented to Sheppard. (*Id.* at ¶ 76.) Church then told CW1 that Sheppard had rejected the

2013 estimates because he wanted a higher sales revenue projection, to which CW1 responded that he did not think a higher number was realistic. (*Id.* at ¶ 77.)  According to the complaint, CW1 also states that his coworker thought that the 2013 projections were in "fantasyland" but does not state whether the coworker shared this information with anyone but CW1. (*Id.* at ¶ 78.) Additionally, the complaint describes a conversation between CW1 and Bill Grannis, EveryWare's senior vice president for sourcing, in which Grannis told CW1 that EveryWare management had instructed him to cut inventories in 2013 and that, according to Grannis, it would be difficult to meet sales goals with lower inventory. (*Id.* at ¶ 79.)  Finally, the complaint recounts CW1's statement that he had two conversations with Defendant Collin, on unspecified dates in 2012 and 2013, to discuss sales and that Collin was "not interested" in making any improvements to EveryWare's operations that could increase revenue. (*Id.* at ¶ 80.)

These statements do not suffice to show that Sheppard (or Peters, who was not yet CFO during the time that CW1 was involved in the formulations of the projections) had actual knowledge that the projections were false or misleading.  First of all, there is no allegation that CW1 or his coworker ever talked directly to Sheppard or that Church conveyed their statements to Sheppard.  Second, there is no indication that Church ever told Sheppard he thought the new projections were unreasonable or misleading in any way, or that Grannis or anyone else ever told Sheppard that they believed insufficient inventory would make the sales goals unachievable. Third, the complaint states that CW1 was responsible for sales figures in "one of the largest segments of the Company," which presumably indicates that other senior officials in other segments of EveryWare also had input into the formulation of the projections, but Plaintiffs allege no facts about the recommended projections of other officials or about the process Sheppard used to craft the final overall projections.  The facts Plaintiffs do offer regarding CW1

20

do not suggest how much of a role CW1 actually had in formulating the Company's overall 2013

projections.  And finally, there are no numbers behind CW1's contentions; he does not state what

his initial recommended projection was, so the size of the discrepancy between his

recommendation and the final 2013 projections is unknown.

The complaint, therefore, fails to show actual knowledge on many levels.  A plaintiff

"must identify particular (and material) facts going to the basis for the [defendant's] opinion—

facts about the inquiry the [defendant] did or did not conduct or the knowledge it did or did not

have—whose omission makes the opinion statement at issue misleading to a reasonable person."

*Omnicare*, 135 S. Ct. at 1332.  Even if Sheppard did have knowledge of CW1's disagreement,

this fact would be insufficient to show that he had knowledge that the 2013 projections were

false or misleading.  *See id.* at 1329 (noting that an opinion statement is not necessarily

misleading when an issuer knows, but fails to disclose, a fact cutting against the opinion even if

the opinion is later proven incorrect because "[a] reasonable investor does not expect that *every*

fact known to an issuer supports its opinion statement."); *Yellen v. Hake*, 437 F. Supp. 2d 941,

954 (S.D. Iowa 2006) (holding that the fact that management discussed lower possible forecasts

"does not amount to an allegation that Defendants did not reasonably believe" the forecasts they

ultimately made).

Plaintiffs simply cannot show through CW1's statements—none of which was made

directly to Sheppard or any other Monomoy Defendant, *see Konkol*, 590 F.3d at 401—that the

2013 projections did not "fairly align[] with the information in the issuer's possession at the

time" and were not based on a "meaningful . . . inquiry," *Omnicare*, 135 S. Ct. at 1328-29.  Nor

do Plaintiffs plausibly allege that Sheppard knew that the 2013 projections were false when he

later relied on them in statements that he made after the company went public in May 2013.

21

There are no allegations in the complaint, from confidential witnesses or otherwise, that anyone made any statements to Sheppard or other Monomoy Defendants about the projections or the bases for the projections. Because the 2013 projections were forward-looking statements and Plaintiffs have not shown that Defendants had actual knowledge of their falsity, such statements are protected by the PSLRA safe harbor.

### 2. *Statements Regarding the Value of EveryWare Stock*

In the January 31, 2013 investor presentation, EveryWare pegged the Company's enterprise value at $420.5 million and characterized EveryWare's stock as an "attractive valuation" because its enterprise value was only 6.9 times expected 2013 earnings, as compared to other similar companies whose enterprise values were 8.1 times their expected 2013 earnings. (Am. Compl., Doc. 38 at ¶ 123.) Therefore, its share price, which is commonly calculated using enterprise value and expected earnings, would seem to be a relative bargain. (*Id.*) The investor presentation, including statements about the enterprise value, were later incorporated by reference in SEC filings on June 11, 2013 and September 16, 2013. Plaintiffs contend that because the statements regarding the stock's value were premised on false and misleading 2013 projections, these statements were also misleading. The parties do not dispute that these statements were not forward-looking, and thus not protected by the safe harbor, so the Court will analyze whether these statements were false or misleading and whether Plaintiffs have sufficiently alleged with particularity the facts on which their belief was formed. *See* 15 U.S.C. § 78u-4(b)(1).

Plaintiffs have not met their burden because: (1) the calculation of the enterprise value was not derived from the 2013 projections and; (2) Defendants fully disclosed how it was calculated and why they believed the stock was an attractive valuation. In its January 31, 2013

investor presentation, EveryWare disclosed the simple formula it used to calculate enterprise value: its pro forma shares outstanding (17.6 million) multiplied by an estimated share price of $10,[3] plus the company's pro forma net debt ($244 million).  (1/31/13 Investor Presentation, Form 8-K, Doc. 111-1 at 46.)  The definition of enterprise value, as stated in the investor presentation, is "equity value plus total debt and minority interest, less cash and equivalents," (*id.* at 51), and Plaintiffs make no contention that this is an incorrect definition of enterprise value or that the enterprise value was incorrectly calculated.  To the extent that they argue that the Company did not disclose that its debts exceeded the value of its assets after the merger and the $90 million payout to Monomoy, this is incorrect because the enterprise value clearly stated that its debt ($244 million) outweighed its pro forma equity value ($175.6 million, the value of the pro forma shares outstanding multipled by the share price of $10).  (*Id.* at 46.)  The Court finds that the Plaintiffs have not alleged an actionable false or misleading statement with regard to the value of the Company's stock.

### 3.   *Statements that EveryWare Remained "On Track" to Meet Its Projections*

#### a.   <u>False or Misleading</u>

Plaintiff next points to statements from Sheppard and Peters, as well as statements that it attributes to the Monomoy Entities[4], that EveryWare remained "on track to meet [its] stated

---

[3] The $10 figure was derived from the ROI initial public offering share price.  (*See* Am. Compl., Doc. 38 at ¶ 72.)

[4] Although they do not discuss it in their opposition brief, in the complaint Plaintiffs also allege that Collin made a false and misleading statement when he said on an investor call regarding the merger with ROI on February 1, 2013:  "We believe in the business, we believe in its people and we believe in the future growth of the organization.  We also believe that the structure of the transaction we are discussing today aligns the interests of all parties involved . . . ."  (Am. Compl., Doc. 38 at ¶ 126.)  This statement is likely forward-looking, and even if it is not, this falls outside of the realm of actionable misstatements because it is "a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the

financial commitments for 2013." (*Id.* at ¶ 140.)  Sheppard made this statement on the second

quarter 2013 earnings call on August 1, 2013, Peters made a similar statement on that call, and

EveryWare made a similar representation in an August 1, 2013 press release.  (*Id.* at ¶¶ 146-47,

145, 138.)

Some courts have labeled statements that a company was "on track" or "still going

strong" to meet its revenue projections as statements that are "not forward-looking but

statements relating to current conditions."  *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942,

964 (N.D. Cal. 2014); s*ee also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705

(7th Cir. 2008); *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 958 F. Supp. 2d 1065, 1076

(D. Minn. 2013).  Having reviewed all of the statements Sheppard and Peters made on the

earnings call, the Court agrees that the statements that the company was "on track" to meet

revenue projections related to the Company's then-current conditions, and now turns to whether

these statements were false or misleading.  For instance, Sheppard stated that "the business

continues to perform well in line with our internal expectations, and we remain on track to meet

our stated financial commitments for 2013," citing the increases in total reported revenue and

EBITDA for the first six months of 2013.  (Am. Compl., Doc. 38 at ¶ 140.)  He also represented

that the company's "top-line growth," which was historically between 5 to 7%, would increase to

8% "as a result of all the initiatives we've put in place."  (*Id.* at ¶ 145.)  The Court finds that

these are statements relating to current condition because they encompass statements of present

fact even if they also represent future predictions.  *See In re Nortel Networks Corp. Sec. Litig.*,

238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (holding that "even when an allegedly false statement

marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so
clearly constituting the opinions of the speaker, that no reasonable investor could find them
important."  *Ind. State Dist. of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009).

has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply").  Therefore, the Court finds that these statements are not protected by the safe harbor.

Plaintiffs contend that these statements that the 2013 projections were on track were misleading because: (1) by August 2013 EveryWare had essentially run out of money and was forced to leave shipments from vendors sitting on the docks due to the Company's inability to pay for them (Am. Compl., Doc. 38 at ¶¶ 92-94); (2) most of the Company's orders for the end of 2013 had already been placed by this time, so they would have known that they were unlikely to meet their optimistic projections (*id.* at ¶ 98); (3) EveryWare's reported results as of August 1, 2013 were inflated by accounting manipulations designed to hide $5.9 million in factory costs (*id.* at ¶¶ 99-102); and (4) EveryWare sold products for less than the cost of production so that they could achieve their revenue projections, which ultimately cost them earnings and shows the extent to which Defendants inflated the stock price. (*Id.* at ¶¶ 103-05.)

### b.  Scienter

Ultimately, however, even though the Plaintiffs have pointed to statements regarding current conditions that Sheppard, Peters, and EveryWare made on August 1, 2013 that are not entitled to the PSLRA safe harbor, Plaintiffs cannot survive the motion to dismiss because they fail plausibly to allege scienter.  The PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The required state of mind for a Section 10(b) claim, scienter, is "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks and citation omitted).  The Supreme Court has defined "strong inference" to require courts to consider not only inferences urged by the plaintiff "but also

competing inferences rationally drawn from the facts alleged." *Id.* at 314.  Further, an inference

of scienter need not be the "most plausible of competing inferences," but it "must be more than

merely reasonable or permissible." *Id.* at 324 (internal quotation marks omitted).  In sum, it must

be "cogent and at least as compelling as any opposing inference one could draw from the facts

alleged." *Id.*  Finally, the proper inquiry for the Court in evaluating allegations of scienter is

"whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23;

*see also Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("Our former method of

reviewing each allegation individually before reviewing them holistically risks losing the forest

for the trees.  Furthermore, after Tellabs, conducting an individual review of myriad allegations

is an unnecessary inefficiency.  Consequently, we will address the Plaintiffs' claims

holistically.").

Defendants contend that Plaintiffs have failed to plead scienter because: (1) the alleged

scheme makes no sense as a motive for fraud, given that the Monomoy Defendants stood to lose

much more financially from the demise of EveryWare than they stood to gain from selling the

stock at an inflated price; (2) the so-called *Helwig* factors that are indicative of scienter militate

against such an inference; (3) the allegations regarding the Company's development of its 2013

projections do not create any basis for inferring scienter; and (4) the remaining allegations

related to inventory accounting and other matters fail to identify any impropriety.  (Doc. 111 at

47.)

Plaintiffs put forward the following theory as to scienter, which the Court will consider

holistically, taking all of Plaintiffs' factual allegations into account.  They allege that Sheppard

was aware that the Company was running out of money because he was involved on an

26

operational level in formulating the projections and tracking the revenue and earnings figures. Plaintiffs further rely on the temporal proximity between Sheppard's "on track" statements on August 1, 2013 and the "actual disastrous year-end results." (Doc. 118 at 39.) Further, the alleged accounting improprieties, including those cited by former General Counsel Love, and the fact that EveryWare was selling products for less than the cost of production, should have been enough for Sheppard to infer that the Company was running out of money. Finally, the fact that there is a long "lead time" for EveryWare's orders allows an inference that sales figures would have been down by August 1, 2013, due to a decreased number of orders for the end of the 2013, so top executives would have known the Company was in trouble. Although Sheppard sold no shares in the Secondary Offering, Plaintiffs suggest that he was motivated to commit fraud by the prospect of losing his job if he told the truth about the Company's financial situation, and that although the Monomoy Defendants initially intended to sell all 15 million shares of their stock— and filed a Form S-3 Registration Statement with the SEC that so indicated—the fact that they "were not able to sell the full amount of stock they had planned to only demonstrates that the Monomoy Defendants failed to make their fraudulent scheme as profitable as hoped, most likely because they decided that they could not conceal EveryWare's failing condition in connection with such a large offering." (Doc. 118 at 45.) Even the Monomoy Defendants' sale of fewer than two million shares of stock, for a value of $18.5 million, at the Secondary Offering was still "highly unusual" in timing and "substantial" in volume, Plaintiffs contend. (*Id.*)

Although the Court cannot say that this theory is outlandish, and may even be plausible, under the *Tellabs* standard it is simply not "cogent and at least as compelling" as the opposing inference toward which Defendants point the Court, namely, that Defendants' actions show that they wanted the Company to succeed. Defendants first rely on the fact that the Monomoy

27

Defendants ultimately only sold 1.7 million shares for proceeds of $18.5 million, which was only a little over 10% of the 15 million shares they held at the time. After the stock price plummeted and the Company was in crisis, Monomoy invested an additional $20 million—more than they received from the sale of stock at the Secondary Offering—in an attempt to prop up the flailing Company. (8/14/14 Form 10-Q, Doc. 111-20 at 32.) [5] After EveryWare entered bankruptcy proceedings, the securities held by the Monomoy Entities were canceled and the Monomoy Entitites were left with approximately 3% of the post-bankruptcy Company. (6/2/15 Schedule 13D/A, amend. 6, Doc. 111-23 at 12.)

Peters owned only 100 shares at the time of the Secondary Offering and he sold none of them in the Offering. (9/9/13 Prospectus Supplement, Doc. 111-11 at S-86.) He also held options for 122,000 shares that would not have vested until June 2014 at the earliest. (4/14/14 Schedule 14A, Doc. 123-3 at 5.) Sheppard did not sell any stock in the Secondary Offering and, in fact, increased his ownership stake from 8,171 shares immediately after the ROI merger to 40,691 shares at the time of the Secondary Offering, which would have been a curious choice if he planned to commit fraud that would cause the stock price to plummet, yet not sell any shares in the Secondary Offering. (*See* 5/28/13 Form 8-K, Doc. 111-3 at 25 and Prospectus Supplement, Doc. 111-11 at S-86.) Sheppard also owned a substantial number of shares that would have vested annually over a four-year period. (4/14/14 Schedule 14A, Doc. 123-5 at 5

---

[5] Defendants also note that 3.5 million of Monomoy's shares were "earn out" shares that the Monomoy Entities would forfeit if the Company did not achieve share prices above specified levels. They ultimately hit the vesting triggers for 2.5 million of the 3.5 million earn out shares during the three-month period between June 30, 2013 and September 30, 2013. Monomoy did not earn the remaining one million shares because the share price did not reach $15. The Court concludes that this fact does not necessarily support either Plaintiffs' or Defendants' theory. On the one hand, Monomoy earned the majority of the eligible shares before the stock price began to plummet after the Secondary Offering. On the other hand, they did lose a significant number of shares when the share price failed to reach the $15 threshold.

("All of the 2013 options issued are subject to time vesting conditions and vest ratably and become exercisable over a period of four years from the date of grant in the case of Mr. Sheppard's options and five years from the date of grant in the case of Mr. Peter[s'] options.").)

Having reviewed these competing inferences, the Court finds that the inferences Plaintiffs draw from the facts alleged in the complaint are not as compelling as those of Defendants.  The Monomoy Defendants had a greater motive to see EveryWare succeed, and they ultimately lost millions more than they received in the Secondary Offering.  Plaintiffs have not offered a compelling reason why Defendants would have sold 1.7 million shares as opposed to the entire 15 million shares they owned.  They cannot explain why the Monomoy Entites would pump $20 million into the company in an effort to prop it up, or why a loss of more than they had gained from the merger—the $90 million cash payout and the $18 million in shares sold—creates an inference of scienter.  Nor can the Court even infer that filing the S-3 Registration Statement indicated that Defendants ever *intended* to sell 15 million shares in the Secondary Offering.  As Defendants point out, all shelf registrations, once granted by the SEC, are active for up to three years, and therefore filing a Registration Statement indicating an intent to sell 15 million shares on June 17, 2013 does not necessarily show that the Monomoy Defendants intended to sell all of these shares at the Secondary Offering.  *See* 17 C.F.R. § 230.415(a)(5) ("Securities registered on an automatic shelf registration statement . . . may be offered and sold only if not more than three years have elapsed since the initial effective date of the registration statement under which they are being offered and sold . . .").

Moreover, EveryWare's publicly available correspondence with the SEC during this period supports an inference that the Monomoy Defendants did not reduce the number of shares they sought to sell because they were worried about the appearance of trying to commit *too much*

29

fraud, as it were.  Rather, a more compelling inference is that the Company elected to reduce the

number of shares it would sell in order to avoid the longer review process by the SEC that would

have resulted if they tried to register more than one-third of the Company's shares.[6]  And

Plaintiffs' attempts to infer fraud from the fact that the Company ultimately revised its 2013

projections downward in October 2013 are unavailing.  *See Albert Fadem Trust*, 334 F. Supp. 2d

at 1017 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)

("[M]isguided optimism is not a cause of action, and does not support an inference of fraud.  We

have rejected the legitimacy of alleging 'fraud by hindsight.'")).  Finally, even if the Court takes

as true the vague allegation that Love revealed accounting improprieties to top management,

only accounting violations that "are the type of extreme 'in your face facts' that 'cry out'

scienter" are sufficient under the PSLRA.  *Konkol*, 590 F.3d at 400 (quoting *PR Diamonds, Inc.

v. Chandler*, 364 F.3d 671, 685 (6th Cir. 2004), *abrogated on other grounds by Matrixx

Initiatives*, 131 S. Ct. at 1323-25).  Given the meager, perhaps even nonexistent, factual support

Plaintiff offers for their accounting violations argument, the Court infers that these are not "in

your face facts."

---

[6] Under the SEC's Compliance and Disclosure Interpretation 612.09, a company must show
"whether a purported secondary offering is really a primary offering, i.e., the selling shareholders
are actually underwriters selling on behalf of an issuer.  Underwriter status may involve
additional disclosure . . . The question of whether an offering styled a secondary one is really on
behalf of the issuer is a difficult factual one . . ."  EveryWare's correspondence with the SEC
suggests that it may have reduced the number of shares in the offering in order to shorten the
SEC registration process.  (*See* 7/12/13 SEC Comment Letter, Doc. 123-1 at 2-3; 8/13/13
EveryWare Response Letter to SEC, Doc. 123-4.) ("While the Registrant does not believe that
the amount of shares being registered alone is determinative of whether an offering is a disguised
primary offering or a valid secondary offering, the Registrant acknowledges the Staff's concern
regarding the amount of shares to be offered by the selling stockholders and has reduced the
amount of shares to be offered by the selling stockholders pursuant to the initial filing of the
Registration Statement from 21,313,334 shares to 6,500,000 shares, as reflected in Amendment
No. 2 filed concurrently with this letter.")

Upon holistic review of these allegations, it is simply more likely that the Monomoy Defendants' actions indicated an intent for the Company to succeed, not to inflate the stock price and ultimately let the Company fail.

As to Sheppard and Peters, they gained nothing from the Secondary Offering because they sold no shares.  *See PR Diamonds*, 364 F.3d at 691 ("[T]he absence of inside sales dulls allegations of fraudulent motive."); *City of Pontiac Gen. Employees' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 834-35 (W.D. Mich. 2012) (explaining that a lack of sales by individual defendants "actually undermines an inference of scienter," particularly where "they suffered large losses . . . from the shares they retained"); *I.B.E.W. v. Limited Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011) ("The[] purchases of shares [during the class period by individual defendants] undermine any inference of scienter.").  Plaintiffs' suggestion that Sheppard was motivated by keeping his job, even if not by profiting from the Secondary Offering itself, does not save their claim.  Although the Supreme Court has stated that the absence of pecuniary motive on the part of a defendant is not fatal to a plaintiff's Section 10(b) claim, "it can be a relevant consideration."  *Tellabs*, 551 U.S. at 325.

Here, Plaintiffs have not alleged "motives to commit fraud as opposed to motives common to corporations and executives generally" such as an executive's "desire for the company to appear successful and . . . to protect his position in the company and increase his compensation."  *Local 295*, 731 F. Supp. 2d at 720 (citing *PR Diamonds*, 364 F.3d at 690); *see also Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers.").  In other words, as the Sixth Circuit has said, a complaint "must show concrete benefits that could be realized by one or more of the false

31

statements and wrongful nondisclosures alleged." *PR Diamonds*, 364 F.3d at 690 (citing *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999)). For instance, the Eighth Circuit found such a motive where a CEO's employment contract awarded him 2.5% of the Company's pre-tax income, so an allegedly fraudulent overstatement of income leading to the expiration of that contract was sufficient to draw an inference of motive. *Fla. State Bd. of Admin. V. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) ("We conclude that the magnitude of [the defendant's] compensation package, together with the timing coincidence of an overstatement of earnings at just the right time to benefit [him], provides an unusual, heightened showing of motive to commit fraud."). Plaintiffs point to no similar such incentive here. Their reliance on the Sixth Circuit's decision in *Helwig*, in which one of the nine factors enumerated by the court to consider in determining the presence of scienter was "the self-interested motivation of defendants in the form of saving their salaries or jobs," is misplaced. 251 F.3d at 552. Given that Plaintiffs have only pointed to general motives common to all executives, this factor likely does not support an inference of scienter and in any event, this factor is only one of nine. As the Court will discuss *infra*, the *Helwig* factors on balance weigh largely in favor of Defendants here.

Plaintiffs' allegations as to Peters' scienter fail for the same reasons as to Sheppard's, as he did not sell stock in the Secondary Offering and, indeed, did not stand to benefit from his stock options until June 2014 at the earliest, which sharply cuts against any inference of scienter because he would not be motivated to see the stock price drop before then.

The Court's finding that Plaintiffs have not sufficiently pleaded scienter is buttressed by the absence of allegations under the *Helwig* factors. In *Helwig*, the Sixth Circuit laid out a non-

32

exhaustive list of nine factors relevant to a determination of whether a plaintiff has adequately

pleaded scienter, including:

> (1) insider trading at a suspicious time or in an unusual amount;
> (2) divergence between internal reports and external statements on the same subject;
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
> (4) evidence of bribery by a top company official;
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
> (6) disregard of the most current factual information before making statements;
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)).

First, there are no allegations that the first, fourth, fifth, or eighth factors are present here.

As discussed earlier, the sales figures CW1 presented to then-CFO Church are not sufficient to

establish that there was a "divergence between internal reports and external statements on the

same subject," *Helwig*, 251 F.3d at 552, because the pleading does not indicate that this was

anything more than an employee's disagreement with management.  *See Omnicare*, 135 S. Ct. at

1329.  Nor have Plaintiffs identified any "internal reports, memoranda or the like and allege[d]

both the contents of those documents and defendants' possession of them at the relevant time,"

*In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 57 (D. Mass. 1998), or alleged any

conversation took place with Sheppard, Peters or the Monomoy Defendants regarding other

relevant factual information that would bear on scienter.  Therefore, Plaintiffs cannot meet the

second or sixth *Helwig* factors.  Nor have Plaintiffs argued that accounting information was disclosed in such a way that its negative implications could only be understood by a highly sophisticated investor.  Indeed, most of Plaintiffs' factual allegations regarding improper accounting, such as the contention that former General Counsel Love disclosed accounting irregularities to senior officials around the time of the Secondary Offering, lack any detail as to the "what, when, where, and how" of the supposed irregularities.  *Local 295*, 731 F. Supp. 2d at 721; *see In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 482 (6th Cir. 2014) ("But the Complaint never offers concrete details, other than to say generally that the audit revealed fraud and compliance issues, that would allow us to determine whether [the company's CEO] knew that the Form 10-K statements were false.")  Therefore, the Plaintiffs cannot show the seventh *Helwig* factor.  As to the ninth factor, as discussed *supra*, the Court finds that the self-interested motivation of Defendants in the form of saving their jobs is probably not applicable because Plaintiffs have not pleaded specific facts beyond general motives common to all executives, and in any case, this factor alone is not sufficient to infer scienter.  Finally, as to the third factor requiring temporal proximity between the fraudulent statement and the later disclosure of the truth, Defendants measure the appropriate length of time as the time between the announcement of the 2013 projections on January 31, 2013 and the point when the Company's troubled financial situation first became apparent in late 2013.  But since it is the August 1, 2013 statements of present conditions that are in question here, the appropriate period of time is actually much shorter—only a few months.  This may still not be a short enough period of time for this factor to weigh in Plaintiffs' favor, but in any event, a balancing of all the *Helwig* factors dictates against a finding of scienter.

34

Plaintiffs have failed to put forth an inference of scienter that is at least as compelling as any competing inference.  Because the Court finds that Plaintiffs have not properly pleaded scienter, it need not reach the question of whether their allegations of loss causation are sufficient.  The Court finds that Defendants' statements on the August 1, 2013 investor call and press release are not actionable under Section 10(b) and, therefore, the Court **GRANTS** Defendants' motions to dismiss the Section 10(b) claims.

### B.  Section 20(a) Control-Person Claims

Section 20(a) of the Exchange Act imposes secondary liability on persons who "control" the violators of Section 10(b).  *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 762 (S.D. Ohio 2006); 15 U.S.C. § 78t.  In order to state a control-person claim, the plaintiff must properly plead a predicate Section 10(b) violation by a "controlled person," and a "controlling person" must have directly or indirectly controlled the person liable for the 10(b) violation.  *PR Diamonds*, 364 F.3d at 696.  Because the Court finds no underlying Section 10(b) violation, Plaintiffs cannot state a Section 20(a) claim.  Defendants' Motions to Dismiss the Section 20(a) claims against Peters, Sheppard, and the Monomoy Defendants are **GRANTED**.

### C.  Section 11 and 12(a)(2) Claims

#### 1.  *Statute of Limitations for Claims Against Newly-Added Defendants*

All of the Defendants to this suit, with the exception of Sheppard and Peters, were not named in the original complaint but instead were added to the May 15, 2015 amended complaint. (*See* Docs. 1, 38.)  Defendants now assert that Section 11 and 12 claims against all Defendants except Sheppard and Peters must be dismissed because the amended complaint was filed more than one year after October 30, 2013, the date on which EveryWare revised its 2013 projections. (Doc. 11 at 4-5.)

35

The statute of limitations applicable to Section 11 and 12(a)(2) claims under the

Securities Act is set forth at 15 U.S.C. § 77m, which states that:

> No action shall be maintained to enforce any liability created under [Section 11] or [Section 12(a)(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . .  In no event shall any such action be brought to enforce a liability created under [Section 11] of this title more than three years after the security was bona fide offered to the public, or under [Section 12(a)(2)] of this title more than three years after the sale.

The Sixth Circuit has held that an applicable one-year statute of limitations may be triggered by

inquiry notice as well as actual notice.  *New England Health Care Employees*, 336 F.3d at 500.[7]

A plaintiff's "knowledge of suspicious facts" does not, in itself, constitute inquiry notice; such

suspicious facts, or "storm warnings," merely trigger "a duty to investigate, and . . . the limitation

period begins to run only when a reasonably diligent investigation would have discovered the

fraud."  *Id.* at 501.  The plaintiff bears the burden of establishing that she commenced the action

within the statute of limitations and, therefore, must demonstrate the point when she knew or

should have known of the fraud.  *Wuliger v. Owens*, 365 F. Supp. 2d 838, 843 (N.D. Ohio 2005)

(quoting *Harner v. Prudential Sec. Inc.*, 785 F. Supp. 626, 632 (E.D. Mich. 1992), *aff'd* 35 F.3d

565 (6th Cir. 1994)).

Defendants contend that Plaintiffs had actual notice of the alleged fraud on October 30,

2013, when EveryWare released its third-quarter financial results and revised its 2013 financial

projections downward.  (Doc. 111 at 19.)  Additionally, Defendants argue that even if the statute

of limitations was not triggered on October 30, 2013, it was certainly triggered by the March 31,

---

[7] *New England Health Care* was a Section 10(b) case, but district courts through this circuit have applied the inquiry notice standard to Securities Act claims as well.  *See, e.g.*, *Wuliger v. Owens*, 365 F. Supp.2d 838, 843 (N.D. Ohio 2005); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1118 (W.D. Mich. 1996).

2014 publication of the company's 2013 Year-End Results. (Doc. 114 at 8.) Using either date, more than a year lapsed between the actual notice and the filing of the amended complaint on May 15, 2015. (*Id.*)

Even if Plaintiffs did not have actual notice of the alleged fraud, Defendants contend they had inquiry notice of the fraud on October 30, 2013, and certainly on March 31, 2014, because a reasonable investor would have interpreted the negative financial results to indicate the possibility of misrepresentations or omissions in the Registration Statement and Prospectus. (*Id.* at 11.)

Plaintiffs respond that it is "nonsensical" to expect that a reasonable investor would have notice of fraud merely by a company's downward revision in its financial projections. (Doc. 118 at 50.) They attempt to bolster their argument further by noting that Sheppard and EveryWare made "self-serving statements attempting to blame EveryWare's negative results on unexpected events."[8] (*Id.*) Plaintiffs state that they only discovered the facts constituting the securities violations after an extensive investigation that included discussions with several former EveryWare employees, including the confidential witnesses referenced in the amended complaint, who explained that Sheppard had manufactured the earlier 2013 earnings and revenue projections and that EveryWare had essentially run out of money by July 2013. (*Id.* at 51.) Plaintiffs do not cite a specific date on which they believe the statute of limitations was triggered, either by actual or inquiry notice. Nor does the Amended Complaint mention any key dates in the investigation or conversations with former employees. Nevertheless, they urge the

---

[8] Defendants further argue that since Sheppard left the company on February 25, 2014, an event that apparently "blindsided" analysts and led to a 28% drop in stock price (Doc. 38 at ¶ 169), at a very minimum, Plaintiffs should be charged with inquiry notice on that date, which would render the claims in the May 15, 2015 Amended Complaint outside the one-year limitations period. (Doc. 121 at 8 n.5.)

Court to rely on case law finding that the statute of limitations in a Securities Act case is a question of fact that cannot be decided on a motion to dismiss, characterizing this issue as one appropriate for discovery.

A plaintiff "need not have fully discovered the nature and extent of the fraud before he was on notice that something may have been amiss.  Inquiry notice is triggered by evidence of the *possibility* of fraud, not full exposition of the scam itself."  *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 846 (11th Cir. 2004) (alterations omitted).  But on a motion to dismiss, a claim is barred by the statute of limitations based on inquiry notice "only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered" the violation.  *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194-95 (2d Cir. 2003); s*ee also La Grasta*, 358 F.3d at 846 (reversing a district court's grant of a motion to dismiss on statute-of-limitations grounds because "[t]here may be numerous reasons, other than fraud, for a stock to decline (even steeply) in price"); *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 367 (7th Cir. 1997) ("Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud under S.E.C. Rule 10b-5 claim is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).") (alterations omitted).  District courts in this circuit have found that a dispute over whether plaintiffs' claims are barred by the one-year statute of limitations is factual in nature and cannot be decided on a motion to dismiss.  *See In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 601-02 (N.D. Ohio 2004); *see also Bovee v. Coopers & Lybrand*, 320 F. Supp. 2d 646, 656 (S.D. Ohio 2004) (whether claims were time-barred was a question of fact inappropriate for resolution on summary judgment); *In re Direct Gen. Corp., Sec. Litig.*, 398 F. Supp. 2d 888, 897 (M.D. Tenn. 2005).

Here, the Amended Complaint does not affirmatively allege when Plaintiffs acquired actual knowledge of the facts that comprised the alleged fraud. But although Plaintiffs knew that EveryWare had adjusted its financial projections downward on October 30, 2013, and that its stock price had begun to drop precipitously, there are many reasons why a company might underperform, or its stock price drop, that have nothing to do with fraud (as Defendants have argued vigorously in other portions of their motions to dismiss). *See La Grasta*, 358 F.3d at 846.

Defendants rely on Sixth Circuit precedent in *Bishop v. Lucent Technologies, Inc.* to bolster their argument that Plaintiffs' failure to "plead facts in avoidance of the statute of limitations defense" is fatal to their claims. 520 F.3d 516, 520 (6th Cir. 2008). This Court does not agree. Although Plaintiffs failed to pinpoint in their complaint the date by which they concluded their investigation into Defendants' alleged wrongdoing, they do detail their investigation and reveal the specific facts that it uncovered. (Am. Compl., Doc. 38 at ¶¶ 74-98.) Indeed, the instant case is distinguishable from some of the cases cited by Defendants in which the disclosures at issue concerned "precisely" the information the defendants had allegedly misrepresented or concealed and, therefore, the date that inquiry notice was triggered was obvious. *See, e.g.*, *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013) (affirming dismissal of Securities Act claims as time-barred because the "corrective disclosures provided precisely the information [the defendant] should have disclosed earlier such that [the plaintiffs] should have *discovered* their alleged claims on the dates of those disclosures") (internal quotation marks omitted); *Monroe Cnty. Emps. Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 351-52 (S.D.N.Y. 2014) (holding that the plaintiffs should have discovered the alleged omissions due to widespread media reports about the risk of nationalization in the industry). Because Defendants have not persuaded the Court that any of the events it cites are comparable,

39

Defendants cannot clear the high hurdle of dismissal on the ground of untimeliness at this juncture.

At this stage, the Court's ruling for Plaintiffs on the question of the statute of limitations does not, of course, definitively mean that the amended complaint was timely filed.  Rather, the Court merely holds that it is not "apparent from the face of the complaint" that the claim is time-barred and, therefore, the issue is one of fact that must be determined at a later stage of the litigation.  *Bishop*, 520 F.3d at 520; *see also La Grasta*, 358 F.3d at 848; *LaSalle v. MedCo Research, Inc.*, 54 F.3d 443, 447 (7th Cir. 1995) ("A fuller factual inquiry might of course cast the critical facts in a more ominous light.  If for example the stock price of [the defendant's] competitors rose or remained steady during the period when [the defendant's] stock price was losing half its value, this might be a reason to believe that fraud was afoot.").

### 2.   *Section 11 Standing*

Section 11 of the Securities Act, 15 U.S.C. § 77k, imposes liability for securities registration statements containing materially false or misleading statements or omissions of material fact.  *J&R Marketing, SEP v. Gen. Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008).  Liability against the issuer of the security "is virtually absolute, even for innocent misstatements" and, therefore, a plaintiff is not required to plead scienter.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).  To have standing under Section 11, a plaintiff who has purchased a security must plead "traceability," meaning that she must show that the securities she purchased were registered under, or traceable to, the false and misleading registration statement at issue.  This Court and others have interpreted this as a requirement that a plaintiff "show that he purchased a security issued pursuant to a registration statement."  *Albert Fadem Trust*, 334 F. Supp. 2d at 1004-05.  Here, just over two million EveryWare shares that were previously issued

40

were already trading on the open market at the time of the Secondary Offering. (Doc. 38 at ¶ 20.) Defendants argue that Plaintiffs' statements that they bought shares traceable to the Secondary Offering lack facial plausibility under *Twombly* and *Iqbal*.

Plaintiffs' complaint states the following. Plaintiffs purchased 29,000 shares of EveryWare stock through their broker, Morgan Stanley, on September 16, 2013, the date of the Secondary Offering. (Doc. 38 at ¶ 20.) These 29,000 shares were approximately 15% of the 196,700 EveryWare shares traded on that day. (*Id.*) They paid a uniform price of $11.54 per share, four cents above the offering price. (*Id.*) Plaintiffs further allege that:

> Typically, a broker such as Morgan Stanley will purchase shares of a Company, such as EveryWare, from multiple counterparties, including the Underwriter Defendants, to satisfy its customers' purchase orders. Given the amount of shares sold in the Secondary Offering (1,750,000 shares) in comparison to the pre-existing public float (2,023,000 shares), the large number of shares purchased by IBEW on the same day as the Secondary Offering and the fact that IBEW's purchase price was within pennies of the offering's price, it is almost certain that at least some, if not all, of IBEW's shares purchased are the same as the shares offered by the Defendants in the Secondary Offering.

(*Id.*) Plaintiffs further state that they expect to develop evidence proving this inference in discovery, including through third-party subpoenas to the Depository Trust Company and the Financial Industry Regulatory Authority and discovery from the Underwriter Defendants. (*Id.*)

Defendants urge the Court to adopt the pleading standard articulated in a recent Ninth Circuit decision, *In Re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104 (9th Cir. 2013). In *Century Aluminum*, the Ninth Circuit explained:

> When a company has issued shares in multiple offerings under more than one registration statement, . . . a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering. Making this determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937. As noted earlier, experience and common sense tell us that when a company has offered shares under more than one registration statement, aftermarket purchasers

41

> usually will *not* be able to trace their shares back to a particular offering. Thus, in this case, plaintiffs had to allege facts from which we can reasonably infer that their situation is different. Standing alone, the conclusory allegation that plaintiffs "purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering" does not allow us to draw a reasonable inference about anything because it is devoid of factual content.

*Id.* at 1107-08. The court went on to determine that allegations that the plaintiffs purchased a certain number of shares on particular dates for particular prices were not sufficient factual detail[9] to save the plaintiffs from the defendants' motion to dismiss because there was an "obvious alternative explanation" that the shares could have come from the previously issued shares, the plaintiffs had not met *Twombly*'s requirement to plead facts tending to exclude the possibility that the alternative explanation is true. *Id.* at 1108 (quoting *Twombly*, 550 U.S. at 567).

Neither the Sixth Circuit nor any district court therein has yet considered whether *Century Aluminum* is persuasive. Plaintiffs point the Court to several post-*Twombly*/*Iqbal* cases that found that plaintiffs had adequately alleged traceability even if they did not allege facts that tended to exclude the possibility that the shares had been bought in another offering. *See*, *e.g.*, *In re Ariad Pharms., Inc.*, 98 F. Supp. 3d 147, 167-69 (D. Mass. 2015) (declining to follow *Century Aluminum* and adhering to the previous rule, finding that other post-*Twombly*/*Iqbal* district court decisions were more persuasive); *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 657-58 (D. Md. 2012) ("It may well be that [the plaintiff] will be unable to prove that he bought directly in the offering or that he can trace his shares to the offering.

---

[9] In *Century Aluminum*, on January 28, 2009, the company issued a prospectus and registration statement in connection with a secondary offering of 24.5 million shares, at which point 49 million shares of the company's common stock were already trading in the market. *Id.* at 1106. The offering price was $4.50 per share and the plaintiffs purchased shares on January 29, 2009 at $4.56 per share and on January 30, 2009 at $3.56 per share. *Id.* at 1108.

42

However, inasmuch as the allegations present a plausible claim, they are adequate."); *In re Wachovia Equity Sec. Litig.,* 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) ("The pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement]; *see also Northumberland Cnty. Ret. Sys. v. Kenworthy,* No. CIV–11–520–D, 2013 WL 5230000, at *6 (W.D. Okla. Sept. 16, 2013) ("Whether Lead Plaintiffs can prove those allegations is a matter that involves consideration of the merits of the claims rather than the sufficiency of the pleadings and should not normally be considered at this stage of the litigation.").

Even in the cases that have rejected conclusory allegations that a plaintiff has purchased "pursuant to or traceable to" a registration statement, courts have left open the door for plaintiffs to plead factual allegations that, while not establishing with great certainty that their shares are traceable, may state a plausible claim.  For instance, in *Grand Lodge of Pennsylvania v. Peters*, 550 F. Supp. 2d 1363, 1369 (M.D. Fla. 2008), the court noted that the lead plaintiffs purchased shares three months after the offering in question, made only a conclusory allegation that the purchase was traceable to the offering's registration statement, and had "not suggested what evidence they intend to use to show that the particular shares purchased by [the plaintiffs] can be traced to the stocks issued in the" secondary offering.  *See also Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012) ("[Plaintiffs] do not offer any facts to support their conclusory statements that their shares can be traced to the [secondary offering].").  Indeed, a district court within the Ninth Circuit, applying *Century Aluminum*, noted that "the bar plaintiffs must clear to plead their claim is set only as high as 'plausibility,' not, as defendants would have it, certain knowledge"; that court found that the plaintiffs' theory of standing was "straightforward, eminently plausible, and, indeed, highly likely" and therefore denied the

defendants' motion to dismiss on the ground of standing. *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1119 (N.D. Cal. 2014).

Although the Court agrees with the reasoning in *Century Aluminum* that *Iqbal* and *Twombly* "moved us away from a system of pure notice pleading," 729 F.3d at 1107, and that, therefore, purely conclusory allegations are not sufficient to survive a motion to dismiss on standing grounds, Plaintiffs here have made sufficient, non-conclusory allegations of standing. In particular, Plaintiffs have alleged that they purchased 15% of the shares traded on the first day of the Secondary Offering, that they paid a uniform price through their broker of just four cents above the asking price, and that 1,7500,000 shares were sold in the Secondary Offering in comparison to the pre-existing public float of 2,023,000 shares. (Am. Compl., Doc. 38 at ¶ 20.) Moreover, they have stated that in discovery they would seek to prove traceability through third-party subpoenas to the Depository Trust Company and the Financial Industry Regulatory Authority as well as through discovery from the Underwriter Defendants. (*Id.*) The Court finds that Plaintiffs have standing to bring a Section 11 claim against Defendants.

### 3. Section 12(a)(2) Standing

Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), imposes liability for selling a security by means of a prospectus or oral communication containing materially false or misleading statements or omissions of material fact. Section 12(a)(2) standing differs from Section 11 standing because a plaintiff has standing to bring a claim only against a "statutory seller" from which the plaintiff purchased the security at issue. *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 310 (S.D.N.Y. 2011). A "statutory seller" is one who "either transferred title to the purchaser or successfully solicited the transfer for financial gain." *Id.* (citing *Pinter v. Dahl*, 486 U.S. 622, 642 (1988)). In other words, Section 12(a) "imposes

44

liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers." *Pinter*, 486 U.S. at 644 n. 21 (citing 15 U.S.C. § 77*l*). Defendants contend that Plaintiffs lack standing because the complaint does not allege that they purchased shares from a statutory seller.

Plaintiffs have alleged that they "purchased" shares of EveryWare stock on the day of the Secondary Offering from their broker, Morgan Stanley.  (Am. Compl., Doc. 38 at ¶ 20.)  They have also alleged that they purchased 29,000 shares on that day at a purchase price of $11.54 per share.  (*Id.* at Sch. A.)  *See Lehman Bros.*, 799 F. Supp. 2d at 311; *see also Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-cv-302, 2011 WL 4389689, at *11 (C.D. Cal. May 5, 2011) (dismissing Section 12(a)(2) claims where the purchases took place after the expiration of the forty-day prospectus delivery period set forth in the Securities Act).  Assuming that these factual allegations are true, and drawing all reasonable inferences in favor of Plaintiffs, the Court must reject Defendants' statutory standing argument.

Section 12(a)(2) applies only to "a public offering of securities by an issuer or controlling shareholder" and not to aftermarket trading.  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995); *FirstEnergy*, 316 F. Supp. 2d at 602.  Defendants contend that because Plaintiffs concede they purchased their shares through a broker, Morgan Stanley, their purchase was an "aftermarket" one and, accordingly, Defendants were not a statutory seller to Plaintiffs.  (Doc. 111 at 21-22.) The Court is not persuaded.  Although Defendants are correct that Plaintiffs must plead that that they purchased their shares "directly" from EveryWare at an initial public offering, the Court finds that Plaintiffs have done so by alleging that they purchased 29,000 shares on September 16, 2013, the date of the initial public offering, at four cents per share over the share price, through their broker, an agent.  (*See* Am. Compl., Doc. 38 at ¶ 20.)

None of the cases cited by Defendants presents the issue of an agent purchasing the stock on the date of the initial public offering.  And it would make little sense to preclude a buyer from bringing a Section 12(a)(2) claim against a seller solely because that buyer used an agent. Plaintiffs have alleged that they purchased EveryWare stock through their broker, Morgan Stanley, which purchased it directly from EveryWare.  A "stock or commodities broker is the agent of the customer."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir. 1989). Other courts have denied motions to dismiss Section 12(a)(2) claims on standing grounds where the plaintiffs pleaded that they purchased a certain number of shares from defendants through a "duly authorized agent."  *In re Royal Ahold N.V. Sec. & Erisa Litig.*, 384 F. Supp. 2d 838, 841 (D. Md. 2005) (rejecting the defendants' argument that the plaintiff's contention that it "purchased stock 'through its duly authorized agent, Bank of Ireland Management,' . . . is not sufficient").  As the court in *Royal Ahold* found:  "The precise nature of the agency relationship can be determined through discovery and resolved on a fuller factual record. The cases relied on by defendants suggest that the agent itself may have standing to sue, but do not conclusively establish that the entity whose funds the agent has used to make the purchase lacks such standing."  *Id.*  Therefore, the Court finds that Plaintiffs have sufficiently alleged facts to show that they have standing to bring Section 12(a)(2) claims, against all Defendants except the Non-Management Director Defendants, as to whom the Court will dismiss Plaintiff's 12(a)(2) claims on an alternative ground.

The Non-Management Director Defendants assert that they are not statutory sellers because merely signing a registration statement is insufficient to show "solicitation" of purchase; they cite decisions from the First, Third, and Fifth Circuits that support this position.  (Doc. 114 at 19-20.)   Plaintiffs fail to respond to this argument in their opposition brief.  Their only

46

allegations in the Complaint as to the Section 12(a)(2) claims against the Non-Management

Director Defendants are that these Defendants signed the Registration Statement, which "was

used to induce investors, such as Plaintiffs and the other members of the Class, to purchase the

Company's shares." (Am. Compl., Doc. 38 at ¶ 216.)

In *Shaw v. Digital Equipment Corp.*, the First Circuit dismissed for lack of standing the

plaintiffs' Section 12(a)(2) claims against individual directors, applying the Supreme Court's

decision in *Pinter v. Dahl*, 486 U.S. 622, 651 n. 27 (1988),[10] to conclude that "neither

involvement in preparation of a registration statement or prospectus . . . , standing alone,

demonstrates the kind of *relationship between defendant and plaintiff* that could establish

statutory seller status." 82 F.3d 1194, 1216 (1st Cir. 1996), *superseded on other grounds by* 15

U.S.C. 78u-4(b)(2). The First Circuit held that a "bald assertion" that the individual officers

"solicited" the purchases by signing and participating in the preparation of the registration

statement was insufficient to confer standing. *Id.* In *Rosenzweig v. Azurix Corp.*, also applying

*Pinter*, the Fifth Circuit found that signing the registration statement was insufficient in itself to

constitute solicitation, asserting that"[t]o count as 'solicitation,' the seller must, at a minimum

directly communicate with the buyer," and that an issuer, rather than an underwriter, "may only

be liable under § 12(a)(2) if the plaintiff alleges 'that an issuer's role was not the usual one; that

it went farther and became a vendor's agent.'" 332 F.3d 854, 871 (5th Cir. 2003) (quoting

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) and *Lone Star Ladies Inv.

Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 370 (5th Cir. 2001)). *See also Pinter*, 486 U.S. at 648-

49 (rejecting the "substantial factor" test, which would impose liability on a non-transferor seller

---

[10] *Pinter* addressed standing in the context of a Section 12(a)(1), not a Section 12(a)(2), claim,
but the First Circuit found that the standing requirements of both statutes were identical.

"whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place.").  In *Craftmatic*, the Third Circuit found that an issuer was not liable "solely on the basis of his involvement in preparing the prospectus."  890 F.2d at 636.[11]  The Sixth Circuit has not yet considered this issue, but the Court finds the reasoning of the other three circuits persuasive and holds that Plaintiffs lack standing to bring a Section 12(a)(2) claim against the Non-Management Director Defendants because they have not alleged any facts to indicate that the Directors' roles were "not the usual one."  *Rosenzweig*, 332 F.3d at 871.  The Court thus **DISMISSES** the Section 12 claims against the Non-Management Director Defendants.

4. *False and Misleading Statements or Omissions under Section 11 and 12(a)(2)*

a. Pleading Standard

Having found that Plaintiffs have standing to pursue their Section 11 claims, as well as Section 12(a)(2) claims, against all Defendants except the Non-Management Directors, the Court will consider whether Plaintiffs have alleged false or misleading statements in the Registration Statement and the Prospectus, respectively.

As a threshold matter, the parties dispute whether the Rule 8 pleading standard or the more demanding Rule 9(b) standard applies to Plaintiffs' Section 11 and 12(a)(2) claims. Plaintiffs are correct that as to Defendants against whom no fraud is alleged, the plausibility pleading requirements of Rule 8(a) apply.  *See Rombach v. Chang*, 355 F.3d 164, 167 (2d Cir. 2004); *First Energy*, 316 F. Supp. 2d at 602.  As to claims that sound in fraud, Plaintiffs must also satisfy the particularity requirements of Rule 9(b).  *Omnicare*, 583 F.3d at 948.  Here,

---

[11] In *Craftmatic*, the Third Circuit found that the plaintiffs' allegations regarding standing were sufficient to survive a motion to dismiss, but explicitly relied on the pleading standard in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) that has since been superseded by *Twombly* and *Iqbal*.  *Id.* at 637.  This Court is skeptical that the conclusory language of the plaintiffs' complaint in *Craftmatic* would survive the more stringent pleading standard.

Plaintiffs have disavowed fraud claims against the Underwriter Defendants and the Non-Management Director Defendants and urge the Court to apply Rule 8 to their claims against those Defendants, while applying Rule 9(b) only to Sheppard, Peters, Collin, and Presser. (*See* Doc. 38 at ¶¶ 44, 53.) Defendants contend that because the underlying allegations are premised on fraud, the Rule 9(b) standard applies to Section 11 and 12(a)(2) claims against all Defendants.

Here, Plaintiffs' complaint contains no allegations that the Section 11 claims against the Non-Management Directors or Underwriter Defendants, or the Section 12(a) claims against the Underwriter Defendants, sound in fraud. Rather, the complaint contains only assertions that they failed to conduct a reasonable investigation to ensure the truth and accuracy of the Registration Statement they signed. (*Id.* at ¶¶ 209, 219.) *Cf. In re Alstom SA*, 406 F. Supp. 2d 402, 410 (S.D.N.Y. 2005), *abrogated on other grounds by Dekalb Cnty. Pension Fund v. Transocean Ltd.*, No. 14-0894, 2016 WL 1055363, at *6 (2d Cir. Mar. 17, 2016) (applying the Rule 9(b) standard to Section 11 and 12(a)(2) claims that sounded in fraud where the complaint contained explicit allegations that the defendants committed misrepresentations and committed accounting fraud). Defendants' argument to the contrary mainly relies on Plaintiffs' allegations of fraud against *other* Defendants, and therefore Defendants' argument that Rule 9(b) should apply fails. It is for this reason, and not the one-sentence "disclaimers" in Plaintiffs' complaint disavowing allegations of fraud against the Non-Management Director Defendants and Underwriter Defendants, that leads the Court to conclude that Plaintiffs need only meet the Rule 8 pleading standard with regard to the Section 11 and 12(a)(2) claims against these two groups of Defendants. *See Local 295*, 731 F. Supp. 2d at 709 (noting that "blanket disavowal" of fraud is "insufficient" to avoid the requirements of Rule 9(b)).

49

Because Plaintiffs' claims "carefully segregate[] [their] allegations of negligence against [certain defendants] from [their] allegations of fraud against those defendants," thereby creating "a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud," *In re Supreme Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 273 (3d Cir. 2006), the Court concludes that the Section 11 and 12(a)(2) claims here do not sound in fraud against the Non-Management Director Defendants and the Underwriter Defendants.  *See also Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 918 (N.D. Cal. 2015) (applying Rule 9(b) where the allegations "accuse[d] all defendants of 'engag[ing] in a fraudulent scheme to manipulate [the company's] financial results' by issuing or causing the issuance of 'false and misleading statements ... in violation of Section 11,'" and alleging "that all defendants 'kn[ew] and/or disregarded with deliberate recklessness' the false and misleading statements in the registration statements"); *Picard Chem.*, 940 F. Supp. at 1133 (applying Rule 9(b) to Section 12 claims where the complaint stated that the defendants "were motivated, at least in part, by a desire to serve their own financial interests").  As discussed below, however, even under the Rule 8 standard, Plaintiffs have failed to state Section 11 or Section 12(a)(2) claims for relief.

b.  <u>False or Misleading Statements</u>

Because Plaintiffs essentially argue that the Registration Statement and Prospectus contained the same representations and were false and misleading for the same reasons, the Court will consider the parties' arguments regarding Section 11 and 12 claims together.  (*See* Am. Compl., Doc. 38 at ¶ 160.)

To state a claim under Section 11, "a plaintiff need only show that he purchased a security issued pursuant to a registration statement and that the statement made a material misrepresentation or omission."  *Albert Fadem Trust*, 334 F. Supp. 2d at 1004-05; 15 U.S.C. §

50

77k(a).  To establish a claim under Section 12(a)(2), Plaintiffs must allege that a prospectus used to sell a security "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77*l*(a)(2).  Under Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"), a registrant must "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations."  An omission is only actionable if "there was a prior statement of material fact that is false, inaccurate, incomplete or misleading in light of the undisclosed information."  *In re Ford Motor Co. Sec. Litig.*, 184 F. Supp. 2d 626, 631-32 (E.D. Mich. 2001).

First, Plaintiffs allege that the Registration Statement was false and misleading because it incorporated by reference EveryWare's false and misleading earnings and revenue projections from its earlier-filed Form 8-Ks.  (Am. Compl., Doc. 38 at ¶ 152.)

Plaintiffs next allege that the Registration Statement and Prospectus were misleading because by September 16, 2013, the date of the Secondary Offering, the Company was on the brink of collapse, had run out of money, and was in danger of violating its debt covenants, all of which the Company should have disclosed under Item 303.  (*Id.* at ¶ 155.)

Finally, Plaintiffs allege that the Registration Statement and Prospectus violated Item 303 because they failed to disclose the following material trends and conditions:  (1) that the Merger had decapitalized EveryWare and rendered it insolvent without the ability to pay its suppliers and expenses; (2) that in the wake of stripping the Company's capital, the Monomoy Defendants and Sheppard had imposed draconian cost reductions, which had led to inventory shortages and alienated customers, affecting the Company's revenues and profits; (3) that the 2013 revenues

51

and earning projections lacked any basis and were not believed by Company management; (4)

that EveryWare was selling products at negative profits in order to boost revenue artificially; and

(5) that EveryWare had improperly failed to recognize as expenses its incurred factory costs and

had instead capitalized them to inventory in violation of the Company's accounting policies. (*Id.*

at ¶ 158.)

Defendants argue that Plaintiffs' Section 11 and 12(a)(2) claims must be dismissed,

contending that Plaintiffs have not alleged any materially false or misleading statements or

omissions because:  (1) Defendants fully disclosed the terms of the merger, including the basis

for the calculations that Plaintiffs' claim were misleading; (2) the 2013 projections were

forward-looking statements that were entitled to the statutory "safe harbor," and even if they

were not, Plaintiffs have failed to allege that Defendants did not believe that the 2013 projections

were achievable; (3) EveryWare's decision to recalibrate the amount of factory expenses

incorporated into its inventory calculation does not establish that the inventory calculations in the

Registration Statement were misleading; and (4) Plaintiffs' claims that the Registration

Statement wrongly omitted pessimistic predictions about the Company's prospects are not

actionable.  (Doc. 111 at 24-25.)

As to Plaintiffs' argument that Registration Statement and Prospectus were false and

misleading because they incorporated the 2013 projections, the Court has already found that

these projections were not false or misleading.  Accordingly, the Court finds this argument

meritless.

As to Plaintiffs' remaining claims, the Court finds that Plaintiff's allegations are not well-

pleaded.  First, Plaintiffs' allegations of accounting violations lack factual support.  The

complaint contains the vague statement that former General Counsel Love discovered certain

"inaccurate financial disclosures" at EveryWare. (Am. Compl., Doc. 38 at ¶ 112.) Plaintiffs'
complaint also cites a complaint from former EveryWare employee Michael Stewart, who
conducted an investigation of Love after she notified management of the accounting
inaccuracies. Stewart alleged that he was charged with reporting his findings on Love's records
to Defendant Peters. (*Id.* at ¶ 114.) Based on the date of her departure, October 7, 2013, and
Stewart's account in his complaint that she had approached management and "threatened to
report her discovery to the [SEC] if the issues were not corrected within ninety days," they
speculate that her discovery occurred around the time of the Secondary Offering. (*Id.* at ¶ 113.)
But Plaintiffs put forth no allegations about the nature of the "inaccurate financial disclosures" or
the content of the reports Stewart provided to Peters. Such a flimsy allegation cannot survive a
Rule 12(b)(6) motion.

To the extent that Plaintiffs argue that the accounting improprieties are related to the
supposed concealment of factory costs, Plaintiffs' allegations are as follows. The improved
margins that the Company cited in its October 30, 2013 announcement of third-quarter earnings
and revenue were obtained by including factory expenses in inventories to make the Company's
margins appear stronger than they were. (*Id.* at ¶ 100.) Then on March 31, 2014, when it
announced its fourth-quarter earnings, the Company stated that its "calculation of the factory
manufacturing variance capitalized in inventory was based on historical experience. In the
fourth quarter 2013, we identified a deviation from historical experience resulting in an increase
in the inventory revaluation reserve of $5.9 million, or $0.35 per diluted share, which was
accounted for as a change in accounting estimate." (3/31/14 10-K, Doc. 111-16 at 50; *see also*
Am. Compl., Doc. 38 at ¶ 100.) But simply alleging that "statements in one report should have
been made in earlier reports do not make out a claim of securities fraud." *In re Comshare, Inc.*

*Sec. Litig.*, 183 F.3d 542, 553-54 (6th Cir. 1999) (quoting *Stevelman v. Alias Research Inc.*, 174

F.3d 79, 84 (2d Cir. 1999)).  Indeed, even the "failure to follow [Generally Accepted Accounting

Principles] is, by itself, insufficient to state a securities fraud claim."  *Comshare*, 183 F.3d at at

553.  And Plaintiff's complaint does not even allege a failure to follow GAAP but, rather, only a

conclusory allegation that the inventory accounting method was "in violation of the Company's

accounting policies."  (Am. Compl., Doc. 38 at ¶ 158.)

Similarly, choosing to sell products at a loss temporarily (*see* Am. Compl., Doc. 38 at ¶¶

103-04) is sometimes a valid business judgment and companies are not required to disclose such

a strategy.  *See In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1208-09 (S.D.N.Y. 1996)

(finding that financial results were not misleading where the company used a "price discounting

scheme" and holding that such a scheme need not be disclosed).  There is also no reason to

believe that simply because EveryWare decided "to exit low/no margin product lines (*id.* at ¶

105)," which purportedly led to a decline in revenues, that such a decision was based on anything

but appropriate business judgment to stop selling in an area once the Company realized it was

not profitable.

As to Plaintiffs' allegations that it was obvious by the time the Registration Statement

and Prospectus were issued that the Company was "running out of money," Plaintiffs' argument

appears to rely mainly on allegations from CW7, the Director of Finance in EveryWare's United

Kingdom office.  CW7 stated that based on his knowledge of EveryWare's business and the

substantial lead time required for placing orders, "EveryWare's management had to have known

that EveryWare was running out of money and in danger of defaulting on its debt" by July 2013.

(*Id.* at ¶ 98.)  But without more support for this conclusory allegation, the Court cannot

determine that the Director of Finance for the United Kingdom office would have been in a

position to know this information about finances in the United States, especially since Plaintiffs have not offered any other non-conclusory allegations that the Company was running out of money when the Registration Statement and Prospectus were issued.  There is no factual support for the proposition that July 2013 would have been the date when the danger of running out of money "would have been unmistakable to EveryWare management."  (*Id.*)  Indeed, the only specific conversation CW7 cites regarding the company running out of money is a conference call in which CW7 participated when an unidentified person told Defendant Peters "that it was time for EveryWare U.S. to extend the promised capital [for the U.K. branch]," at which point Peters said that "the funding would not be forthcoming because there was 'no money in the U.S.'"  (*Id.* at ¶ 97.)

Nor do the statements from other confidential witnesses constitute plausible factual allegations that the Company was running out of money when it issued the Registration Statement on June 17, 2013, the later amendments to the Registration Statement on August 13, 2013 and September 3, 2013, or the Prospectus on September 16, 2013.  Plaintiffs' complaint does not indicate how any of the other confidential witnesses—a sales manager, an inventory control manager in the United Kingdom, a district sales manager, and a national sales manager—would have been in a position to know that the Company was running out of money by September 16, 2013.  For instance, Confidential Witness 5 ("CW5"), the inventory control manager, was allegedly told by his manager that the Company's international segment would have to manage inventory with less available capital and that vendors had informed him that EveryWare had slowed payment to them.  (*Id.* at ¶¶ 92-93.)  The district sales manager, Confidential Witness 4, stated that the Company's relationships with two major customers, Ruby Tuesday's and Chili's. were "harmed" because the customers were frustrated "regarding the

quality of EveryWare's products and the delays they had experienced in waiting for EveryWare to fill orders." (*Id.* at ¶ 89.)  Confidential Witness 3, the sales manager, and Confidential Witness 6, the national sales manager, also reported inventory shortages. (*Id.* at ¶¶ 86-97, 95.) But none of these allegations sufficiently "establish[es] their basis of knowledge . . . ('what, when, where, and how')" because Plaintiffs offer no facts regarding the specifics of the inventory shortages or the delays in the orders or, most importantly, how these particular confidential witnesses were in a position to know that these inventory shortages were not merely specific to their areas but reflected a companywide problem.[12]  *See Local 295*, 731 F. Supp. 2d at 721.  The complaint lacks any such allegation.  Moreover, as Defendants point out, it seems somewhat contradictory for Plaintiffs, on the one hand, to allege that EveryWare was selling large amounts of inventory and taking a loss on it in order to drive up revenue to inflate the share price and, on the other hand, to suggest that there were inventory shortages that, presumably, were making it difficult for the Company to make a healthy number of sales.  Plaintiffs have not attempted to explain this contradiction.

Finally, as to Plaintiffs' argument that EveryWare was running out of money because the Monomoy Defendants had stripped it of $90 million in capital, Defendants are correct that the January 31, 2013 Form 8-K disclosed that the Monomoy Defendants would receive a payout of between $90 million and $107.5 million in cash under the terms of the merger.  (1/31/13 Form 8-K, Doc. 111-1 at 3; 5/21/13 Form 8-K, Doc. 111-3 at 8.)  The fact that the ROI Merger resulted in negative stockholder equity of $59 million was also disclosed.  (Doc. 111-3 at 81.)

---

[12] CW5 did allege that, in his capacity as the inventory control manager in which he worked with vendors to procure inventory required for customer sales, his manager told him that Everyware was experiencing cash shortages that required the Company's international segment to manage inventory will less available capital, but there is no suggestion that this problem was not specific to the international segment of the business.  (*Id.* at ¶¶ 92-93.)

### D.  Section 15 Control-Person Claims

Defendants move to dismiss Plaintiffs' "control person" claims under Section 15 of the Securities Act on the grounds that: (1) they have not stated a claim for relief under Section 11 or 12(a)(2); and, in the alternative, (2) they have not alleged that Defendants were sufficiently involved in the challenged statements to support "control person" liability.  (Doc. 111 at 33.)

Section 15 claims must be dismissed if Section 11 and 12(a)(2) claims are dismissed because Section 15 liability is "triggered only to the extent primary liability first attaches to a 'controlled person.'"  *Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 188 (D. Mass. 2012) (quoting 15 U.S.C. § 77*o*(a)).  Therefore, Defendants' motions to dismiss the Section 15 claims are **GRANTED**.

## V.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** all Defendants' Motions to Dismiss (Docs. 110, 111, 112, 113, 114, 115).  The Amended Class Action Complaint is **DISMISSED with prejudice**.  The Clerk is directed to enter Judgment for Defendants.

**IT IS SO ORDERED.**

  **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATE: March 30, 2016**

57